# EXHIBIT A

As of September 22, 2008

Live Nation Worldwide, Inc.
9348 Civic Center Drive, 4th Floor
Beverly Hills, California 90210
Attention: Mr. Michael Rapino

Re:   Proposed Purchase of Certain Assets of Live Nation Worldwide, Inc. (the "**Company**") by Events Acquisition Corporation (the "**Buyer**"), a Delaware corporation owned by Michael Cohl ("**Cohl**")

Dear Michael:

We have been discussing the proposed acquisition (the "**Acquisition**") by the Buyer of certain assets of the Company. As soon as possible following the execution of this letter, the Company's counsel will commence the drafting of definitive agreements (the "**Definitive Agreements**") that set forth in detail the terms and provisions described in Article 1 of this letter for submission to the Buyer and its counsel for review. The Definitive Agreements will be consistent with the terms and provisions of this letter. The Buyer and the Company agree to engage in further negotiations, *in good faith*, in an effort to finalize and execute the Definitive Agreements consistent with the foregoing provisions as soon as possible following the date of this letter. However, pending execution of Definitive Agreements, the provisions hereof shall be given immediate effect as of September 22, 2008 (the "**Closing Date**") even though this letter is being physically executed after the Closing Date. Disagreements regarding the form, content or wording to be included in the Definitive Agreements that are not resolved by mutual agreement on or before December 31, 2008 shall be resolved pursuant to the provisions of Section 2.5 hereof.

## ARTICLE 1
## ACQUISITION

Section 1.1    Assets to be Purchased.

(a)    Purchase of Purchased Assets and Management of Streisand DVD. The Buyer hereby purchases all of the Company's right, title and interest in and to the specific media properties, shows and events listed on Schedule 1.1(a) attached hereto (the "**Purchased Assets**") for the purchase price determined in accordance with the provisions of this letter. In addition to purchasing the Purchased Assets, the Buyer agrees that it will, for a term of one year (subject to renewal on mutually acceptable terms), manage the Company's right, title and interest in and to the Barbra Streisand DVD in a manner consistent with the past practices between the parties for a fee equal to (i) 20% of the Company's net profits (after full recoupment) from the Streisand DVD *plus* (ii) $150,000. The calculation, reporting and payment of the Buyer's share of net profits, if any, from the Streisand DVD will be consistent with the provisions of Section 1.2(b) hereof concerning the calculation, reporting and payment of the Company's share of net profits from the Purchased Assets during the First Earn Out Period.

(b)    Cohl's Familiarity with the Purchased Assets and Impact on Representations and Warranties. Cohl oversaw the acquisition and development of the Purchased Assets either while employed by the Company or prior to his employment with the Company and is therefore familiar with the nature, characteristics, financial status, contractual matters and other financial and legal issues related to the Purchased Assets. The Company did an investigation of the Purchased Assets prior to their acquisition by the Company, and is familiar with such status,

Live Nation Worldwide, Inc.
September 22, 2008
Page 2

matters and issues. Cohl has not been involved with the operations of the Purchased Assets since his separation from the Company. As a result, the representations and warranties to be given by the Buyer and the Company will be limited as follows:

> (i)      Provisions Relating to the Company's Representations and Warranties. The Definitive Agreements will expressly provide that the Buyer is acquiring the Purchased Assets in their AS IS, WHERE IS condition and status and that the Company is not required to provide any representations and warranties other than standard representations and warranties that (A) the Company is duly authorized to consummate the Acquisition, (B) the consummation by the Company of the Acquisition will not result in the creation of a lien, charge or encumbrance upon any portion of the Purchased Assets pursuant to the charter or by laws of the Company, or any indenture, mortgage, deed of trust, lease, licensing agreement, contract, instrument or other agreement to which the Company is a party other than the leases, licensing agreements, contracts, instruments or other agreements that create the rights under, or otherwise relate to, the Purchased Assets (collectively, the "**Purchased Contracts**"), (C) the Company owns the Purchased Assets free and clear of all liens, mortgages and security interests, (D) to the Company's knowledge after due inquiry the Purchased Assets have been operated in the ordinary course of business and have not suffered any material adverse effect since June 20, 2008, the date that Cohl's employment with the Company was terminated, except for any matter that Cohl has actual personal knowledge at the time of the execution of this letter, (E) to the Company's knowledge the Company has not taken any measures to accelerate receipts or defer due dates of payments in respect of the Purchased Assets in a manner that is inconsistent with past practices and would prejudice Buyer, and (F) the Company is aware of no material information affecting the Purchased Assets that has not been disclosed or made available to the Buyer (provided that the knowledge of the Continuing Employees shall not be characterized as the knowledge of the Company for purposes of the representations and warranties described in clauses (D), (E) and (F)).

> (ii)      Provisions Relating to the Buyer's Representations and Warranties.  In addition to standard representations regarding due authorization, the Buyer and Cohl will be required to provide to the Company, in the Definitive Agreements, representations and warranties that (A) to their actual knowledge after due inquiry, the consummation of the Acquisition will not conflict with, or result in the breach or termination of any provision of, or constitute a default under, or result in the acceleration of the performance of the obligations of the Company under, any of the Purchased Contracts in a manner that would result in the Company suffering any damage or incurring any liability and (B) to their actual knowledge the Company has not taken any measures to defer receipts or accelerate due dates of payments in respect of the Purchased Assets in a manner that is inconsistent with past practices.

> (c)      Indemnity Provisions.   The Definitive Agreements will include standard indemnification provisions whereby each party will agree to indemnify the other party for breaches of the representations, warranties and covenants made by such party in the Definitive Agreements.

> (d)      Cooperation Regarding Effective Completion of Assignment.  Without limiting, negating or abrogating the representation to be provided by the Buyer as described in Section 1.1(b)(ii)(A) hereof, if the consent of any third party should be required under the terms of any of the Purchased Contracts in order to properly and effectively complete the assignment of such

Live Nation Worldwide, Inc.
September 22, 2008
Page 3

Purchased Contract to the Buyer, then (i) the Company and the Buyer will each cooperate with the other and use their respective reasonable efforts to obtain such consent as soon as reasonably possible following the execution hereof and (ii) the Company will, pending receipt of any such consent, take such actions as may be necessary, without being required to breach any such Purchased Contract, to confer upon the Buyer all of the economic benefit attributable to such Purchased Contract.

Section 1.2    Purchase Price.  On and subject to the terms and provisions herein, the Buyer will pay to the Company the following amounts as the purchase price (the "**Purchase Price**") for the Purchased Assets:

(a)    Base Purchase Price.  The Buyer will pay to the Company the sum of $9,850,000 as a base purchase price (the "**Base Purchase Price**") for the Purchased Assets, which will be payable in the following installments:

(i)    $5,000,000 (subject to the adjustments below) shall be payable within 7 days of the execution of this letter;

(ii)    $2,250,000 shall be payable on, or, at the Buyer's option, any time before, the first anniversary of the Closing Date; and

(iii)    $2,600,000 shall be payable on, or, at the Buyer's option, any time before, the second anniversary of the Closing Date.

The initial installment of the Base Purchase Price payable pursuant to Section 1.2(a)(i) hereof will be reduced by the following amounts and for the following purposes: (A) $63,461 as a reimbursement to the Buyer of a portion of Marc Choper's accrued vacation; (B) $175,000 as a reimbursement to the Buyer for certain amounts previously advanced to Zac Brown and Greg Ham; (C) $150,000 as payment of the fee due to the Buyer for managing the Barbra Streisand DVD as referenced in Section 1.1(a)(ii) hereof; and (D) $250,000 as a contribution towards the salary of Norman Perry.  After the foregoing reductions, the Buyer will pay to the Company, pursuant to Section 1.2(a)(i) hereof, the sum of $4,361,539 within 7 days of the execution of this letter.

