UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-24144-CIV-ALTONAGA/Simonton

**LIVE NATION WORLDWIDE, INC.**,

    Plaintiff,
vs.

**MICHAEL COHL**, *et al.*,

    Defendants.
_____/

## ORDER

**THIS CAUSE** came before the Court on Plaintiff, Live Nation Worldwide, Inc.'s ("Live Nation['s]") Motion to Dismiss ("Motion") [ECF No. 23], filed on February 11, 2011. In the Motion, Live Nation seeks to dismiss the counterclaims asserted in Defendants, Michael Cohl ("Cohl") and S2BN Entertainment Corporation's ("S2BN[']s]") (collectively, "Defendants[']") Answer, Affirmative Defenses and Counterclaim ("Counterclaim") [ECF No. 8]. The Court has carefully considered the parties' written submissions and applicable law.

### I. BACKGROUND[1]

This case arises from a dispute over the purchase of certain rights and assets of a live event promotion business. In 2007, pursuant to a Stock Purchase Agreement ("SPA"), Cohl, a well-established live-event concert promoter, sold his various concert promotion entities to Live Nation. (*See* Countercl. ¶ 14). As part of the SPA, Cohl agreed to a non-compete covenant ("Non-Compete Covenant") "that prohibited him, on a worldwide basis, for a period of nine years . . . from engaging in certain activities." (*Id.* ¶ 15). In addition, Cohl agreed to serve as "the most senior executive of the 'Artist Nation Division' of Live Nation" and "subsequently became Chairman of

---

[1] The allegations of Defendants' Counterclaim are taken as true.

Case No. 10-24144-CIV-ALTONAGA/Simonton

the Board of Directors of Live Nation." (*Id.* ¶ 16). Effective June 20, 2008, Cohl resigned from both positions. (*Id.* ¶ 17).

Following his resignation, Cohl entered into an agreement (the "Letter Agreement") with Live Nation in which Cohl purchased various rights and assets from Live Nation. (*See id.* ¶ 18; *see* Letter Agreement [ECF No. 8-1]). As part of the Letter Agreement, Cohl "also paid separate and additional consideration in return for partial relief from the [Non-Compete Covenant] set forth in the SPA." (Countercl. ¶ 18). The relief is categorized into five "buckets," one of which allows Cohl to "co-promote with Live Nation concert tours of four music performers [('the Cohl Relationship Artists')] with whom Cohl has had long-standing and highly successful professional relationships." (*Id.*; *see* Letter Agreement 6–7). Specifically, the Letter Agreement states:[2]

> Section 1.3    Partial Relief from Non-Compete Covenants.
>
> (a)    Existing Non-Compete Covenants and Non-Compete Relief Fee.
>
> . . .
>
> (ii)    Non-Compete Relief Fee. The Buyer will pay $5,500,000 (the "**Non-Compete Relief Fee**") to the Company as a fee for the agreement of the Company to grant the partial relief from the Non-Compete Covenants as more fully set forth herein. The Non-Compete Relief Fee shall be payable in the following installments:
>
> (A) $2,750,000 shall be payable on, or, at the Buyer's option, any time before the first anniversary of the Closing Date; and
>
> (B) $2,750,000 shall be payable on, or, at the Buyer's option, any time before, the second anniversary of the Closing Date.
>
> (b)    Partial Relief from Existing Non-Compete Covenants. On and subject to the terms hereof, in consideration for the Non-Compete Relief Fee, the Company

---

[2] As used in the Letter Agreement, "the Company" refers to Live Nation, and "the Buyer" refers to Cohl's corporation, S2BN, which was formerly called Events Acquisition Corporation.

Case No. 10-24144-CIV-ALTONAGA/Simonton

hereby partially releases Cohl from the Non-Compete Covenants in such a manner that Cohl may thereafter engage in and pursue the following specifically identified activities, to the extent that he requires such release to engage in such activities without being in violation of the Non-Compete Covenants, it being understood that anything contained herein that provides relief from the Non-Compete Covenants shall be given effect, but nothing herein shall be deemed to extend or expand such Non-Compete Covenants:

. . .