(b)    First Earn Out Purchase Price.  Within 45 days following the end of each calendar year during the First Earn Out Period (as defined below), the Buyer will pay to the Company, as installments of a contingent earn out purchase price ("**First Earn Out Purchase Price**"), 50% of the net profit of the Buyer from the operation of the Purchased Assets for the prior calendar year, calculated in accordance with generally accepted accounting principles (as modified in the next succeeding sentence), consistently applied, provided that the first installment shall be paid in respect of the period from the Closing Date to the end of the first full calendar year, and the last installment shall be paid with respect to the period from January 1 of that year to the end of the First Earn Out Period.  Notwithstanding any contrary requirements of generally accepted accounting principles, for purposes of calculating the net profit of the Buyer from the operation of the Purchased Assets, both the Non-Compete Relief Fee and the Base Purchase Price will be amortized evenly over the period from the Closing Date to the third anniversary of the Closing Date.   The Buyer will provide to the Company, within 45 days after the end of each calendar year during the First Earn Out Period, an income statement prepared in accordance with generally accepted accounting practices (as modified in the immediately preceding sentence), consistently applied, reflecting the results of operations of the Buyer allocable to the Purchased

Live Nation Worldwide, Inc.
September 22, 2008
Page 4

Assets for the entire portion of the First Earn Out Period through the end of such calendar year, and the Company will have the right to audit and review the books and records of the Buyer, from time to time, at reasonable times and upon reasonable notice, to confirm the amount of net profit from the operation of the Purchased Assets. The parties will cooperate with one another, upon completion of the financial statements related to the Purchased Assets for each year, in implementing an annual true-up based on cumulative annual net profit related to the Purchased Assets for such year. As used herein, the "**First Earn Out Period**" shall mean the period beginning on the Closing Date and continuing until the earlier to occur of (i) the third anniversary of the Closing Date and (ii) the date upon which all of the installments of the Base Purchase Price and the Non-Compete Relief Fee have been actually paid by the Buyer to the Company. At the conclusion of the First Earn Out Period, the parties shall reconcile accounts in accordance with the following:

(i)      Contingent Payment by the Buyer at Reconciliation.  If, at the time of such reconciliation of accounts, 50% of the cumulative net profit of the Buyer from the operation of the Purchased Assets during the entire First Earn Out Period exceeds the aggregate amount of all prior installments of the First Earn Out Purchase Price actually paid to the Company by the Buyer, then the Buyer shall pay the Company the amount of such excess as a final installment of the First Earn Out Purchase Price.

(ii)     Contingent Payment by the Company at Reconciliation.  If, at the time of such reconciliation of accounts, the aggregate amount of all prior installments of the First Earn Out Purchase Price actually paid to the Company by the Buyer exceeds 50% of the cumulative net profit of the Buyer from the operation of the Purchased Assets during the entire First Earn Out Period, then the Company shall pay to the Buyer the amount of such excess; provided, however, in no event will the Company be obligated to pay to the Buyer pursuant to this clause an amount greater than the aggregate amount of all prior installments of the First Earn Out Purchase Price actually received by the Company from the Buyer.

(c)      Second Earn Out Purchase Price.  In the manner, at the times and in the amounts specified in Section 1.7 hereof, the Buyer will, upon the occurrence of certain events, pay to the Company a contingent earn out purchase price (the "**Second Earn Out Purchase Price**").  The First Earn Out Purchase Price and the Second Earn Out Purchase Price are separate and distinct from one another and neither will impact, affect or interrelate with the other.

(d)      Provisions Related to Undistributed Profits for the Bodies Exhibit.  The parties agree that the Company has previously earned a certain amount of profits in excess of actual distributions received from its investment in the *Bodies* exhibition (the "**Undistributed Profit Amount**"), and the Undistributed Profit Amount has been invested back into future shows being acquired as a part of the Purchased Assets.  If the Buyer receives distributions prior to the end of the First Earn Out Period, the Buyer agrees that it will pay up to the Undistributed Profit Amount to the Company in such amounts and at such times as the Buyer may receive distributions on account of the *Bodies* exhibition, and, to the extent that the full Undistributed Profit Amount has not been paid to the Company by the Buyer by the end of the First Earn Out Period, the Buyer will pay the remaining balance thereof in full on the last day of the First Earn Out Period.  The parties current best estimate of the Undistributed Profit Amount is $2,600,000, but the parties agree that the actual amount of the Undistributed Profit Amount may hereafter be adjusted by mutual agreement based upon the actual books and records of JAM Exhibitions, the co-promoter of the *Bodies* exhibition.

Live Nation Worldwide, Inc.
September 22, 2008
Page 5

(e)     Certain Cash Adjustment Provisions.  The following provisions also apply:

(i)     The Company's Retention of Previously Distributed Cash.  Any cash previously distributed to the Company on account of any of the Purchased Assets will be retained by the Company and not included in the Purchased Assets.

(ii)     Buyer's Share of Revenues and Expenses.  The Buyer shall be entitled to all revenues relating to the Purchased Assets that are actually received by the Company or the Buyer on or after the Closing Date.  The Buyer shall assume and perform, discharge and pay when due all unpaid obligations and unpaid liabilities of the Company relating to the Purchased Assets that are due and payable on or after the Closing Date, including, without limitation, all unpaid obligations and unpaid liabilities of the Company under any of the Purchased Contracts, such as unpaid obligations or unpaid liabilities of the Company to make any capital contributions, that are due and payable after the Closing Date.  The Buyer will indemnify and hold the Company harmless in respect of the obligations and liabilities assumed by the Buyer pursuant to this Section 1.2(e)(ii).

(iii)     The Company's Share of Revenue and Expenses.  The Company shall be entitled to all revenues relating to the Purchased Assets that are actually received by the Company prior to the Closing Date. The Company shall retain liability for and perform, discharge and pay when due all unpaid obligations and unpaid liabilities of the Company relating to the Purchased Assets that are due and payable prior to the Closing Date, including, without limitation, all obligations and liabilities of the Company under any of the Purchased Contracts, such as obligations or liabilities of the Company to make any capital contributions, that are due and payable prior to the Closing Date.  The Company will indemnify and hold the Buyer harmless in respect of the obligations and liabilities being retained by the Company pursuant to this Section 1.2(e)(iii).

Section 1.3     Partial Relief from Non-Compete Covenants.

(a)     Existing Non-Compete Covenants and Non-Compete Relief Fee.

(i)     Reference to Existing Non-Compete Covenants.  In connection with the sale of various businesses to the Company and his employment with the Company, now terminated, Cohl has previously covenanted to the Company to comply with certain non-compete covenants (collectively, the "**Non-Compete Covenants**") set forth in (i) Section 6.1 of that certain Stock Purchase Agreement (the "**2007 SPA**") dated September 12, 2007 and entered into by and among, the Company, as buyer, and Cohl and certain other parties, as sellers and (ii) Section 5 of that certain Services Agreement dated September 12, 2007 and entered into by and among KSC Consulting (Barbados) Inc., Cohl, the Company and certain other affiliates of the Company.

(ii)     Non-Compete Relief Fee.  The Buyer will pay $5,500,000 (the "**Non-Compete Relief Fee**") to the Company as a fee for the agreement of the Company to grant the partial relief from the Non-Compete Covenants as more fully set forth herein. The Non-Compete Relief Fee shall be payable in the following installments:

(A) $2,750,000 shall be payable on, or, at the Buyer's option, any time before, the first anniversary of the Closing Date; and

Live Nation Worldwide, Inc.
September 22, 2008
Page 6

(B) $2,750,000 shall be payable on, or, at the Buyer's option, any time before, the second anniversary of the Closing Date.

(b)    Partial Relief from Existing Non-Compete Covenants.  On and subject to the terms hereof, in consideration for the Non-Compete Relief Fee, the Company hereby partially releases Cohl from the Non-Compete Covenants in such a manner that Cohl may thereafter engage in and pursue the following specifically identified activities, to the extent that he requires such release to engage in such activities without being in violation of the Non-Compete Covenants, it being understood that anything contained herein that provides relief from the Non-Compete Covenants shall be given effect, but nothing herein shall be deemed to extend or expand such Non-Compete Covenants:

(i)    First Bucket – Operation of Purchased Assets.  Those activities directly associated with the ownership, operation, use and exploitation of the Purchased Assets but only to the nature and extent of the specific activities engaged in by the Company prior to the Closing Date with respect to the ownership, operation, use and exploitation of the Purchased Assets.