(ii) <u>Second Bucket — Touring Activities for Cohl Relationship Artists</u>. Subject to compliance with Section 1.4 hereof, the promotion of live concert tours ("<u>Tour Promotion Activities</u>") featuring the performance of any of the following artists (the "<u>Cohl Relationship Artists</u>") as the headline act: (i) Rolling Stones (with Mick Jagger) or Mick Jagger performing outside of the Rolling Stones, (ii) Pink Floyd (with David Gilmour) or David Gilmour performing outside of Pink Floyd, (iii) Barbra Streisand and (iv) Genesis (with Phil Collins). Without limiting or expanding the scope, extent or terms of the Non-Compete Covenants, under no circumstances will the Buyer, Cohl or any of their [sic] affiliates be permitted during the remaining term of the Non-Compete Covenants, without the prior written consent of the Company (which consent may be withheld in the Company's sole and absolute discretion), to (A) engage in, or solicit any other live concert promotional opportunities other than the foregoing opportunities with the Cohl Relationship Artists, (B) solicit or enter into any artists [sic] rights deals, including so-called "<u>360 deals</u>", with any Concert Artists (defined below) or (C) become interested or involved, in any capacity, in the music recording business other than as expressly permitted hereby with respect to the Purchased Assets or to the extent not otherwise prohibited by the Non-Compete Covenants.

(Letter Agreement 6–7).

With respect to the concert tours of the Rolling Stones, the Letter Agreement provides the following:

Section 1.4   <u>Co-Promotion of Cohl Relationship Artists with the Company</u>.

(a) <u>The Company's Approval Rights and Terms of Co-Promotion Arrangements</u>. Notwithstanding the provisions of Section 1.3(b)(ii) hereof, Cohl may not engage in the activity of promoting any live concerts featuring the performances of any of the Cohl Relationship Artists at any time during the remainder of the term of the Non-Compete Covenants unless (A) the financial terms

3

and other material agreements related to the promotion of any such live concerts have been approved by the Company in its sole and absolute discretion (with respect to Rolling Stones and/or Mick Jagger, its approval not to be unreasonably withheld), and (B) arrangements with the Company have first been entered into acceptable to the Company in its sole and absolute discretion (with respect to Rolling Stones and/or Mick Jagger, its approval not to be unreasonably withheld), whereby the Company will participate with Cohl on the following basis:

>   (i)   <u>Rolling Stones/Mick Jagger</u>.  For any live concert tour involving the performance of Rolling Stones (with Mick Jagger) or Mick Jagger performing outside of Rolling Stones as the featured headline act, (i) the Company is retained as the Exclusive Global Promoter, as hereinafter defined, (ii) the Company and Cohl share the profits and losses 33-1/3% to the Company and 66-2/3% to Cohl[,] and (iii) the Company is granted any ancillary concert rights (such as tickets, merchandise, fan club, etc.) that are controlled by Cohl at market rates and on customary terms;

>   . . . .

>   As used herein, the term "<u>Exclusive Global Promoter</u>" means the provider of a full range of traditional tour support and management services in a manner consistent with the services provided by Live Nation pursuant to the Tour Financing and Services Agreement dated March 23, 2005 related to the 2005-2006 Rolling Stones Tour.

(*Id.* 9–10).

The Letter Agreement also discusses a "coordination of efforts" with regard to the Cohl Relationship artists:

>   Section 1.9   <u>Coordination of Efforts with Regard to Cohl Relationship Artists: The Company's Freedom of Activity</u>.
>
>   (a)   <u>Generally</u>.  Cohl represents to the Company, and the Company acknowledges, the [sic] Cohl currently has a close business and working relationship with each of the Cohl Relationship Artists that should enable Cohl to successfully negotiate the acquisition of the rights to promote the concert tours of each Cohl Relationship Artist.  As provided in Section 1.4(a) hereof, it is the intent of the parties that Company and Cohl will co-promote the concert tours of each Cohl Relationship Artist if Cohl is successful in obtaining the rights to promote such concert tours.  Therefore, it is the parties' intent that Cohl will, as long as he is alive and able to do so, generally take the lead in conducting negotiations with each of the