(ii)    Second Bucket – Touring Activities for Cohl Relationship Artists.  Subject to compliance with Section 1.4 hereof, the promotion of live concert tours ("**Tour Promotion Activities**") featuring the performance of any of the following artists (the "**Cohl Relationship Artists**") as the headline act: (i) Rolling Stones (with Mick Jagger) or Mick Jagger performing outside of Rolling Stones, (ii) Pink Floyd (with David Gilmour) or David Gilmour performing outside of Pink Floyd, (iii) Barbra Streisand and (iv) Genesis (with Phil Collins).  Without limiting or expanding the scope, extent or terms of the Non-Compete Covenants, under no circumstances will the Buyer, Cohl or any of their affiliates be permitted, during the remaining term of the Non-Compete Covenants, without the prior written consent of the Company (which consent may be withheld in the Company's sole and absolute discretion), to (A) engage in, or solicit, any other live concert promotional opportunities other than the foregoing opportunities with the Cohl Relationship Artists, (B) solicit or enter into any artists rights deals, including so-called "**360 deals**", with any Concert Artists (defined below) or (C) become interested or involved, in any capacity, in the music recording business other than as expressly permitted hereby with respect to the Purchased Assets or to the extent not otherwise prohibited by the Non-Compete Covenants.

(iii)    Third Bucket – Ancillary Music Activities.  Subject to compliance with Section 1.5 hereof, the production, development or exploitation of any rights (other than touring, recording and publishing rights) ("**Ancillary Music Activities**") related to or associated with the name, image, likeness, biography, music or performances of any of the Cohl Relationship Artists or Elvis Presley.  Examples of Ancillary Music Activities would include (A) design, assembly and touring of an Exhibition Event (as defined below) featuring music, memorabilia or other artifacts of a Cohl Relationship Artist or Elvis Presley, (B) the production and distribution of a film or DVD featuring a concert performance of a Cohl Relationship Artist or Elvis Presley and (C) the production and distribution of a documentary film with an historical or human interest treatment of a Cohl Relationship Artist or Elvis Presley, and including their music.

(iv)    Fourth Bucket – Permitted Events.  The promotion, production and presentation of Permitted Events (as defined below).

Live Nation Worldwide, Inc.
September 22, 2008
Page 7

(v)　　Fifth Bucket – Specific Projects.　The exploitation of the specifically identified projects described on Schedule 1.3(b)(v) hereto (the "**Specific Projects**").

(c)　　Reaffirmation of Existing Non-Compete Covenants and Clarification Regarding No Interaction Between or Among the Various Non-Compete Relief Buckets.　Except as expressly modified in Section 1.3(b), all of the Non-Compete Covenants shall remain in full force and effect, and the Buyer and Cohl will confirm and restate (by cross-reference) the Non-Compete Covenants (as so modified) in the Definitive Agreements.　However, nothing in this letter or the Definitive Agreements is intended, nor shall it be interpreted, to expand, modify, clarify or otherwise affect in any way the scope of the Non-Compete Covenants (as expressly modified in Section 1.3(b) hereof).　The parties hereto further agree and acknowledge that the relief from the Non-Compete Covenants set forth in each of clauses (i), (ii), (iii), (iv) and (v) of Section 1.3(b) are separate and distinct from one another and that nothing contained herein shall be read to imply that (A) the type or nature of entertainment events included in the Purchased Assets shall be read to inform or define the types of entertainment events intended to be included in Section 1.3(b)(iv) because not all of the entertainment events included in the Purchased Assets are "Permitted Events" or (B) the Company has agreed, or will hereafter agree, to grant relief from the Non-Compete Covenants with respect to any other projects that may be similar in type, scope or nature to the Specific Projects.

(d)　　Definition of Permitted Event.　As used herein, the term "**Permitted Event**" means any Traditional Broadway Show, any Exhibition Event and/or any Family Event (as such terms are defined below); *provided, however*, in no event shall a Permitted Event (as distinct from Ancillary Music Activities) ever include:

(i)　　any type of concert;

(ii)　　any type of entertainment event that includes any musical or non-musical performance or appearance by a Concert Artist; or

(iii)　　any type of entertainment event that includes (i) the lyrics or music of a Concert Artist and/or (ii) an imitation, impersonation, parody, replica, reproduction or copy of any performance of a Concert Artist.

(e)　　Other Definitions Related to the Definition of Permitted Event.　As used herein, the following terms will have the meanings indicated:

(i)　　"**Traditional Broadway Show**" means any play, musical, comedy or drama (including any such play, musical, comedy or drama that is placed on tour at theatrical venues) that is (i) presented on stage to a live audience, (ii) produced from a written book or script with a plot and story line and (iii) of the type typically presented in one of the professional theatres with 500 seats or more located in the Theatre District of New York City; *provided, however*, in no event shall any show or other type of entertainment event that includes any type of musical performances without a traditional plot and story line be characterized as a Traditional Broadway Show.

(ii)　　"**Exhibition Event**" means any display of inanimate objects in a fixed locale (which may include incidental or background music) to paying customers, such as an exhibition of any one or more of the following: (A) paintings or sculptures, (B) historical artifacts, (C) scientific displays or (D) sports memorabilia.

Live Nation Worldwide, Inc.
September 22, 2008
Page 8

(iii)     "**Family Event**" means any entertainment event presented to a live audience that is primarily designed to appeal to a "family audience" such as, by way of example, (i) staged shows featuring life-sized characters from animated shows and (ii) a show featuring elements or characters from a popular movie performing on ice; *provided, however*, in no event shall any concert or any entertainment event that includes any musical or non-musical performance or appearance by a Concert Artist be characterized as a Family Event.

(iv)     "**Concert Artist**" means any individual musician or group of musicians, whether living or dead, that has appeared, is pursuing opportunities to appear or has announced plans to appear in a concert that prominently includes or features a musical performance by such musician or group of musicians.

Section 1.4     <u>Co-Promotion of Cohl Relationship Artists with the Company</u>.

(a)     <u>The Company's Approval Rights and Terms of Co-Promotion Arrangements</u>. Notwithstanding the provisions of Section 1.3(b)(ii) hereof, Cohl may not engage in the activity of promoting any live concerts featuring the performances of any of the Cohl Relationship Artists at any time during the remainder of the term of the Non-Compete Covenants unless (A) the financial terms and other material agreements related to the promotion of any such live concerts have been approved by the Company in its sole and absolute discretion (with respect to Rolling Stones and/or Mick Jagger, its approval not to be unreasonably withheld), and (B) arrangements with the Company have first been entered into acceptable to the Company in its sole and absolute discretion (with respect to Rolling Stones and/or Mick Jagger, its approval not to be unreasonably withheld), whereby the Company will participate with Cohl on the following basis:

(i)     <u>Rolling Stones/Mick Jagger</u>.  For any live concert tour involving the performance of Rolling Stones (with Mick Jagger) or Mick Jagger performing outside of Rolling Stones as the featured headline act, (i) the Company is retained as the Exclusive Global Promoter, as hereinafter defined, (ii) the Company and Cohl share the profits and losses 33-1/3% to the Company and 66-2/3% to Cohl and (iii) the Company is granted any ancillary concert rights (such as tickets, merchandise, fan club, etc.) that are controlled by Cohl at market rates and on customary terms;

(ii)     <u>Pink Floyd/David Gilmour</u>.  For any live concert tour involving the performance of Pink Floyd (with David Gilmour) or David Gilmour performing outside of Pink Floyd as the featured headline act, (i) the Company is retained as the Exclusive Global Promoter, (ii) the Company and Cohl share the profits and losses 55% to the Company and 45% to Cohl and (iii) the Company is granted any ancillary concert rights (such as tickets, merchandise, fan club, etc.) that are controlled by Cohl at market rates and on customary terms;

(iii)     <u>Barbra Streisand</u>.  For any live concert tour involving the performance of Barbra Streisand as the featured headline act, (i) the Company directly enters into the exclusive touring agreement with the artist, (ii) the Company and Cohl share the profits and losses 60% to the Company and 40% to Cohl and (iii) the Company is granted any ancillary concert rights (such as tickets, merchandise, fan club, etc.) that are controlled by Cohl at market rates and on customary terms; and

Live Nation Worldwide, Inc.
September 22, 2008
Page 9

(iv)    <u>Genesis</u>. For any live concert tour involving the performance of Genesis (with Phil Collins) as the featured headline act, (i) the Company is retained as the Exclusive Global Promoter (provided that the Company may enter into the touring agreement directly if requested by the artist's management), (ii) the Company and Cohl share the profits and losses 60% to the Company and 40% to Cohl and (iii) the Company is granted any ancillary concert rights (such as tickets, merchandise, fan club, etc.) that are controlled by Cohl at market rates and on customary terms.