Case No. 10-24144-CIV-ALTONAGA/Simonton

> Cohl Relationship Artists in an effort to procure the rights to promote each concert tour of the Cohl Relationship Artists during the remaining term of the Non-Compete Covenants.  As Cohl negotiates the acquisition of the rights to promote the concert tour of any Cohl Relationship Artist Cohl will be required to remain in constant communication with the Company and its touring division head to advise of the terms under negotiation and to allow the Company to provide its input and advice concerning the financial terms under negotiation in an effort to facilitate and simplify the approval process described in Section 1.4(a)(A) of this letter.  The foregoing provisions will not preclude the Company from engaging in discussions with any Cohl Relationship Artist (or the management of any Cohl Relationship Artist) in regard to the promotion rights for any proposed concert tour as the Company may believe, in good faith, will be helpful to Cohl's efforts in obtaining the rights to promote the concert tour of such Cohl Relationship Artist.
>
> (b)  <u>Company's Right to Step-In with Cohl Relationship Artists</u>.  Notwithstanding Section 1.9(a), if the Company should determine, in its reasonable judgment, that Cohl will be unable, for any reason, to successfully negotiate the acquisition of the rights to promote the concert tour of any Cohl Relationship Artist, then the Company will, after providing reasonable prior notice to Cohl, have the free and unfettered right to thereafter bid or seek to obtain directly the right to promote any such concert tour for its own account without any duty to share, co-promote or jointly pursue with Cohl any such rights that the Company may acquire.
>
> (c)  <u>The Company's Freedom of Activity</u>.  Except as expressly contemplated by Section 1.9(a), (i) nothing contained in this letter shall be deemed to create any implied duty or obligation on the part of the Company that would require the Company to refrain from competing with, or bidding against the prospective interests of Cohl, the Buyer or any affiliate of either Cohl or the Buyer and (ii) the Company shall have the sole and unfettered right to pursue its own business interests and activities in the same manner and to the same extent as the Company was free to do prior to the execution of this letter.

(*Id.* 17).

Defendants' Counterclaim explains that on February 8, 2010, Live Nation sent Cohl a letter ("Feb. 8 Letter"), which states:

> This letter is formal notice, pursuant to Section 1.9(b) of the [Letter] Agreement, that Live Nation has determined, in its reasonable judgment, that you will be unable to successfully negotiate the acquisition of the rights to promote the next Rolling Stones tour.

Case No. 10-24144-CIV-ALTONAGA/Simonton

> Therefore, as provided in Section 1.9(b) of the [Letter] Agreement, Live Nation now has the free and unfettered right to hereafter bid or seek to obtain directly the right to promote the next concert tour of the Rolling Stones, whenever that may occur, for its own account without any duty to share, co-promote or jointly pursue with Cohl any such rights that Live Nation may acquire.

("Feb. 8 Letter" 27 [ECF No. 8-1]). According to Defendants, Live Nation's February 8 Letter was Live Nation's first and only communication to Cohl regarding Live Nation's assertion "that Cohl will be unable to successfully negotiate the rights to promote the concert tour of any Cohl Relationship Artist." (Countercl. ¶ 23). Defendants also allege Live Nation "made no effort whatsoever to discuss any concerns that it purportedly had regarding Cohl's ability to acquire the rights to the Rolling Stones' next tour." (*Id.*).

Subsequently, on February 10, 2010, Live Nation's Executive Vice President, Michael Rowles, sent an email to Cohl attempting to "clarify [Live Nation's] position" in the February 8 Letter. The email stated:

> Michael, to clarify our position in my letter of February 8, you are not precluded from trying to acquire the rights to the next RS tour. Just as before my letter, you may seek those tour rights as long as you comply with the terms of the September 2008 letter agreement. Those terms include, without limitation, the language in Section 1.4(a) which only permits you to pursue the promotion of this tour in participation with us and upon terms that we have reasonably approved. Therefore, should you decide to try to acquire the rights to the next RS tour, you must either obtain our approval of any bids prior to submitting them to the band or you must be sure that the band is aware that any such bid is subject to subsequent approval and change. . . .

("Feb. 10 Email" 29 [ECF No. 8-1]).

Defendants' counsel responded to Live Nation's letters with correspondence dated February 12, 2010 in which Defendants indicated their displeasure with Live Nation's communications and informed Live Nation that Defendants believed Live Nation's actions violated the Letter Agreement. (*See* "February 12 Letter" 31–34 [ECF 8-1]). Live Nation responded on February 23, 2010 with a

6

Case No. 10-24144-CIV-ALTONAGA/Simonton

letter which claimed Defendants' February 12 Letter had mischaracterized the contractual provisions. (*See* Feb. 23 Letter 36–37 [ECF No. 8-1]).  In addition, in its February 23 Letter, Live Nation proposed an amendment to the Letter Agreement, which Defendants did not accept.