As used herein, the term "**Exclusive Global Promoter**" means the provider of a full range of traditional tour support and management services in a manner consistent with the services provided by Live Nation pursuant to the Tour Financing and Services Agreement dated March 23, 2005 related to the 2005-2006 Rolling Stones Tour.

(b)    <u>The Company's Required Financing for Approved Joint Tours</u>. For each live concert tour featuring any Cohl Relationship Artist that is approved by the Company and for which the Company and Cohl jointly participate in the manner contemplated by the provisions of Section 1.4(a) of this letter ("**Approved Joint Tours**"), the Company will be required, at its sole cost and expense, to finance 100% of the Approved Joint Tour's working capital needs and artist advances and provide the services consistent with those provided by an Exclusive Global Promoter and local promoters, where applicable. Notwithstanding the foregoing, the following will apply with respect to each Approved Joint Tour:

(i)    <u>Collateral</u>. The Company will be provided with collateral (consisting of all or part of the assets of the Approved Joint Tour) to secure repayment of all funds advanced by the Company with respect to such Approved Joint Tour and payment to the Company of its share of tour profits, which collateral will include the right to control the tour bank account, in a manner consistent with the Tour Financing and Services Agreement dated March 23, 2005 related to the 2005-2006 Rolling Stones Tour;

(ii)    <u>Cohl Guaranty</u>. Cohl will be required to provide a personal guaranty to the Company with respect to the Buyer's obligation to fund, at the conclusion of such Approved Joint Tour, the Buyer's share of any losses arising from such Approved Joint Tour; and

(iii)    <u>The Company's Recoupment of the Cost of Insurance</u>. The Company will be reimbursed for the reasonable cost (based on the lowest rates charged by the Company to any other act during the same calendar year) of any liability insurance that is supplied by the Company for such Joint Approved Tour.

(c)    <u>Overarching Prohibition of Touring Activities Alone or with Others</u>. Notwithstanding anything to the contrary contained herein or implied hereby, under no circumstances will Cohl have the right, without the prior written consent of the Company, to engage in any Tour Promotion Activities at any time during the remaining term of the Non-Compete Covenants either for his own account or together with or as agent for any other party except for the co-promotion with the Company of Tour Promotion Activities of Cohl Relationship Artists as expressly provided for in this Section 1.4. Cohl releases and waives any right that he may otherwise have or acquire, at any time during the remaining term of the Non-Compete Covenants, pursuant to the terms of this letter or otherwise to pursue any Tour Promotion Activities except for the co-promotion with the Company of Tour Promotion Activities of Cohl Relationship Artists as expressly provided for in this Section 1.4.

Live Nation Worldwide, Inc.
September 22, 2008
Page 10

   Section 1.5  Co-Venturing Ancillary Music Activities Related to Cohl Relationship Artists or Elvis Presley.

    (a)  The Company's Right to Approve Ancillary Music Activities. Notwithstanding the provisions of Section 1.3(b)(iii) hereof, neither Cohl nor the Buyer may engage in any Ancillary Music Activity related to any of the Cohl Relationship Artists or Elvis Presley at any time during the remainder of the term of the Non-Compete Covenants unless (i) the concept, financial terms and other material agreements related to such Ancillary Music Activity have been approved by the Company in its sole and absolute discretion (with respect to Rolling Stones, its approval may not be withheld unless the Company demonstrates that such Ancillary Music Activity is likely to have an adverse impact on any core business or asset of the Company), and (ii) arrangements have been finalized with the Company in a manner reasonably acceptable to the Company whereby the Company will participate with the Buyer (or its affiliates), as a co-venturer in such proposed Ancillary Music Activity, with profits and losses being shared 50% to the Company and 50% to the Buyer (or its affiliate). The term of any such co-venture arrangement must extend through and until the underlying rights and properties in the proposed Ancillary Music Activity finally expire, without regard to when the term of the Non-Compete Covenants expire. When negotiating the documents that will govern a co-venture arrangement or any number of co-venture arrangements for any Ancillary Music Activity, the parties will each negotiate reasonably and in good faith a provision that will grant to each party a right of first refusal, matching right or similar provision that will apply in the event of any proposed sale of the other party's interest in the co-venture arrangement(s) to an unrelated third party.

    (b)  Financing for Approved Ancillary Music Activities. For each proposed Ancillary Music Activity related to any of the Cohl Relationship Artists or Elvis Presley that have been approved in the manner contemplated by the provisions of Section 1.5(a) of this letter ("**Approved AMA**"), the Company will have the first right to finance 100% (but not less than 100%) of the approved budgeted outlays for the costs associated with the build-out, development, operation and exploitation of such Approved AMA. If, after the Company and the Buyer have both used their respective reasonable efforts to negotiate reasonable terms for the financing of an Approved AMA, the Company and the Buyer do not reach a mutual agreement for the terms upon which the Company will provide the financing for such Approved AMA, then the Buyer shall be authorized to thereafter seek alternative financing arrangements for the funding of the approved budgeted outlays for the costs associated with the build-out, development, operation and exploitation of such Approved AMA with the express understanding that any and all costs of financing (including, interest and fees payable to the alternative financing source and any equity interests that are issued to any such alternative financing source) will be borne by and out of the Company's 50% equity interest in such Approved AMA before dilution of the Buyer's 50% equity interest in such Approved AMA; provided that if Cohl, the Buyer or an affiliate of either Cohl or the Buyer have more than a 10% interest in the alternative financing arrangement, then the Company will be afforded the right to match the terms of the alternative financing arrangement.

Section 1.6  Certain Transfer Restrictions.

   (a)  Defined Terms.

    (i)  "**Cohl Touring Interests**" means any and all of Cohl's rights and interests in the promotion of live concert tours of the Cohl Relationship Artists during the remaining term of the Non-Compete Covenants.

Live Nation Worldwide, Inc.
September 22, 2008
Page 11

(ii)      "**New Assets**" mean, other than the Cohl Touring Interests, all of Cohl's direct or indirect interest in (i) the Purchased Assets and/or (ii) any Ancillary Music Activities, Permitted Events and/or Specific Projects that are purchased, acquired or developed during the remaining term of the Non-Compete Covenants.

(iii)     "**Newco**" means the Buyer and/or any other person(s) or entity(ies) through which Cohl holds a direct or indirect interest in any New Assets.

(iv)     "**LN AMA Interests**" means all of the ownership interests, if any, that the Company acquires in any Ancillary Music Activities pursuant to the provisions of Section 1.5 hereof during the remaining term of the Non-Compete Covenants.

(v)      "**New Asset Transfer**" means, any sale, assignment, conveyance, pledge or other transfer completed at any time prior to the expiration of the Non-Compete Covenants of any direct or indirect interest in any of the New Assets to any person(s) other than Cohl or an entity(ies) wholly-owned and controlled by Cohl.  New Asset Transfers will include, without limitation, the following:

(A)  any sale, assignment, conveyance, pledge or other transfer of a New Asset or of a direct or indirect interest in a New Asset;

(B)  any sale, assignment, transfer, conveyance or issuance of equity in Newco; and

(C)  a contribution or similar assignment, conveyance or transfer of a New Asset to an entity that is less than wholly-owned by Cohl or Newco.

(vi)     "**Subject Transfer**" means any and all New Asset Transfers other than those specific types of transactions described in Section 1.6(c)(i), (ii), (iii) and (iv) of this letter.  All other New Asset Transfers, including transactions of the type described in Section 1.6(c)(v), shall be "Subject Transfers" for purposes hereof.

(vii)    "**Transfer Restriction Period**" means the period from the Closing Date until the later of (i) the first anniversary of the Closing Date or (ii) full and final payment to the Company of all installments of the Base Purchase Price and the Non-Compete Relief Fee.