During the time period when this correspondence was being exchanged, no Rolling Stones Tour was available for bid. (*See* Countercl. ¶ 31).  Shortly thereafter, the Rolling Stones began entertaining bids for a potential tour in 2011. (*See id.* ¶ 31).  According to the Defendants, during the latter half of 2010, Cohl met with members of the Rolling Stones and was expressly invited to bid for tour promotional rights. (*See id.*).

In their Counterclaim, Defendants allege Live Nation "has attempted to interfere with and destroy Cohl's potential to procure the promotion rights to the Rolling Stones' future tours." (*Id.* ¶ 32). Specifically, they claim Live Nation "communicated to representatives of the Rolling Stones that Cohl and Live Nation were in a dispute" and "denigrated Cohl to representatives of the Rolling Stones in an additional attempt to damage the ability of Cohl to once again obtain the tour promotional rights." (*Id.*).  As a result, the Rolling Stones informed Cohl and his counsel that they perceived a "spat" developing between Cohl and Live Nation and they did not want to get dragged into the middle of such a dispute. (*Id.*).  Consequently, Defendants allege that, as a result of Live Nation's conduct, they have been damaged.

Defendants assert claims for breach of contract (Count I) and breach of the covenant of good faith and fair dealing (Count II) against Live Nation.  In the present Motion, Live Nation contends it cannot be liable for the counterclaims alleged because Defendants do not identify a provision in the Letter Agreement that Live Nation has breached. (*See* Mot. 6–7).  Additionally, Live Nation maintains Defendants have not been damaged by any of the alleged breaches because the damage

7

Case No. 10-24144-CIV-ALTONAGA/Simonton

alleged by Defendants — losing the right to promote the next Rolling Stones tour — has not occurred. (*See id.* 7).

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 129 S. Ct. at 1950 (citing *Twombly*, 550 U.S. at 556). To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949 (citing *Twombly*, 550 U.S. at 556). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citing *Iqbal*, 129 S. Ct. at 1949).

When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). But pleadings that "are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 129 S. Ct. at 1950; *see also Sinaltrainal*, 578 F.3d at 1260 ("'[U]nwarranted deductions of fact' in a complaint

8

are not admitted as true for the purpose of testing the sufficiency of plaintiff's allegations.").

## III. ANALYSIS

**A. Breach of Contract (Count I)**

To state a claim for breach of contract under Florida law, a plaintiff must allege: "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *Friedman v. N.Y. Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. 4th DCA 2008)). Live Nation asserts Defendants have failed to sufficiently plead the second and third elements for a breach of contract claim. (*See* Mot. 6–7). Nevertheless, taking all well-pleaded facts as true, and viewing them in the light most favorable to Defendants, the allegations are sufficient to adequately set forth all three elements of a breach of contract claim. In particular, Defendants allege the existence of a contract (the Letter Agreement), that Live Nation breached its obligations under the contract by attempting to conduct direct negotiations with the Rolling Stones for its own benefit, and that Defendants have suffered damages as a result of Live Nation's actions. These allegations sufficiently provide Live Nation with fair notice of the claim and the grounds upon which it rests.

### 1. Material Breach

"A breach is material if it goes 'to the essence of the contract.'" *Modern Gaming, Inc. v. Malone*, No. 6:10-cv-182-Orl-28DAB, 2010 WL 724434, at *2 (M.D. Fla. Feb. 24, 2010) (quoting *Covelli Family, L.P. v. ABG5, L.L.C.*, 977 So. 2d 749, 752 (Fla. 4th DCA 2008)). Count I of the Counterclaim alleges Live Nation breached the Letter Agreement by depriving Defendants of the rights they paid for under the agreement — namely, the rights to: "(a) not have to bid against Live Nation for the Rolling Stones' next tour, (b) have Live Nation finance the tour, (c) have Live Nation