(viii)   "**LN Competitor**" means, as of any time, any business or enterprise (or an owner, officer or director of any business or enterprise) that engages in competition with a business activity in which the Company or any of its subsidiaries is then actively engaged.

(b)      Absolute Prohibition on the Sale or Transfer of Cohl Touring Interests.   The rights to pursue and engage in Tour Promotion Activities related to the Cohl Relationship Artists pursuant to the provisions of Section 1.3(b)(ii) shall be personal to Cohl during the remaining term of the Non-Compete Covenants, and Cohl may not, at any time during the remaining term of the Non-Compete Covenants, sell, transfer or assign, directly or indirectly, any such rights (including any ownership interests derived therefrom) to any person other than business entities that are and remain wholly-owned by Cohl; provided that Cohl may undertake or otherwise commit to assign or contribute all or any portion of his share of any net proceeds derived from the

Live Nation Worldwide, Inc.
September 22, 2008
Page 12

co-promotion with the Company of the Tour Promotion Activities related to the Cohl Relationship Artists without violating the foregoing restriction. Cohl is prohibited, during the remaining term of the Non-Compete Covenants, from holding any other person (other than Cohl himself) out, or permitting any other person (other than Cohl himself) to hold itself out, as the Company's co-promoter with respect to the tours of the Cohl Relationship Artists. The prohibitions, restrictions and limitation of this Section 1.6(b) shall (i) apply throughout the remaining term of the Non-Compete Covenants without exception and (ii) not be altered, amended, modified, released, limited or otherwise affected by any of the remaining provisions of this Section 1.6.

(c)     Transfer Restrictions on the New Assets During the Transfer Restriction Period. During the Transfer Restriction Period, Cohl must own and maintain ownership of, directly or indirectly, a 100% interest in all New Assets except as expressly provided pursuant to the following provisions:

(i)     The New Assets may be pledged to secure an obligation to repay straight debt that is not convertible into any type of equity interest;

(ii)     An interest in a New Asset may be transferred pursuant to an ordinary commercial arrangement in a manner consistent with industry standards in connection with the regular and necessary operation or exploitation of such New Asset, such as, by way of example, the grant to a local presenter of the right to present a Permitted Event for a limited run in the local presenter's market;

(iii)     Up to 25% of the equity in Newco, in the aggregate, may be issued by Newco to employees of Newco and/or personal associates of Cohl ("founding members"); provided that (A) Newco and each such employee are both obligated to effect a sale or transfer of such equity back to Newco upon the employee's departure from employment, (B) Newco may not issue more than 2.5% of its equity to any one such founding member without the prior written consent of the Company, (C) Cohl will be responsible for insuring that each such employee and each such founding member comply with (i) the Non-Compete Covenants until the earlier of (x) the expiration of the remaining term of the Non-Compete Covenants or (y) divestiture of such employee's or founding member's equity in Newco and (ii) the provisions and restrictions that apply to Cohl and the Buyer in this letter;

(iv)     Equity in Newco may be issued by Newco solely in connection with the acquisition of any rights or interests in a Permitted Event; and

(v)     On and subject to the terms and provisions of this letter, including the obligations in Section 1.7 hereof regarding the payment of the Second Earn Out Purchase Price, equity in Newco may be issued by Newco for cash or discharge of debt owed by Newco but only if all installments of the Base Purchase Price and the Non-Compete Relief Fee have been previously paid in full or will be paid in full from the proceeds of, or simultaneously with, the issuance of such equity in Newco.

(d)     No Transfers to LN Competitors. Notwithstanding anything to the contrary contained in, or implied by, this letter, throughout the remaining term of the Non-Compete Covenants, Cohl will not undertake or complete, nor will Cohl permit or authorize the undertaking or completion of, (i) any New Asset Transfer to any LN Competitor, (ii) the

Live Nation Worldwide, Inc.
September 22, 2008
Page 13

formation of any partnership or other co-ownership arrangement with any LN Competitor in connection with the ownership, development or operation of any New Asset or (iii) the engagement of any LN Competitor to provide services in connection with the ownership, development or operation of any New Asset.

(e)    Transfers of New Assets Following the Transfer Restriction Period.   On and subject to the terms and provisions of this letter, including the obligations in Section 1.7 hereof regarding the payment of the Second Earn Out Purchase Price, Cohl and/or Newco may effect, after the Transfer Restriction Period, any one or more New Asset Transfers.

Section 1.7    Detailed Provisions Related to the Second Earn Out Purchase Price.

(a)    Payment Terms for the Second Earn Out Purchase Price.   The Second Earn Out Purchase Price shall not exceed $15,000,000 in amount and shall be paid, in installments, as a percentage of proceeds received from Subject Transfers in accordance with the following provisions (but subject to the application of the provisions of Section 1.7(g) hereof):

(i)    0% of the first $15,500,000 of aggregate proceeds received from Subject Transfers; and

(ii)    50% of all remaining proceeds received from Subject Transfers until the entire $15,000,000 of the Second Earn Out Purchase Price has been paid.

(b)    Effect of Voluntary Sales of LN AMA Interests on the Second Earn Out Purchase Price.   If the Company should elect, in its discretion, to sell to a bona fide unrelated third party purchaser any one or more of the LN AMA Interests at any time prior to the full and final payment of the Second Earn Out Purchase Price, then the net proceeds (if any) received by the Company from such sale, after full recoupment of all amounts invested by the Company in the underlying Ancillary Music Activity, shall be deemed to be a payment of an installment of the Second Earn Out Purchase Price (each such deemed installment of the Second Earn Out Purchase Price being herein called a "**Deemed Installment**").   Notwithstanding the foregoing, (A) the Company may not be forced to sell, assign, convey or transfer any LN AMA Interests to any person or at any time except as specifically required pursuant to the provisions of Section 1.7(d) hereof in conjunction with the full and final payment of the Second Earn Out Purchase Price and (B) distributions, whether characterized as return of capital or profits, received by the Company in respect of the LN AMA Interests shall be the sole and exclusive property of the Company and shall not be included as a part of any Deemed Installment.

(c)    Right of Prepayment; Notice of Full Payment of Second Earn Out Purchase Price.   The Buyer will have the right, at any time, to prepay, without any premium or penalty, the Second Earn Out Purchase Price by paying to the Company an amount equal to $15,000,000 less the sum of (A) the aggregate amount of all prior installments of the Second Earn Out Purchase Price paid to the Company pursuant to Section 1.7(a)(ii) and (B) the amount of any and all Deemed Installments.   The Buyer must provide at least 15 days prior notice ("**Payment Notice**") to the Company before effecting any full and final payment of the Second Earn Out Purchase Price, whether as a prepayment or in accordance with the required payment terms set forth above. If the Buyer fails to complete the full and final payment of the Second Earn Out Purchase Price within 90 days after the delivery of a Payment Notice, then a second Payment Notice must be provided again before the Buyer thereafter effects a full and final payment of the Second Earn Out Purchase Price.

Live Nation Worldwide, Inc.
September 22, 2008
Page 14

(d)   Effect of Full Payment of the Second Earn Out Purchase Price.  Upon full and final payment of (i) the Second Earn Out Purchase Price, whether as a prepayment or in accordance with the required payment terms set forth above, and (ii) all amounts invested by the Company in the underlying Ancillary Music Activities that have not yet been repaid (the "**Unpaid Investment Amount**"), the Company will be required to assign to Cohl (or his designee) all of the LN AMA Interests (if any) that are then owned by the Company.  The Company will continue to own the LN AMA Interests until full and final payment of the Second Earn Out Purchase Price and the Unpaid Investment Amount and will be entitled to receive all distributions and profits attributable to its ownership of the LN AMA Interests through and until the full and final payment of the Second Earn Out Purchase Price and the Unpaid Investment Amount.  Notwithstanding the foregoing, if the Company provides an Appraisal Notice to Cohl within 15 days following receipt of a Payment Notice, then the Company will have the right to condition its obligation to so assign the LN AMA Interests upon the creation of a mutually acceptable escrow arrangement into which Cohl contributes or causes to be contributed a monetary sum reasonably approved by the Company as security for payment of any amounts that may be subsequently determined to be due to the Company pursuant to the application of the provisions of Section 1.7(e) hereof.