Case No. 10-24144-CIV-ALTONAGA/Simonton

perform the services of the 'Exclusive Global Promoter' of the tour, and (d) receive two-thirds of the promoters' profits from the tour." (Countercl. ¶ 35). In addition, Defendants claim Live Nation breached section 1.9(a) of the Letter Agreement by attempting to conduct direct negotiations with the Rolling Stones, failing to act in a manner that "will be helpful to Cohl's efforts in obtaining the rights to promote the concert tour," and failing to communicate with Cohl in good faith and provide "reasonable prior notice" of any basis or justification for its assertion that Cohl may not be successful in procuring the rights to the Rolling Stones tour. (*Id.* ¶ 36–38). Basically, Defendants claim they paid Live Nation for certain rights under the contract, and Live Nation subsequently interfered with Defendants' assertion of those rights.

Live Nation maintains that, with regard to the alleged deprivation of contractual rights and breach of contractual duties, no such rights are granted or duties imposed under the Letter Agreement. (*See* Mot. 9). Additionally, Live Nation maintains the allegedly improper conduct — Live Nation's bidding on the promotional rights for its own account — was expressly authorized under the Letter Agreement. (*See id.* 6).

Notwithstanding these assertions, it is clear the Letter Agreement does confer certain rights and benefits on Defendants, and the allegations of the Counterclaim, taken as true, adequately plead a breach of contract claim with regard to those rights and benefits. For example, Defendants allege Live Nation interfered with Defendants' rights under the Letter Agreement by attempting to conduct direct negotiations with the Rolling Stones for its own account. (*See* Countercl. 15). Defendants assert that, in doing so, Live Nation violated section 1.9 of the Letter Agreement, which allows Cohl to take the lead in negotiations with the Rolling Stones and requires Live Nation to provide reasonable notice to Defendants with regard to any determination that Cohl will be unable to

10

successfully negotiate the acquisition of rights prior to bidding on the tour for its own account. (*See id.*). Defendants claim Live Nation breached the Letter Agreement by failing to allow Cohl to take the lead in negotiating with the Rolling Stones and by not discussing with Cohl any concerns Live Nation had regarding Cohl's ability to negotiate and acquire rights for the Rolling Stones' next tour. These allegations adequately plead a material breach of the Letter Agreement.

**2. Damages Resulting from Breach**

Defendants allege that as a result of Live Nation's breach of the Letter Agreement, they have sustained monetary damages. Defendants indicate they are entitled to monetary damages (1) for being deprived of the benefit of their bargain under the Letter Agreement in connection with the Rolling Stones tour, (2) for lost profits in connection with the Rolling Stones tour, and (3) for the diminution in value of S2BN. (*See* Countercl. 15). Live Nation maintains, however, that the "damage [Defendants] allege — losing the right to promote the next Rolling Stones tour — has not occurred." (Mot. 7). In support of its contention, Live Nation points to a Rolling Stones press release issued in February 2011, in which the Rolling Stones indicate they have "no firm plans for tour at this time." (*Id.* (citing "Press Release" [ECF No. 23-1] 2)). Live Nation asserts that, as the press release evinces, the Rolling Stones have no plans to tour, and thus Defendants cannot claim they have suffered any injuries relating to the promotion of a Rolling Stones tour.

Admittedly there was no Rolling Stones tour available for bid at the time Live Nation sent the February 8 Letter. (*See* Countercl. ¶ 31) ("there was no tour available for bid in February 2010 when Live Nation announced its unwarranted conclusion that Cohl could not successfully acquire promotional rights."). Nonetheless, Defendants allege "the Rolling Stones thereafter began entertaining bids for a potential tour in 2011." (*Id.*). Specifically, during the second half of 2010,

11

Case No. 10-24144-CIV-ALTONAGA/Simonton

"Cohl met with various representatives of the Rolling Stones including Mick Jagger and Keith Richards, and was expressly invited to bid for tour promotional rights." (*Id.*). But as a result of Live Nation's actions, the Rolling Stones communicated to Cohl that they "perceived a 'spat' developing between Cohl and Live Nation and that they did not want to get dragged into the middle of such a dispute." (*Id.*).