(e)   Additional Payments if the Value of the LN AMA Interests Exceed $15,000,000.  The Company may provide notice ("**Appraisal Notice**") to Cohl at any time within 15 days following receipt of a Payment Notice that the Company is invoking the provisions of this Section 1.7(e).  If the Company timely provides an Appraisal Notice, then the following provisions will apply:

(i)   Determination of Fair Market Value.  The fair market value of all of the LN AMA Interests that are then owned by the Company at the time of the delivery of the Appraisal Notice (the "**AMA Value**") will be determined by mutual agreement between Cohl and the Company as soon as reasonably possible following the delivery of the Appraisal Notice.  If Cohl and the Company are unable to reach mutual agreement on the AMA Value within 15 days following delivery of the Appraisal Notice, then either party may thereafter demand, by notice to the other, that the AMA Value be determined by an appraisal procedure conducted in accordance with the provisions of Section 1.7(e)(ii).

(ii)   Appraisal Procedure.  If either the Company or Cohl demands that the AMA Value be determined pursuant to the provisions of this Section 1.7(e)(ii), then the AMA Value shall be determined by a third party appraiser to be selected in accordance with the subsequent provisions hereof and whose determination of the AMA Value will be final, binding and conclusive on all parties.  The Company shall retain an independent professional appraiser having not less than five (5) years experience in evaluating similar equity interests (a "**Qualified Appraiser**"), mutually satisfactory to Cohl and the Company, or if no such mutually satisfactory Qualified Appraiser can be selected, then the Company shall appoint one Qualified Appraiser, Cohl shall appoint one Qualified Appraiser and thereafter the two Qualified Appraisers so appointed shall select a third Qualified Appraiser who shall make the applicable determination of the AMA Value.  In making any determination of the AMA Value pursuant to the provisions hereof, the Qualified Appraiser appointed hereunder shall in good faith take into account all of the respective and relative economic or inherent aspects of the LN AMA Interests being valued.  The cost of the Qualified Appraiser shall be borne one-half by the Company and one-half by Cohl.

Live Nation Worldwide, Inc.
September 22, 2008
Page 15

       (iii)     <u>Applicable Provisions if the Aggregate Value of the LN AMA Interests Exceed $15,000,000</u>.  If the sum (the "**Aggregate AMA Value**") of (A) the AMA Value (as determined pursuant to Section 1.7(e)(i) or (ii) hereof) and (B) the total amount of any and all Deemed Installments should exceed $15,000,000, then the Buyer shall immediately pay to the Company the amount by which the Aggregate AMA Value exceeds $15,000,000 (the "**Excess AMA Value**").

       (iv)     <u>Applicable Provisions if the Aggregate Value of the LN AMA Interests Does Not Exceed $15,000,000</u>.  If the Aggregate AMA Value should be $15,000,000 or less, then the Buyer will have no further payment obligations to the Company pursuant to this Section 1.7.

       (f)     <u>Non-Compete Covenants Survive Payment of the Second Earn Out Purchase Price and Assignment of the LN AMA Interests</u>.  Notwithstanding anything to the contrary contained herein or implied hereby, the terms of the Non-Compete Covenants (as amended hereby) and all of the terms of Sections 1.3, 1.4, 1.5 and 1.6 of this letter shall expressly survive and continue through and until the expiration of the term of the Non-Compete Covenants even after the payment of the Second Earn Out Purchase Price and after the transfer of the LN AMA Interests to the Buyer pursuant to the provisions of Section 1.7(d).  Without limiting the generality of the foregoing, the provisions of Section 1.5 shall continue to apply to any new Ancillary Music Activity related to any Cohl Relationship Artist or Elvis Presley that is proposed by Cohl or the Buyer even after payment in full of the Second Earn Out Purchase Price and transfer of the previously owned LN AMA Interests by the Company to the Buyer.

       (g)     <u>No Payments on the Second Earn Out Purchase Price Until the Company Approves an Ancillary Music Activity</u>.  Notwithstanding anything to the contrary contained in this Section 1.7, no installments shall be payable in respect of the Second Earn Out Purchase Price until such time as the Company and the Buyer have made arrangements pursuant to Section 1.5(a)(ii) hereof to participate as co-venturers in at least one proposed Ancillary Music Activity.  However, upon the Company and the Buyer having made arrangements pursuant to Section 1.5(a)(ii) to participate as co-venturers in their first proposed Ancillary Music Activity, all of the provisions of this Section 1.7 shall become effective immediately, with retroactive effect, such that any installments of the Second Earn Out Purchase Price that would have been payable under the provisions of this Section 1.7, had it not been for the application of this Section 1.7(g), will be immediately payable by the Buyer to the Company.

Section 1.8    <u>Fontainebleau and Getty Images</u>.  The Company and Buyer will negotiate in good faith, exclusively with one another, with respect to the business opportunities known as the Fontainebleau concept and the Getty Images concept, which business opportunities are more fully described as follows:

       (a)     The Fontainebleau concept involves a series of premium-priced, low capacity events to be presented at the Fontainebleau Hotel in Miami, Florida.

       (b)     The Getty Images concept involves a business designed to generate revenue from the control, licensing, creation and sale of photographic images taken at Company concerts and venues.

In order to avoid delays in attempting to reach mutual agreement between the parties concerning the joint exploitation of such business opportunities, each party agrees that it will respond within 14 business days

Live Nation Worldwide, Inc.
September 22, 2008
Page 16

following any written proposal from the other party regarding any proposed terms for exploiting either of such business opportunities. If the Company should elect, on or before March 31, 2009, to pursue one or both of such business opportunities, then the Company and the Buyer will execute a profit sharing agreement in a form mutually approved by both parties setting forth, with respect to the Getty Images concept, a 50-50 sharing of profits and losses and, with respect to the Fontainebleau concept, a 50-50 sharing of profits and losses. If the Company has not elected to pursue either or both of such business opportunities on or before March 31, 2009, then both the Company and the Buyer will be free to pursue such opportunities, alone or with others, subject to any restrictions imposed upon the Buyer pursuant to the Non-Compete Covenants.

Section 1.9    Coordination of Efforts with Regard to Cohl Relationship Artists; The Company's Freedom of Activity.

(a)    Generally.  Cohl represents to the Company, and the Company acknowledges, that Cohl currently has a close business and working relationship with each of the Cohl Relationship Artists that should enable Cohl to successfully negotiate the acquisition of the rights to promote the concert tours of each Cohl Relationship Artist. As provided in Section 1.4(a) hereof, it is the intent of the parties that the Company and Cohl will co-promote the concert tours of each Cohl Relationship Artist if Cohl is successful in obtaining the rights to promote such concert tours. Therefore, it is the parties' intent that Cohl will, as long as he is alive and able to do so, generally take the lead in conducting negotiations with each of the Cohl Relationship Artists in an effort to procure the rights to promote each concert tour of the Cohl Relationship Artists during the remaining term of the Non-Compete Covenants. As Cohl negotiates the acquisition of the rights to promote the concert tour of any Cohl Relationship Artist, Cohl will be required to remain in constant communication with the Company and its touring division head to advise of the terms under negotiation and to allow the Company to provide its input and advice concerning the financial terms under negotiation in an effort to facilitate and simplify the approval process described in Section 1.4(a)(A) of this letter. The foregoing provisions will not preclude the Company from engaging in discussions with any Cohl Relationship Artist (or the management of any Cohl Relationship Artist) in regard to the promotion rights for any proposed concert tour as the Company may believe, in good faith, will be helpful to Cohl's efforts in obtaining the rights to promote the concert tour of such Cohl Relationship Artist.

(b)    Company's Right to Step-In with Cohl Relationship Artists.  Notwithstanding Section 1.9(a), if the Company should determine, in its reasonable judgment, that Cohl will be unable, for any reason, to successfully negotiate the acquisition of the rights to promote the concert tour of any Cohl Relationship Artist, then the Company will, after providing reasonable prior notice to Cohl, have the free and unfettered right to thereafter bid or seek to obtain directly the right to promote any such concert tour for its own account without any duty to share, co-promote or jointly pursue with Cohl any such rights that the Company may acquire.