Considering the allegations as a whole, Defendants have stated a plausible claim that they were damaged by Live Nation's breach of the Letter Agreement. The mere statement by the Rolling Stones that they have no firm plans for a tour[3] does not, at this stage in the proceedings, negate Defendants' claim of damages. That the Rolling Stones may not have made any *firm* plans does not mean they have not engaged in negotiations regarding promotional rights for potential tours. Moreover, Defendants' claim of reputational damages sustained as a result of Live Nation's breach is not dependent on whether or not the Rolling Stones have actual plans for a tour.

Count I of the Counterclaim contains sufficient information to withstand a motion to dismiss and to allow Live Nation to frame a responsive pleading.

**B. Breach of Covenant of Good Faith and Fair Dealing (Count II)**

"Under Florida law, every contract contains an implied covenant of good faith and fair dealing." *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005); *see also Cnty. of Brevard v. Miorelli Eng'g, Inc.*, 703 So. 2d 1049, 1050 (Fla. 1997). Nonetheless, a breach of the implied covenant "is not an independent cause of action, but attaches to the performance of a specific contractual obligation." *Id.*; *see also Burger King Corp. v. Weaver*, 169 F.3d 1310, 1316 (11th Cir. 1999) ("[A]n action for breach of the implied covenant of good faith

---

[3] In any event, this public statement, which is not attached to the pleading, cannot even be considered on a motion to dismiss for failure to state a claim.

12

Case No. 10-24144-CIV-ALTONAGA/Simonton

cannot be maintained [under Florida law] in the absence of breach of an express contract provision."). "To allege a breach of the implied covenant, the party must demonstrate a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence; but, rather by a conscious and deliberate act, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1319 (M.D. Fla. 2000) (quoting *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097–98 (Fla. 1st DCA 1999)).

Additionally, the implied covenant of good faith and fair dealing is a "gap-filling default rule" that is "usually raised when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards." *Publix Super Markets, Inc. v. Wilder Corp. of Del.*, 876 So. 2d 652, 654 (Fla. 2d DCA 2004); *see also Cox*, 732 So. 2d at 1097 (noting the covenant limits a party's ability to act capriciously when exercising its discretion); *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1291 (11th Cir. 2001) ("[O]ne party cannot capriciously exercise discretion accorded it under a contract so as to thwart the contracting parties' reasonable expectations."). In other words, "'where the terms of the contract afford a party substantial discretion to promote that party's self-interest, the duty to act in good faith nevertheless limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.'" *Abels v. JPMorgan Chase Bank, N.A.*, 678 F. Supp. 2d 1273, 1278 (S.D. Fla. 2009) (quoting *Cox*, 732 So. 2d 1097–98). Still, "the limit placed on a party's discretion is not great. As the Florida Second District Court of Appeal has stated, 'Unless no reasonable party . . . would have made the same discretionary decision . . . , it seems unlikely that [the party's] decision would violate the covenant of good faith . . . '" *Ernie Haire Ford*, 260 F.3d at 1291

13

(alteration in original) (quoting *Sepe v. City of Safety Harbor*, 761 So. 2d 1182, 1185 (Fla. 2d DCA 2000)).

Defendants do not expressly link the claim of breach of the implied covenant to any specific contractual provision, and thus Count II necessarily fails. Presumably, Defendants intended to claim Live Nation violated the covenant by exercising its discretion under section 1.9 arbitrarily and capriciously.[4] Under section 1.9(b) of the Letter Agreement, Live Nation, "after providing reasonable notice to Cohl, [has] the free and unfettered right to thereafter bid or seek to obtain directly the right to promote any such concert for its own account" if, "in its reasonable judgment," Live Nation determines "Cohl will be unable to successfully negotiate the acquisition of the rights to promote the concert tour." (Letter Agreement 17). This provision of the Letter Agreement grants Live Nation discretion to make a determination regarding Cohl's ability to successfully negotiate the rights to promote the Rolling Stones concert, and, if it determines Cohl will be unsuccessful, discretion to bid or seek to obtain the right for its own account. Because the Letter Agreement does not provide any standards to determine the reasonableness of Live Nation's exercise of its discretion under section 1.9 — other than to require the exercise of "reasonable judgment" — the covenant of good faith and fair dealing might be invoked to serve as a gap-filler.