(c)    The Company's Freedom of Activity.  Except as expressly contemplated by Section 1.9(a), (i) nothing contained in this letter shall be deemed to create any implied duty or obligation on the part of the Company that would require the Company to refrain from competing with, or bidding against the prospective interests of, Cohl, the Buyer or any affiliate of either Cohl or the Buyer and (ii) the Company shall have the sole and unfettered right to pursue its own business interests and activities in the same manner and to the same extent as the Company was free to do prior to the execution of this letter.

Section 1.10    Staff Members Related to the Purchased Assets.

Live Nation Worldwide, Inc.
September 22, 2008
Page 17

(a)     General Provisions Related to the Buyer's Obligations Related to the Continuing Employees.  Upon execution of this letter, the Buyer will retain and hire those employees listed on Schedule 1.10(a) hereto (the "**Continuing Employees**").  The Buyer will (i) assume, effective as of the Closing Date, responsibility for all salary, bonuses, benefits (including accrued vacation), severance and other obligations to the Continuing Employees (including the relocation costs of Marc Choper described in Section 1.10(c)(ii)) and (ii) reimburse to the Company any payments made by the Company in respect of, and indemnify and hold the Company harmless for, any obligations or liabilities to the Continuing Employees that accrues after the Closing Date (including severance and COBRA payments) and any unused and accrued vacation as of the Closing Date.  If requested by the Buyer, the Company will cooperate in making the Company's COBRA health insurance plan available to the Continuing Employees upon the terms and subject to the standard administration of such COBRA plan.  The Buyer shall deliver to the Company, within 7 days of the execution of this letter, copies of release agreements signed by certain of the Continuing Employees in a form previously approved by the Company.

(b)     Indemnity by the Company Related to Pre-Closing Obligations to the Continuing Employees.  Other than unused and accrued vacation as of the Closing Date, any severance costs and the relocation costs of Marc Choper assumed by the Buyer as described in Section 1.10(c)(ii), the Company will indemnify and hold the Buyer harmless for any obligations or liabilities to the Continuing Employees that accrued prior to the Closing Date in connection with their employment with the Company.

(c)     Provisions Relating to the Moving Costs of Marc Choper.  In regard to the relocation costs owed to Marc Choper, the parties agree as follows:

(i)     The Buyer will be responsible for all amounts payable to Marc Choper under the terms of his Employment Agreement in connection with or relating to (A) expenses related to the sale of his house in California (including closing costs and commissions) and the tax gross-up amount in respect of those expenses and (B) the costs of temporary accommodations in Miami that he incurs after the Closing Date and the tax gross-up amount in respect of those amounts.

(ii)     The Company will be responsible for all amounts payable to Marc Choper under the terms of his Employment Agreement in connection with or relating to his costs of moving from California to Miami other than those amounts payable by the Buyer pursuant to Section 1.10(c)(i).

(d)     Settlement.  After execution of this letter, the parties and their respective accounting representatives will work together reasonably and promptly to settle accounts and determine the net amount payable by one party to the other after applying the provisions of both Section 1.2(e) and this Section 1.10 (the "**Net Adjustment Amount**").  The Buyer and the Company shall cooperate with one another in connection with providing information to one another relating to the calculation of the Net Adjustment Amount.   When the Net Adjustment Amount is finally determined, whether pursuant to mutual agreement or by an arbitrating accountant pursuant to the provisions of Section 1.10(e), the party that owes the Net Adjustment Amount will pay such amount to the other party plus interest thereon at six percent per annum from the Closing Date until the date paid.

(e)     Arbitrating Accountant.  If the Buyer and the Company are unable to resolve any dispute concerning the calculation of the Net Adjustment Amount within the thirty (30) day

Live Nation Worldwide, Inc.
September 22, 2008
Page 18

period following the date that this letter is signed, then a mutually approved Big 4 Accounting Firm that does not regularly perform services for the Company or the Buyer (the "**Arbitrating Accountant**") shall be engaged as arbitrator hereunder to settle such dispute as soon as practicable.  In connection with the resolution of any such dispute, the Arbitrating Accountant shall have access to all documents, records, work papers, facilities and personnel necessary to perform its function as arbitrator.  The Arbitrating Accountant's function shall be to review only those items that are in dispute and to resolve the dispute with respect to such items.  The Arbitrating Accountant's award with respect to any such dispute shall be final and binding upon the parties hereto, and judgment may be entered on the award.  The fees and expenses of the Arbitrating Accountant shall be allocated between Company, on the one hand, and Buyer, on the other hand, by the Arbitrating Accountant based on the relative success of the positions taken by each party in regard to such dispute.  This Section 1.10(e) shall only apply to disputes regarding the calculation and/or determination of the Net Adjustment Amount.  Except as provided in Section 2.5 hereof, any other disputes, disagreements arising out of this letter or the Definitive Agreements shall be governed by the provisions of Section 2.4 and shall not be subject to any type of non-judicial arbitral procedure.

Section 1.11    Office Space.

(a)    The Buyer and the Continuing Employees shall vacate the office space currently in use in Miami, Florida as soon as reasonably practicable following the execution of this letter.  The parties will hereafter work together reasonably in an effort to mutually determine which of the office furniture and equipment located in the Miami office will be purchased by the Buyer for an additional payment equal to the current book value  of such furniture and equipment on the Company's books (after all appropriate depreciation in accordance with GAAP to the extent not previously reflected on the Company's books).

(b)    The Company and the Buyer will split the two suites currently under lease in Toronto at #10 Alcorn Avenue (Suite 303 and 304), such that, from and after the Closing Date, (i) the Buyer will occupy and be responsible for all payments due with respect to Suite 304 and (ii) the Company will occupy and be responsible for all payments due with respect to Suite 303.  The parties will hereafter (A) execute such documents and agreements as may be necessary to result in each party being directly responsible for the rent payments attributable to its respective suite and (B) work together reasonably in an effort to mutually determine which of the office furniture and equipment located in the Suite 304 of the Toronto office will be purchased by the Buyer for an additional payment equal to the current book value of such furniture and equipment on the Company's books (after all appropriate depreciation in accordance with GAAP to the extent not previously reflected on the Company's books).

Section 1.12    Special Provisions Related to Cirque Relationship.

(a)    Elvis/Cirque.  The Company is currently in negotiations with Cirque to jointly pursue the promotion and production of an entertainment show (the "Cirque Elvis Show") that features the work of Elvis Presley.  Notwithstanding anything to the contrary contained in or implied by this letter, the Company's rights in and to the Cirque Elvis Show shall be the sole and exclusive property of the Company with no obligation to share any rights or interests therein with the Buyer or Cohl.

(b)    Restrictions on Contacting Cirque in Development of Ancillary Music Activities.  During the remaining term of the Non-Compete Covenants, Cohl and the Buyer covenant and

Live Nation Worldwide, Inc.
September 22, 2008
Page 19

agree with the Company, in addition to the obligations under the Non-Compete Covenants, that they will not contact, or otherwise attempt to negotiate with, Cirque in respect of the development of any proposed Ancillary Music Activity unless such contact or attempt to negotiate with Cirque is approved by the Company in its sole discretion (with respect to Ancillary Music Activities involving or relating to Rolling Stones, its approval not to be unreasonably withheld).

Section 1.13    Assignment of Stock in Concerts Production International, B.V.    For no additional compensation or payment, the Company agrees that it will, as soon as reasonably practicable, hereafter take such actions, sign such documents and deliver such certificates as may be reasonably necessary (and in a manner reasonably approved by both parties) to assign, transfer and deliver to the Buyer (or its designee) ownership of all of the issued and outstanding shares ("**CPI BV Stock**") in Concerts Production International, B.V. ("**CPI BV**") free and clear of any liens and security interests. Notwithstanding the foregoing, (A) the Company shall not be required to complete the assignment of the CPI BV Stock to the Buyer (or its designee) until such time as the Company is satisfied, in its sole discretion, that CPI BV has no assets other than the favorable tax position ruling previously made by Netherlands Taxing Authority for the benefit of CPI BV and (B) the Company will, at the time of such assignment, expressly reserve and retain any and all rights and claims that it may have under the 2007 SPA (as defined in Section 1.3(a)(i) hereof) and/or the 2006 SPA (as defined below) in respect of matters related to the CPI BV Stock (including tax matters associated with CPI BV).  As used herein, the "**2006 SPA**" shall mean that certain Stock Purchase Agreement dated May 26, 2006 and entered into by and among, the Company, as buyer, and Samco Investments Ltd. and certain other parties, as sellers.  If, at any time after the assignment of the CPI BV Stock to the Buyer in accordance with the provisions of this Section 1.13, it is determined that CPI BV can be used in connection with a tour being co-promoted by the Company and Cohl (or his affiliates) in a manner that provides tax advantages to the Company, then Cohl and the Buyer will cooperate reasonably with the Company in an effort to structure the ownership of such tour so as to effect those tax advantages for the benefit of the Company.