For instance, in the February 8 Letter, Live Nation informed Defendants it had determined Cohl would be unsuccessful in negotiating the rights for the Rolling Stones tour. The covenant of

---

[4] In Defendants' Response in Opposition to Live Nation's Motion to Dismiss Counterclaim ("Response") [ECF No. 33], they attempt to clarify that the breach of good faith claim refers to Live Nation's capricious exercise of discretion in sending the February 8 Letter "without having or providing a reasonable basis to justify its false assertion that Cohl would not be able to successfully acquire rights to promote a Rolling Stones tour" as required by section 1.9. (Resp. 11). This reference is not evident in the Counterclaim.

good faith and fair dealing could be properly invoked by Defendants to claim Live Nation capriciously exercised the discretion accorded to it under section 1.9. This would be a cognizable claim if Defendants alleged Live Nation's reason for exercising that discretion was not founded on any agreed-to conditions contained in the Letter Agreement. In other words, if Defendants alleged Live Nation's determination that Cohl would be unsuccessful in negotiations with the Rolling Stones was "based on whim, caprice, or some other arbitrary consideration," then Defendants could claim Live Nation's action was a breach of the implied covenant of good faith and fair dealing. *Merrill Lynch Bus. Fin. Servs., Inc. v. Performance Mach. Sys. U.S.A., Inc.*, No. 04-60861-CIV, 2005 WL 975773, at *10 (S.D. Fla. Mar. 4, 2005).

Essentially, to maintain a cause of action under the covenant, Defendants must plead that Live Nation was granted discretion under a *specific provision* of the Letter Agreement, Live Nation *arbitrarily* exercised that discretion, and "no reasonable party would have made the same discretionary decision." *Merrill Lynch*, 2005 WL 975773, at *10 n.7 (citing *Ernie Haire Ford*, 260 F.3d at 1291). As presented, Count II fails to state a claim for breach of the implied covenant of good faith and fair dealing.[5]

---

[5] Even if the claim is amended and properly pleaded, the count may still be dismissed as redundant if the conduct violating the implied covenant is duplicative of the conduct underlying the breach of contract claim. *See Shibata*, 133 F. Supp. 2d at 1319 (collecting cases). "[A] party can maintain a claim for breach of the implied duty only if it is based on allegations different than those underlying the accompanying breach of contract claim." *Id.*; *see also Merrill Lynch*, 2005 WL 975773, at *11; *Long v. Murray*, No. 6:09-cv-1320-Orl-19DAB, 2009 WL 4042961, at *6 (M.D. Fla. Nov. 20, 2009). "If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." *Shibata*, 133 F. Supp. 2d at 1319; *see also Amica Mut. Ins. Co. v. Morowitz*, 613 F. Supp. 2d 1358, 1362 (S.D. Fla. 2009) (dismissing breach of implied warranty of good faith and fair dealing claim because the plaintiff made no distinct factual allegations that differentiated the breach of implied warranty and breach of contract claims)*; Enola Contracting Servs. Inc. v. URS Grp., Inc.*, No. 5:08cv2-RS-EMT, 2008 WL 1844612 (N.D. Fla. Apr. 23, 2008) (dismissing a claim for breach of the implied covenant as redundant to the breach of contract claim where the factual allegations underlying the

Case No. 10-24144-CIV-ALTONAGA/Simonton

## IV. CONCLUSION

Based on the foregoing, it is

**ORDERED AND ADJUDGED** that Plaintiff, Live Nation's Motion to Dismiss **[ECF No. 23]** is **GRANTED in part** and **DENIED in part**. Count II of the Counterclaim is **DISMISSED without prejudice**. Live Nation's Motion with respect to Count I is **DENIED**. Defendants have until **April 11, 2011** to file an amended counterclaim.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 4th day of April, 2011.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record

---

claims were identical).

    Here, a claim alleging breach of the implied covenant of good faith and fair dealing would likely be redundant. This is because section 1.9 of the Letter Agreement incorporates a good faith requirement into Live Nation's exercise of discretion under that provision. Section 1.9(b) requires Live Nation to exercise "reasonable judgment" in making its determination regarding Cohl's ability to negotiate the Rolling Stones' tours. By requiring Live Nation to use reasonable judgment, the Letter Agreement transforms the *implied* covenant of good faith, which would otherwise apply to that provision, into an *express* term of the contract. Consequently, any breach of the implied covenant would also constitute a breach of contract.