## ARTICLE 2
## OTHER AGREEMENTS

Section 2.1    Payment of Expenses.  The Buyer and Cohl, on the one hand, and the Company, on the other hand, will each pay the costs and expenses incurred by each of them in connection with the Acquisition.

Section 2.2    No Public Disclosure of the Acquisition.  The Buyer shall not disclose to any third party (other than counterparties to any of the Purchased Contracts and the Continuing Employees) or publicly announce the proposed Acquisition until such time as the Company agrees to make such an announcement or unless otherwise required by applicable law and in any event no sooner than 90 days after the closing of the Acquisition.  The Company will not issue any press release or public announcement describing the Acquisition without having first provided a copy of the proposed release or announcement to the Buyer for review and comment.  Subject to applicable Securities and Exchange Commission laws and applicable stock exchange rules, the Company will not unreasonably withhold consent to any reasonable requests from the Buyer for changes to any such proposed release or announcement.

Section 2.3    Michael Cohl Guaranty.  Cohl is joining in the execution of this letter in the space provided below for the purpose of (i) representing to the Company that Cohl controls the Buyer, (ii) agreeing to comply with the covenants and restrictions set forth herein that apply to Cohl, including the restrictions on transfer contained in Section 1.6 hereof and the obligation to provide a personal guaranty for Approved Joint Tours pursuant to Section 1.4(b)(ii) hereof and (iii) guaranteeing the full, complete

Live Nation Worldwide, Inc.
September 22, 2008
Page 20

and timely performance of the obligations, liabilities and responsibilities of the Buyer pursuant to this letter and the Definitive Agreements.

Section 2.4    Governing Law.  This letter shall be governed by, and construed in accordance with, the laws of the State of Florida without regard to principles of conflict of law.  Each party to this letter (A) hereby submits to the exclusive jurisdiction of the state courts located in Miami, Florida and the federal court for the Southern District of Florida with respect to all actions brought under this letter and (B) hereby irrevocably agrees that (i) all claims in respect of such action or proceeding may be heard and determined in such courts and (ii) no such claim may be filed or pursued in any other court or forum anywhere in the world.  Each party to this letter hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding. EACH PARTY TO THIS LETTER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER OR RELATING TO THIS AGREEMENT.

Section 2.5    Arbitration Procedure for Resolving Drafting Issues Related to the Definitive Agreements.  If the parties have any disagreements regarding the form, content or wording to be included in the Definitive Agreements that are not resolved by December 31, 2008, then such disagreements may, at any time thereafter, be submitted by either party for resolution to a mutually acceptable attorney who is a partner in one of the 100 largest U.S. law firms as most recently listed in the *American Lawyer* and who specializes in mergers and acquisitions (the "**Arbitrator**").  The Arbitrator shall review any disputed matters regarding the form, content or wording of the Definitive Agreements and shall resolve any such disputes within thirty (30) days of the date the Arbitrator is retained based upon the terms, provisions and intent expressed in this letter and the Arbitrator's best judgment as a disinterested practicing attorney.  The decision of the Arbitrator shall be final and binding between the parties for the purpose of resolving any disputes concerning the form, content or wording to be included in the Definitive Agreements.  The fees and expenses of the Arbitrator shall be borne one-half by the Buyer and one-half by the Company.  This Section 2.5 shall only apply to disputes regarding the form, content or wording to be included in the Definitive Agreements.  Except as provided in Section 1.10(e) hereof, any other disputes, disagreements arising out of this letter or the Definitive Agreements shall be governed by the provisions of Section 2.4 and shall not be subject to any type of non-judicial arbitral procedure.

Section 2.6    Headings.  Headings are not a part of this letter but are only for convenience.

If the foregoing correctly sets forth the understanding between us with respect to the proposed Acquisition described herein, please sign and return the enclosed copy of this letter. This letter may be executed in multiple counterparts, each of which shall be deemed to be an original.

[Signatures Appear on the Following Page]

September 22, 2008
Page 21

Very truly yours,

EVENTS ACQUISITION CORPORATION

By:_____
     Michael Cohl, CEO

ACCEPTED AND AGREED TO:

LIVE NATION WORLDWIDE, INC.

By:_____
   Name:_____
   Title:_____

The undersigned joins in the execution hereof for the purposes stated in Section 2.3 hereof:

_____
MICHAEL COHL

HOUSTON 999913v.18

Live Nation Worldwide, Inc.
September 22, 2008
Page 21

Very truly yours,

EVENTS ACQUISITION CORPORATION

By:_____
    Michael Cohl, CEO

ACCEPTED AND AGREED TO:

LIVE NATION WORLDWIDE, INC.

By:_____
Name:_____
Title:_____

The undersigned joins in the execution hereof for the purposes stated in Section 2.3 hereof:

_____
MICHAEL COHL

**Schedule 1.1(a)**
**List of Purchased Assets**

Bodies
Fuerzabruta
Bowfire Production
Bowfire DVD
Rock & Roll Hall of Fame
Young Frankenstein
Spamalot (including Laughalot and Touralot)
Spiderman
Walking with Dinosaurs

Stones Movie (Shine a Light)
Belafonte Movie
Biggest Bang DVD (including the BluRay format)
Folk - Isn't this a Time (The Carnegie Project)
RS at the Max
RS Four Flicks
Pete Seeger DVD
Mariah Carey DVD

**Schedule 1.3(b)(v)**
**List of "Specific Projects"**

1.       A documentary film concerning Phil Ochs.

2.       Management of the existing film known as "Toronto Rocks" on behalf of Rolling Stones provided that (i) Cohl and his affiliates do not receive any compensation for those management services and (ii) all of the net proceeds from such film are contributed to charity.

**Schedule 1.10(a)**
**List of Continuing Employees**

| Full Name | Employment Category | Position / Oracle Job | Location |
|---|---|---|---|
| Armstrong, Robert | | Events, Finance, Manager | Toronto |
| Bell, Caren Kristine | Full-Time Regular | VP - Marketing | Miami |
| Choper, Marc Steven | Full-Time Regular | Chief Accounting Officer | Miami |
| Cielo, Ana Cristina | Full-Time Regular | Executive Assistant | Miami |
| Cohl, Elijah M (Eli) | Fulltime-Regular | Manager | Miami |
| Doval, Melissa | Full-Time Regular | Manager - Accounting | Miami |
| Farrell, Michael J | Full-Time Regular | Director - Tour | Miami |
| Gerstein, Carrie L | Full-Time Regular | Manager | Miami |
| Green, Stacey J | Full-Time Regular | Finance, Director | Miami |
| Harper, John W | Full-Time Regular | Events, Assistant | Miami |
| Howard, Steve | | EVP - Operations | Toronto |
| LeCoche, Lilly | | Receptionist | Toronto |
| Linden, Jonathan M | Fulltime-Regular | VP | Miami |
| Lowe, Brenda | Full-Time Regular | Executive Assistant | Miami |
| Luba, Michael A (Mike) | Full-Time Regular | VP | Miami |
| Mac Donald, Judi | | Executive Assistant | Toronto |
| McTague, Maureen | | Director - PR & Sponsorship | Toronto |
| Pansieri, Natalia | | Manager - Project Finance | Toronto |
| Perry, Norman J | Full-Time Regular | SVP | New York |
| Stollman, Marc D | Full-Time Regular | Legal, SVP | Miami |
| Valencia, Maria C (Catalina) | Full-Time Regular | Finance, Accounting Asst | Miami |
| Scace, Patrick D | Full-Time Regular | Coordinator Non-Exempt | Miami |
| Shaw, Steve | | Project Coordinator | Toronto |