UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-CIV-24144-CMA

LIVE NATION WORLDWIDE, INC.,

       Plaintiff/Counterdefendant,

v.

MICHAEL COHL and S2BN
ENTERTAINMENT CORPORATION
(f/n/a EVENTS ACQUISITION CORP.),

       Defendants/Counterclaimants.

_____/

## COHL PARTIES' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendants/Counterclaimants Michael Cohl ("Cohl") and S2BN Entertainment Corporation (collectively, "Cohl Parties"), by and through undersigned counsel, hereby submit their proposed Findings of Fact and Conclusions of Law:

### I.  Findings of Fact

1.      Cohl is a well established live music concert promoter.  He has worked in the concert promotion industry for over 40 years.  His clients have included Rolling Stones, U2, Pink Floyd, Frank Sinatra, Barbra Streisand, Stevie Wonder, Prince, The Who, Phil Collins/Genesis, and Crosby, Stills, Nash & Young.  He is responsible for promoting several of the top-grossing concert tours of all time and has promoted every Rolling Stones tour since 1989, the most recent of which was the "A Bigger Bang Tour" that began in 2005 and had its last leg in 2007.  By November 2006, that tour had been declared the highest grossing tour of all time.

2.      After having served as Chairman of the Board of Directors of Live Nation, Inc., the corporate parent of Plaintiff/Counterdefendant Live Nation Worldwide, Inc. (collectively,

COFFEY BURLINGTON

OFFICE IN THE GROVE, PENTHOUSE    2699 SOUTH BAYSHORE DRIVE    MIAMI, FLORIDA 33133
T: 305.858.2900    F: 305.858.5261
Email: info@coffeyburlington.com    www.coffeyburlington.com

"Live Nation"), and as the head of Live Nation's Artist Nation Division, Cohl was terminated without cause and resigned those positions effective June 20, 2008.

3.     Cohl Parties and Live Nation thereafter entered into a Letter Agreement dated September 22, 2008, pursuant to which Cohl bought various assets and rights from Live Nation and where partial relief from pre-existing restrictive covenants was obtained by him.

4.     Section 1.3(b)(ii) of the Letter Agreement identifies four "Cohl Relationship Artists" or "CRAs" – Rolling Stones, Barbra Streisand, Pink Floyd and Genesis – for which Cohl received partial relief from his restrictive covenants, in that, among other things, Cohl could co-promote with Live Nation the live concert tours of the CRAs.  As part of the contractual co-promotion, § 1.4(b) of the Letter Agreement requires Live Nation to provide 100% of the financing for any co-promoted concert tour and § 1.4(a) requires it to perform the services of an "Exclusive Global Promoter."

5.     Rolling Stones are treated differently than the other CRAs and more advantageously to Cohl in the Letter Agreement, as Cohl receives 66-2/3% of the profits from a Rolling Stones tour (Cohl's share of the profits for the other CRAs is either 40% or 45%) and, while Live Nation can approve or disapprove the financial terms and other material agreements related to the promotion of concerts for the other CRAs in its sole and absolute discretion, its approval cannot be unreasonably withheld with regard to Rolling Stones.

6.     Cohl negotiated more advantageous treatment with regard to Rolling Stones because, from his perspective, the partial relief from the restrictive covenants as they pertained to promotion of a Rolling Stones concert tour was the most valuable asset being obtained by him in the Letter Agreement, and he wanted to restrict Live Nation's ability to frustrate his rights through unreasonable actions.

2

COFFEY BURLINGTON

OFFICE IN THE GROVE, PENTHOUSE   2699 SOUTH BAYSHORE DRIVE   MIAMI, FLORIDA 33133
T: 305.858.2900    F: 305.858.5261
Email: info@coffeyburlington.com    www.coffeyburlington.com

7.     For its part, Live Nation was agreeable to the different treatment with regard to Rolling Stones because it believed it had a much greater chance of securing rights to the next Rolling Stones concert tour by co-promoting with Cohl and because, having been involved in support of Cohl in prior Rolling Stones concert tours, Live Nation was comfortable with the parameters of the likely financial arrangements.  Indeed, 100% of the reason that Live Nation previously paid approximately $100,000,000 to acquire Cohl's business in 2006 and 2007 was profits to be generated from promoting Rolling Stones tours.

8.     Not only does the Letter Agreement provide Cohl with the ability to co-promote concert tours for the CRAs, but also its § 1.9 speaks to the nature and manner in which Cohl and Live Nation will interact with the CRAs and each other regarding negotiating tour rights. Section § 1.9(a) establishes that it is the parties' intent that **Cohl will, as long as he is alive and able to do so, generally take the lead in conducting negotiations** with each of the CRAs in an effort to procure the rights to promote each concert tour.  Additionally, as Cohl negotiates the acquisition of the rights to promote the concert tour of any CRA, he is required to remain in constant communication with Live Nation's touring division head to advise of the terms under negotiation so that it can provide input and advice concerning the financial terms under negotiation.  Finally, Live Nation is only permitted to have discussions with any CRA or their management in regard to the promotion rights for any proposed concert tour as Live Nation may believe, **in good faith, will be helpful to Cohl's efforts** in obtaining the rights to promote the concert tour.

9.     Therefore, under the Letter Agreement, Live Nation was contractually bound to be Cohl's co-promoter and financier (unless, with regard to Rolling Stones, it reasonably withheld approval of the financial terms and other material agreements), and it agreed to allow

3

COFFEY BURLINGTON

OFFICE IN THE GROVE, PENTHOUSE    2699 SOUTH BAYSHORE DRIVE    MIAMI, FLORIDA 33133
T: 305.858.2900    F: 305.858.5261
Email: info@coffeyburlington.com    www.coffeyburlington.com

him to take the lead in conducting negotiations with the CRAs and to only communicate with the CRAs in a manner supportive to his efforts.  Cohl has been alive and able to take the lead in conducting negotiations with Rolling Stones in an effort to procure rights to promote a concert tour at all times since the effective date of the Letter Agreement.

10.  Michael Rapino, Live Nation's President and Chief Executive Officer, understands the Letter Agreement to provide that Cohl is to be the point of communication with the CRAs and that Live Nation is to stand back in second position.

11.  Section 1.9(b) of the Letter Agreement only permits Live Nation to seek to obtain directly the right to promote a concert tour of a CRA for its own account, without any duty to share or co-promote with Cohl, if it determines, **in its reasonable judgment, that Cohl will be unable, for any reason, to successfully negotiate the acquisition of the tour rights**. Furthermore, Live Nation must provide Cohl with reasonable prior notice before seeking to obtain directly those rights.

12.  The Letter Agreement is governed by, and construed in accordance with, Florida law.

13.  In February 2009, Live Nation announced a planned merger with Ticketmaster, which was run by Irving Azoff.  The merger closed on January 25, 2010 and Azoff thereafter became Chairman of the Board of Directors of the merged Live Nation.

14.  In the time period between announcement of the merger and its approval nearly a year later, Live Nation asserts that a privileged attorney/client relationship existed between its general counsel and Azoff as concerns communications relating to Cohl Parties.  Any management agreement that Azoff was able to obtain during the period after the merger was announced but before its approval was an asset of the merged Live Nation.

COFFEY BURLINGTON

OFFICE IN THE GROVE, PENTHOUSE   2699 SOUTH BAYSHORE DRIVE   MIAMI, FLORIDA 33133
T: 305.858.2900   F: 305.858.5261
Email: info@coffeyburlington.com   www.coffeyburlington.com

15.     Azoff has never seen the Letter Agreement and has never been briefed on its specifics, although it was his understanding that it provided that, if Live Nation "had good reason to believe that others were going to be allowed to bid on the tour [of a CRA], Live Nation could make its own bid" in competition with Cohl.  When Azoff asked Rapino in May and June 2009 whether he could "go after" the Rolling Stones, Rapino did not give Azoff any more guidance other than to tell him to go ahead and speak with Mick Jagger, one of the founding members of the band.  The e-mailed summary of the Letter Agreement that Rapino then provided to Azoff was incorrect and incomplete in a number of ways – it understated the percentage that Cohl would receive from a Rolling Stones tour and mentioned nothing about the Letter Agreement's provisions regarding communications with CRAs and their management.

16.     By June 2009, Azoff had already started his fervent pursuit of the Rolling Stones. By October 2009, Azoff was communicating on a nearly daily basis with Joyce Smyth, the lawyer for Jagger, regarding Rolling Stones business.  In so doing, Azoff was acting as an agent of Live Nation.

17.     While Azoff testified that he was pursuing the position of Rolling Stones manager, Rapino testified that "when you are managing the Rolling Stones, probably 99 percent of what you are going to talk about with the band and Joyce [Smyth] and others is what the tour plan is going to be."   Azoff acknowledges that "touring is obviously a big part of a management relationship with any artist" because touring is "where the money is." As stated by Live Nation's general counsel, "managers are intimately involved in the touring of their artists."

18.     Shelley Lazar, the president of Live Nation's VIP ticketing division, understood as early as July 2009 that Azoff was pursuing a concert touring deal through his communications with Smyth.  In July 2009, soliciting Rolling Stones tour proposals came up in conversations

COFFEY BURLINGTON

OFFICE IN THE GROVE, PENTHOUSE   2699 SOUTH BAYSHORE DRIVE   MIAMI, FLORIDA 33133
T:  305.858.2900    F:  305.858.5261
Email:  info@coffeyburlington.com    www.coffeyburlington.com

between Azoff and Smyth and that same month, Azoff reported to Rapino and Arthur Fogel, Live Nation's Chief Executive Officer of Global Touring, that a record company executive who owned the Rolling Stones recorded music catalogue told the band "to hire me **to do the touring**." Documents reflect that Azoff made tour pitches to Smyth in August and September 2009.

19.     By June 2009, Fogel had some measure of concern that there might be trouble for Cohl in connection with any future Rolling Stones tour. Fogel does not recall the source of his concern, but it did not come from the Rolling Stones or their representatives. In fact, Bill Zysblat, the business manager of Keith Richards (another founding member of the band), told Fogel at that time that Cohl was "absolutely not in trouble on tour." At the same time, Rapino was getting worried because he heard rumors that AEG – Live Nation's primary competitor for concert promotions – was pursuing the Rolling Stones.

20.     Cohl was not informed by anyone at Live Nation (his contractual co-promoter) about any of Azoff's communications with Smyth or anyone else with the Rolling Stones or their management concerning or relating to the Rolling Stones and issues regarding concert tours. Cohl was also not informed by anyone at Live Nation (at least prior to February 8, 2010) about any concerns that Live Nation might have had about Cohl's ability to successfully negotiate the acquisition of Rolling Stones tour rights.

21.     Despite having no communications with Cohl on the subject, Live Nation began considering in July 2009 sending a notice to him pursuant to § 1.9(b) of the Letter Agreement announcing that it had determined, in its reasonable judgment, that Cohl was unable to successfully negotiate the acquisition of Rolling Stones tour rights and that it would seek to obtain directly the right to promote a Rolling Stones concert tour for its own account, without

COFFEY BURLINGTON

OFFICE IN THE GROVE, PENTHOUSE    2699 SOUTH BAYSHORE DRIVE    MIAMI, FLORIDA 33133
T: 305.858.2900    F: 305.858.5261
Email: info@coffeyburlington.com    www.coffeyburlington.com

any duty to share or co-promote with Cohl. Rather than provide such notice to Cohl, Azoff continued to have what became nearly daily communications with Smyth – communications not disclosed to Cohl – before the notice was sent over six months later.

22.    During this time when Live Nation was considering sending the § 1.9(b) notice letter, Fogel was advising Rapino to "think about RS [Rolling Stones] revenge," by which he meant that Cohl would not be involved as co-promoter and Live Nation would promote a tour alone.

23.    While Azoff was having nearly daily communications with Smyth that were not disclosed to Cohl, he was expressing concern to Rapino and Fogel about if Cohl had "surfaced" and to make sure that no one tipped Cohl off or that he heard anything. Azoff viewed Cohl as his competitor – suggesting in October 2009 that it was "game on" between Live Nation and Cohl, and that Cohl was "not winning." However, at that time, there was not supposed to be competition between Live Nation and Cohl. Instead, they were to be co-promoters and Live Nation was only supposed to act in a manner helpful to Cohl's efforts in the lead negotiating position.

24.    While the Letter Agreement requires Cohl not to publicly disclose it, Azoff revealed to Smyth in 2009 that there was a contractual arrangement between Cohl and Live Nation regarding bidding on Rolling Stones tour rights. Smyth discussed that matter in greater detail with Live Nation's general counsel on February 3, 2010 and was displeased that Cohl had not divulged the arrangement to her.

25.    When Live Nation sent its February 8, 2010 notice to Cohl pursuant to § 1.9(b) of the Letter Agreement announcing that it had purportedly "determined, in its reasonable judgment, that [Cohl] will be unable to successfully negotiate the acquisition of the rights to

promote the next Rolling Stones tour", Fogel had not communicated in anyway with anyone from the Rolling Stones or their management regarding Cohl or touring, Michael Rowles (Live Nation's general counsel) and Rapino had each had only a single phone conversation with Smyth (Jagger's lawyer), and Azoff's communications regarding Cohl had been only with Smyth.

26.     Rolling Stones operate essentially as two camps.  There is a Jagger/Smyth camp and a Richards/Jane Rose (Richards' personal manager) camp, and, according to the testimony of Live Nation's officers, the two camps say different things.  No one individual member of the band has decision-making authority and Jagger, Richards and Charlie Watts (the other founding band member) each has veto power.  As of February 8, 2010 (and since), Smyth – the one point of contact for Live Nation regarding Cohl's prospects for acquisition of Rolling Stones tour promotion rights (even though her position is that of Jagger's lawyer) – had not conveyed to anyone at Live Nation that Cohl was unable to successfully negotiate the acquisition of Rolling Stones tour rights.  Lazar, who has been in contact with a wide range of Rolling Stones members and management, has had no indication from Jagger, Richards, Watts, Smyth or Rose that any of them are unwilling to work with Cohl on a future Rolling Stones tour.

27.     As opposed to informing Live Nation that Cohl would be unable to successfully negotiate the acquisition of Rolling Stones tour rights, the sentiment that Smyth conveyed to Azoff and Rowles was that the Rolling Stones wanted the unfettered right to speak with whomever they wanted regarding touring, including Live Nation.  Smyth conveyed the same to Cohl shortly after February 8, 2010.  Of course, Cohl paid Live Nation millions of dollars for it to forego seeking to obtain CRA tour promotion rights on its own account so long as he was alive and able to lead in negotiations.

28.     Not only did Smyth inform Cohl that she did not express to Live Nation that he would be unable to successfully negotiate the acquisition of Rolling Stones tour rights, but also, in the same time period, Richards informed Cohl that he had also not said anything like that to anyone.  Rather, Richards told Cohl that, should there be another Rolling Stones tour, he "did not want to change horses at this late stage" and Cohl was the only person whom he would want selected as promoter, but that Richards was being told that Cohl's agreement with Live Nation prevented him from being the promoter.  Cohl had discussions later in 2010 with Jagger and Rose, and they both also told him that they, too, had not informed Live Nation that he would be unable to successfully negotiate the acquisition of Rolling Stones tour rights.  To date, no one in the Rolling Stones camp has communicated concern to Cohl about his ability to secure the rights to a future Rolling Stones tour.

29.     At the time that Live Nation sent its February 8, 2010 notice to Cohl announcing that it had purportedly determined, in its "reasonable judgment," that Cohl was unable to successfully negotiate the acquisition of Rolling Stones tour rights, there was no Rolling Stones tour even available for bid.

30.     Rapino acknowledges that, under § 1.9(b) of the Letter Agreement, Cohl could be pushed aside by Live Nation only if it reasonably concluded that he was unable to acquire Rolling Stones tour rights, not that there was going to be competition or open bidding for those rights. Notwithstanding this recognition, Rapino (who dealt directly with Cohl regarding the creation of this provision) contends that Live Nation wanted § 1.9(b) included in the Letter Agreement because if it concluded that Cohl is "not in pole position" or that a Rolling Stones tour was "going to market," Live Nation would be able to pursue the tour rights on its own.  In Rapino's view, the provision allows Live Nation to pursue the tour rights on its own if he wakes

COFFEY BURLINGTON

OFFICE IN THE GROVE, PENTHOUSE   2699 SOUTH BAYSHORE DRIVE   MIAMI, FLORIDA 33133
T: 305.858.2900   F: 305.858.5261
Email: info@coffeyburlington.com   www.coffeyburlington.com

up and believes for whatever reason that Live Nation has a better shot going directly to the Rolling Stones and that Cohl is not needed.

31.     Open market bidding for Rolling Stones tour rights is something with which Cohl had to contend each time that the band granted him those rights over the past 20 years.  Azoff, in fact, testified that Cohl informed him in 2009 that the Rolling Stones "dance with others but they always come back to me."

32.     Not only was Cohl not given prior notice of Live Nation's purported concerns about his ability to successfully negotiate the acquisition of the rights to promote the next Rolling Stones tour before the February 8, 2010 notice letter was sent to him, but Live Nation also never identified to Cohl the basis for its claimed reasonable determination that Cohl would be unable to win those rights, even though it does not have sole and absolute discretion in making that determination.  From Live Nation's perspective, however, it is only Live Nation that decides whether its determination was, in fact, reasonable.

33.     Rather than perceiving Cohl as being unable to successfully negotiate the acquisition of the rights to promote the next Rolling Stones tour, Azoff instead thinks that the only three realistic contenders to acquire those rights are Live Nation, AEG **and Cohl**.

34.     Subsequent to the February 8, 2010 notice letter, Azoff testified that Smyth was giving him mixed messages about what the Rolling Stones wanted to do with regard to Cohl.  It was Azoff's belief in June 2010 that Cohl would end up being selected by the Rolling Stones as the tour director.  Indeed, as far as selection of a tour promoter is concerned, Azoff understood that "it's never over until the fat lady sings in Rolling Stones land.  So I have no idea" who was in or out as a contender to be the promoter.

COFFEY BURLINGTON

OFFICE IN THE GROVE, PENTHOUSE    2699 SOUTH BAYSHORE DRIVE    MIAMI, FLORIDA 33133
T: 305.858.2900    F: 305.858.5261
Email: info@coffeyburlington.com    www.coffeyburlington.com

35.     In July 2010, some five months **after** Live Nation sent to Cohl its February 8, 2010 notice letter, Cohl was expressly invited by Smyth to present a bid for the promotion rights to a potential Rolling Stones tour.  As requested, Cohl submitted a Rolling Stones tour promotion proposal in August 2010.

36.     Live Nation did not exercise reasonable judgment when it announced a determination on February 8, 2010 that Cohl will be unable to successfully negotiate the acquisition of the rights to promote the next Rolling Stones tour.

37.     Although Cohl outlined preliminary tour concepts to the Rolling Stones members in June 2009, there were never any terms under negotiation and Cohl had no negotiations in that year (or the first half of 2010) for the acquisition of the rights to promote a Rolling Stones tour, and no financial terms were under negotiation.  Indeed, given the historical frequency of Rolling Stones tours, there was absolutely no prospect of there being a tour subject to negotiation in that time period.  Had the Rolling Stones expressed any interest in touring at that time and had they wanted to discuss financial terms, Cohl would have communicated with the appropriate individuals at Live Nation as he negotiated the acquisition of the rights to promote the concert tour to advise of the terms under negotiation so that Live Nation could provide input and advice concerning the financial terms under negotiation.  That was the precise approach used by Cohl in 2010 in connection with negotiations for the acquisition of the touring rights for Barbra Streisand (another CRA), which approach was approved by Fogel.  Additionally, while Live Nation was aware at the time of Cohl's submission to the Rolling Stones in June 2009, it never voiced any complaint to him about his having done so.

38.     Because Cohl Parties were unaware at the time of Live Nation's secret communications with Smyth and Jagger that prevented Cohl from taking the lead in negotiations

COFFEY BURLINGTON
OFFICE IN THE GROVE, PENTHOUSE   2699 SOUTH BAYSHORE DRIVE   MIAMI, FLORIDA 33133
T:  305.858.2900   F:  305.858.5261
Email:  info@coffeyburlington.com     www.coffeyburlington.com

and which were not helpful to Cohl's ability to obtain the tour rights, Cohl Parties made payment to Live Nation of $5,000,000 in October 2009 called for under the Letter Agreement. However, Cohl Parties refused to make payment to Live Nation of $5,350,000 in October 2010 called for under the Letter Agreement because of Live Nation's prior breaches of the terms of the Letter Agreement. Cohl Parties would not have made the payment in October 2009 had they known at that time of Live Nation's secret communications with Smyth and Jagger.

39.     Rolling Stones have not announced any plans for a future tour and no promoter has been selected for a future Rolling Stones tour. Cohl remains a viable bidder for the rights to a future Rolling Stones tour.

40.     Cohl has never been the manager of the Rolling Stones or any of the band members. Cohl has never sought or desired to be the manager of the Rolling Stones or any of the band members. Cohl has never held himself out as the manager of the Rolling Stones or any of the band members.

41.     Having sent the February 8, 2010 notice letter, it is Live Nation's position that it is free to compete with Cohl in regard to the acquisition of Rolling Stones tour rights.

42.     The total compensation of $15,350,000 to be paid by Cohl Parties to Live Nation under the Letter Agreement was established without any allocation between the "Purchased Assets" and the non-compete relief. Live Nation later determined the allocation based on its own accounting and tax concerns. That allocation has no relationship to the relative values of the "Purchased Assets" and the non-compete relief. As late as October 7, 2008, on Live Nation's fourteenth draft of the Letter Agreement, there was no allocation between the "Purchased Assets" and the non-compete relief, and on October 13, 2008, Live Nation's seventeenth draft of the Letter Agreement allocated $10,500,000 of the total compensation to non-compete relief.

CASE NO. 10-CIV-24144-CMA

43.     The "Purchased Assets" under the Letter Agreement had little value and Live Nation viewed them as misfits, non-core, a drastic drag on earnings and money losers, as Rapino represented to the investment community in November 2008.  Rapino also suggested to Azoff that all $15,000,000-plus paid by Cohl was for non-compete relief.

44.     Cohl would not have entered into the Letter Agreement and acquired the "Purchased Assets" if he did not obtain non-compete relief as to the Cohl Relationship Artists, particularly the Rolling Stones.  It was one interrelated transaction.

45.     The interrelationship between the "Purchased Assets" and the non-compete relief in the Letter Agreement is reflected in the fact that the "first bucket" of activities for which Cohl obtained non-compete relief is the operation of the "Purchased Assets."

46.     The transactions between Cohl Parties and Live Nation memorialized in the Letter Agreement include not only the "Purchased Assets" and the non-compete relief, but also the business opportunities known as the Fontainebleau concept and the Getty Images Concept, the assignment of responsibilities for various employees and office space, and the assignment of stock.

47.     Rowles sent a draft declaration to Smyth for her to execute, but she never signed it.

## II.   Conclusions of Law

1.      Live Nation breached the Letter Agreement.  A breach of contract is material if it goes "to the essence of the contract."  *Modern Gaming, Inc. v. Malone*, 2010 WL 724434, at *2 (M.D. Fla. Feb. 24, 2010), *quoting Covelli Family, L.P. v. ABG5, LLC*, 977 So. 2d 749, 752 (Fla. 4th DCA 2008).

COFFEY BURLINGTON

OFFICE IN THE GROVE, PENTHOUSE   2699 SOUTH BAYSHORE DRIVE   MIAMI, FLORIDA 33133
T: 305.858.2900   F: 305.858.5261
Email: info@coffeyburlington.com   www.coffeyburlington.com

2.      Live Nation breached four material, express provisions of the Letter Agreement: 1) it did not exercise reasonable judgment when it announced a determination on February 8, 2010 that Cohl will be unable to successfully negotiate the acquisition of the rights to promote the next Rolling Stones tour; 2) it did not allow Cohl to take the lead in conducting negotiations with the Rolling Stones; 3) it did not limit itself to discussions with Rolling Stones management that it believed would be helpful to Cohl's efforts; and 4) it did not provide Cohl with reasonable prior notice of any purported concerns Live Nation had regarding his ability to negotiate and acquire rights for the Rolling Stones' next tour.

3.      Section 1.9 of the Letter Agreement incorporates a good faith requirement into Live Nation's exercise of discretion under that provision.  *See, e.g., Levin v. Lang*, 933 So. 2d 107, 109 (Fla. 3d DCA 2006) (in an action for specific performance of a real estate purchase contract, "reasonable diligence requires 'such actions as are consistent with good faith and appropriate in view of the circumstances'") (quotation omitted); *Batur v. Signature Properties of Northwest Florida, Inc.*, 903 So. 2d 985, 996-97 (Fla. 1st DCA 2005) (corporate custodian's investigation of shareholder's derivative claims was not "objectively reasonable" so as to warrant rejection of the claims); *Dyes v. Spick*, 606 So. 2d 700, 702 (Fla. 1st DCA 1992) (the requirement for a jury verdict to be reasonable "connotes the application of an objective standard"); *Doebereiner v. Sohio Oil Co.*, 893 F.2d 1275, 1276-77 (11th Cir. 1990) (although the term "reasonable", for purposes of the basis for franchise termination, is not expressly defined in the Petroleum Marketing Practices Act, "[r]easonable is defined as that which is fair, proper, just or moderate" and "the court should determine reasonableness and materiality from the standpoint of a neutral observer"); *Riddle v. Mobil Oil Corp.*, 1992 WL 81321 at *5 (M.D. Fla. Apr. 8, 1992) ("[i]n *Doebereiner*, the 11th Circuit adopted an objective reasonableness test").  *See also*

14

*In re Chateaugay Corp.*, 198 B.R. 848, 855 (S.D.N.Y. 1996) ("reasonable efforts" clause of agreement equates to requiring the exercise of "good faith business judgments"), *aff'd*, 108 F.3d 1369 (2d Cir. 1997).  Live Nation did not reach an objectively reasonable, good faith judgment when it announced on February 8, 2010 that it had determined that Cohl would be unable to successfully negotiate the acquisition of the rights to promote the next Rolling Stones tour.  The Court rejects Live Nation's attempt to twist an objective examination of its reasonable judgment into a subjective, essentially unreviewable test whereby, if Live Nation thinks its decision was reasonable, nothing more is required.  As stated above, the law stands in direct contravention to Live Nation's position.

4.     Live Nation is contractually required under § 1.9(b) to reach a reasonable judgment that Cohl is "**unable**" to acquire Rolling Stones tour rights, not that there would be competition for those rights from other bidders or that there might be difficulties that had to be overcome to acquire those rights.  In reaching its determination and claiming the right to seek promotion of a Rolling Stones tour for its own account, Live Nation (at best) completely failed to recognize that only the weighty standard of Cohl's utter inability to acquire the tour rights sufficed.[1]  Having made a judgment using the wrong standard, Live Nation cannot be found to have made a reasonable determination.

5.     Even if there was evidence that Live Nation's determination on February 8, 2010 was actually that Cohl was unable to acquire the rights to promote the next Rolling Stones tour, such a determination could not have been a product of reasonable judgment because no one ever said such a thing to Live Nation.

---

[1] In fact, the Court concludes that Live Nation consciously disregarded Cohl's contractual rights.

15

COFFEY BURLINGTON

OFFICE IN THE GROVE, PENTHOUSE   2699 SOUTH BAYSHORE DRIVE   MIAMI, FLORIDA 33133
T: 305.858.2900   F: 305.858.5261
Email: info@coffeyburlington.com   www.coffeyburlington.com

6.      To the extent that alleged, undocumented comments made by Smyth[2] and unidentified, unspecified "industry rumors" that there were problems in Cohl's relationship with the Rolling Stones or that others were seeking to obtain the tour rights[3] served as the basis for Live Nation's determination that Cohl was unable to acquire the tour promotion rights, it was plainly unreasonable and not in good faith to purport to rely on such vagaries without the slightest effort to inquire with Rolling Stones decision-makers (Smyth is Jagger's lawyer, not a member of the band) or Cohl himself.  Because it is undisputed that there were no efforts by Live Nation to either confirm with Rolling Stones members whether allegedly rumored problems with Cohl were accurate and, if so, had rendered him unable to obtain tour rights, or to raise any supposed concerns with Cohl himself, there is no credence to Live Nation's contention that its judgment was exercised reasonably.

7.      Furthermore, when Live Nation announced its unreasonable determination that Cohl would be unable to acquire Rolling Stones tour rights, there was no Rolling Stones tour even available for bid.  In other words, before there was even an announced tour or a bidding process in place, Live Nation determined that Cohl could not win that process.  The evidence is that reaching such a determination was categorically unreasonable.  The record bears out that

_____

[2] The alleged comments made by Smyth to Live Nation were, if made, expressed in the course of impermissible communications on the part of Live Nation that violated Cohl's contractual rights to take the lead in negotiations to procure Rolling Stones tour rights and for Live Nation's discussions with the band and its management to be limited to those helpful to Cohl.  The alleged comments are thus akin to evidence that is the fruit of a poisonous tree and are not an acceptable basis for any action by Live Nation.

[3] Rumors of others seeking to obtain Rolling Stones tour rights does not support a reasonable determination that Cohl was therefore unable to win those rights because it is undisputed that open market bidding for Rolling Stones tour rights is something with which Cohl had to contend each time that the band granted him those rights over the past 20 years, and something that would be expected for a band of the Rolling Stones' stature.

COFFEY BURLINGTON

OFFICE IN THE GROVE, PENTHOUSE    2699 SOUTH BAYSHORE DRIVE    MIAMI, FLORIDA 33133
T: 305.858.2900    F: 305.858.5261
Email: info@coffeyburlington.com    www.coffeyburlington.com

there was simply no reasonable basis for Live Nation's determination to seek to obtain Rolling Stones tour rights on its own behalf because of Cohl's supposed inability to acquire those rights.

8.      The lack of good faith and reasonableness exhibited by Live Nation is exemplified by its steadfast refusal to provide any reasons to Cohl resulting in its determination. It is undisputed that Live Nation never identified to Cohl the basis for its determination.

9.      Live Nation breached the Letter Agreement by not permitting Cohl to take the lead in negotiations in an effort to procure the rights to promote a Rolling Stones concert tour.

10.     The pertinent provision sets forth an intent of the parties that is highly deferential to Cohl's capacity to lead negotiations, requiring merely that he be "alive and able to do so," which standard has been met by Cohl.  With Cohl being denominated as the leader of negotiations, it was the intention of the parties for Cohl is to be the point of communication with the CRAs, and that Live Nation is to stand back in second position.  Rather than abide by its contractual commitment to allow Cohl to be the point of communication with the Rolling Stones and to have Live Nation sit in second position, Live Nation instead spent some eight months before the February 8, 2010 notice letter was sent conducting what became nearly daily communications with Smyth that concerned procuring Rolling Stones concert tour promotion rights for Live Nation.  Soon after agreeing to merge with Azoff's company, Rapino essentially unleashed Azoff in a full court press on Smyth, although Rapino did not bother to explain accurately to Azoff the terms of the Letter Agreement and failed to mention to him the provisions governing communications with CRAs.   Moreover, Azoff's ceaseless communications with Smyth were never disclosed to Cohl.  Live Nation's apparent excuse – that Azoff's communications with Smyth prior to February 8, 2010 supposedly did not violate its agreement that Cohl take the lead in negotiations in an effort to procure touring rights because

COFFEY BURLINGTON

OFFICE IN THE GROVE, PENTHOUSE   2699 SOUTH BAYSHORE DRIVE   MIAMI, FLORIDA 33133
T: 305.858.2900   F: 305.858.5261
Email: info@coffeyburlington.com   www.coffeyburlington.com

they only concerned Azoff's attempt to become the manager of the Rolling Stones – does not withstand scrutiny.

11.     As early as July 2009, Azoff was pursuing a concert touring deal through his communications with Smyth.  In July 2009, soliciting Rolling Stones tour proposals came up in conversations between Azoff and Smyth.  That month, in fact, Azoff reported to Rapino and Fogel that a record company executive who owned the Rolling Stones recorded music catalogue told the band "to hire me **to do the touring**" and documents reflect that Azoff made tour pitches to Smyth in August and September 2009.  In light of this evidence, credulity is strained beyond the breaking point by Live Nation's suggestion that, though Azoff was supposedly not communicating with Smyth about Rolling Stones touring, all of those communications were hidden from Cohl because he might have somehow been threatened by the presumably helpful prospect of his contractual co-promoter's merger partner becoming the manager of the Rolling Stones, particularly where it is undisputed that Cohl has never sought or desired to be the manager of the Rolling Stones or any of the band members.

12.     Cohl had the contractual right to take the lead in negotiations with the Rolling Stones and their management personnel related to touring, a right that Live Nation sold to him in 2008 because Live Nation believed it had a much greater chance of securing rights to the next Rolling Stones concert tour by co-promoting with Cohl.  Live Nation's decision to reverse course in secret once it had Azoff on board and have him then engage in those negotiations was all part of an eight-month course of action directed towards wrongfully removing from Cohl his contractual right to 66 2/3% of the profits to any future Rolling Stones tour.  That conduct breached § 1.9(a) of the Letter Agreement.

COFFEY BURLINGTON

OFFICE IN THE GROVE, PENTHOUSE   2699 SOUTH BAYSHORE DRIVE   MIAMI, FLORIDA 33133
T: 305.858.2900   F: 305.858.5261
Email: info@coffeyburlington.com   www.coffeyburlington.com

13.    Live Nation did not limit itself to discussions helpful to Cohl, and therefore breached the last sentence in § 1.9(a) of the Letter Agreement.  According to that sentence, Live Nation is only permitted to have discussions with any CRA or their management in regard to the promotion rights for any proposed concert tour as Live Nation may believe, **in good faith, will be helpful to Cohl's efforts** in obtaining the rights to promote the concert tour.  Live Nation was having nearly daily communications with Smyth regarding to tour promotion rights that it did not believe, in good faith, were helpful to Cohl, the lead actor per the Letter Agreement.  Live Nation hid these communications from Cohl.  In fact, Live Nation began considering in July 2009 sending a notice to Cohl pursuant to § 1.9(b) announcing that it would seek to obtain directly the right to promote a Rolling Stones concert tour for its own account, without any duty to share or co-promote with Cohl.  As the secret communications between Azoff and Smyth continued behind Cohl's back, Fogel was advising Rapino to "think about RS [Rolling Stones] revenge," by which he meant that Cohl would not be involved as co-promoter and Live Nation would promote a tour alone.  For his part, Azoff was expressing concern to Rapino and Fogel about if Cohl had "surfaced" and to make sure that no one tipped Cohl off or that he heard anything.  Azoff viewed Cohl as his competitor – suggesting in October 2009 that it was "game on" between Live Nation and Cohl, and that Cohl was "not winning."  However, at that time, there was not supposed to be competition between Live Nation and Cohl.  Instead, they were to be co-promoters and Live Nation was only supposed to act in a manner helpful to Cohl's efforts in the lead negotiating position.

14.    It is clear that Live Nation was engaged in discussions with regard to Rolling Stones tour promotion rights that it did not believe, in good faith, would be helpful to Cohl's

COFFEY BURLINGTON

OFFICE IN THE GROVE, PENTHOUSE   2699 SOUTH BAYSHORE DRIVE   MIAMI, FLORIDA 33133
T: 305.858.2900   F: 305.858.5261
Email: info@coffeyburlington.com   www.coffeyburlington.com

efforts to obtain those rights.  As a result, Live Nation breached the terms of the last sentence of § 1.9(a) of the Letter Agreement.

15.    Live Nation also materially breached § 1.9(b) of the Letter Agreement by not providing Cohl with reasonable prior notice.  Despite having no communications with Cohl on the subject, Live Nation began considering in July 2009 sending notice to him pursuant to § 1.9(b) that it would seek to obtain directly the right to promote a Rolling Stones concert tour for its own account, without any duty to share or co-promote with Cohl.  Rather than provide such notice to Cohl, Azoff continued to have what became nearly daily communications with Smyth – communications not disclosed to Cohl – before the notice was sent **over six months later**.  Not only was the notice not sent for over six months while Azoff continued to have his proscribed, frequent communications with Smyth, but Cohl was also not given prior notice of Live Nation's purported concerns about his ability to successfully negotiate the acquisition of the rights to promote the next Rolling Stones tour before he was sent the February 8, 2010 notice letter.

16.    As a result of Live Nation's four material breaches (any one of which would suffice), Cohl Parties were relieved of their obligations under the Letter Agreement.  It is a well settled principal of Florida law (which governs this dispute) that, where a party has materially breached a contractual agreement, the other party to the contract is discharged of his contract liability.  *See, e.g., Bradley v. Health Coalition,* 687 So. 2d 329, 333 (Fla. 3d DCA 1997) (holding that an employee "is relieved of any further obligation under the contract" containing a restrictive covenant where there was a prior breach by the employer, and stating that, "'[h]aving committed the first breach, the general rule is that a material breach of the Agreement allows the non-breaching party to treat the breach as a discharge of his contract liability'"), *quoting In re Thomas,* 51 B.R. 653, 654 (Bankr. M.D. Fla. 1985).  *See also Benemerito & Flores, M.D.'s, P.A.*

20

CASE NO. 10-CIV-24144-CMA

*v. Roche*, 751 So. 2d 91, 93-94 (Fla. 4th DCA 1999) (a material breach of the bonus payment calculation terms of an employment contract relieves the employee of her obligation to comply with the contractual restrictive covenant); *City of Miami Beach v. Carner,* 579 So. 2d 248, 251 (Fla. 3d DCA 1991) (in a breach of contract matter, "[t]he rule is quite clear that a contracting party, faced with a material breach by the other party, may treat the contract as totally breached and stop performance").  Cohl Parties' contract liability was discharged when Live Nation breached material provisions of the Letter Agreement.

17.     There was no prior breach by Cohl Parties, as has been affirmatively asserted by Live Nation.  First, as set forth above, Live Nation's prior material breaches of the Letter Agreement discharged Cohl's payment obligation.  Second, Cohl adhered to the communication terms outlined in §1.9(a) of the Letter Agreement by staying in constant communication with Live Nation.  Although Cohl outlined preliminary tour concepts to the members of the Rolling Stones in June 2009, there were never any terms under negotiation and Cohl had no negotiations in that year (or the first half of 2010) for the acquisition of the rights to promote a Rolling Stones tour, and no financial terms were under negotiation.  Further, while Live Nation was aware at the time of Cohl's submission to the Rolling Stones in June 2009, it never voiced any complaint to him about his having done so.

18.     The Letter Agreement is not severable or divisible.  A "contract is 'indivisible' or 'entire' when 'by its terms, nature, and purpose, it contemplates and intends that each and all of its parts, material provisions, and the consideration, are common each to the other and interdependent.  **There is a presumption against finding a contract divisible**, unless divisibility is expressly stated in the contract itself, or the intent of the parties to treat the contract as divisible is otherwise clearly manifested.'"  *AMEC Civil, LLC v. State of Florida, Dep't of*

21

COFFEY BURLINGTON

OFFICE IN THE GROVE, PENTHOUSE    2699 SOUTH BAYSHORE DRIVE    MIAMI, FLORIDA 33133
T: 305.858.2900    F: 305.858.5261
Email: info@coffeyburlington.com    www.coffeyburlington.com

*Transp.*, 41 So. 3d 235, 240 (Fla. 1st DCA 2010), *quoting* 15 *Williston on Contracts* §§ 45:1, 45:4 (4th ed. 2000) (emphasis added), *review denied*, 63 So. 3d 748 (Fla. 2011).  "[A] contract is indivisible where the entire fulfillment of the contract is contemplated by the parties as the basis of the arrangement."  *Florida Mortgage Fin., Inc. v. Flagler Plaza Corp.*, 308 So. 2d 571, 572 (Fla. 3d DCA), *cert. denied*, 317 So. 2d 443 (Fla. 1975).

19.     While the terms of the Letter Agreement nominally provide for the payment of separate consideration for the "Purchased Assets" and the non-compete relief (with $9,850,000 earmarked for the "Purchased Assets" and $5,500,000 for the non-compete relief), that happenstance does not render the Letter Agreement severable.  The evidence is clear that such a distinction was done for Live Nation's accounting purposes and tax concerns, and not because of any independent nature of the various provisions of the Letter Agreement or the relative values of the "Purchased Assets" and the non-compete relief.

20.     The Letter Agreement constitutes one interrelated transaction.  The interrelationship between the "Purchased Assets" and the non-compete relief in the Letter Agreement is reflected not only in Cohl's undisputed intention, but also by the fact that the "first bucket" of activities for which Cohl obtained non-compete relief is the operation of the "Purchased Assets."  Moreover, the transactions between Cohl Parties and Live Nation memorialized in the Letter Agreement include not only the "Purchased Assets" and the non-compete relief, but also the business opportunities known as the Fontainebleau concept and the Getty Images Concept, the assignment of responsibilities for various employees and office space, and the assignment of stock.

21.     Live Nation is unable to overcome the presumption that the Letter Agreement is one indivisible contract.  Prevailing legal authorities support that the Court should conclude, as a

OFFICE IN THE GROVE, PENTHOUSE   2699 SOUTH BAYSHORE DRIVE   MIAMI, FLORIDA 33133
T: 305.858.2900   F: 305.858.5261
Email: info@coffeyburlington.com   www.coffeyburlington.com

matter of law, that the Letter Agreement is indivisible and Live Nation's breach of it relieves Cohl Parties of all their liabilities under it.  In *Arquette Dev. Corp. v. Hodges*, 934 So. 2d 556 (Fla. 1st DCA 2006), the appellate court held that a real estate purchase and lease contract was indivisible, emphasizing that there was one document executed by the parties (as is the case here) and that there was interdependence between the provisions because the two parts reference each other (as is the case here, where the "Purchased Assets" are one of the "buckets" of non-compete relief).  *Id.* at 558.

22.     Furthermore, in *Arquette*, a prior material breach of one provision of the contract was deemed to allow the other party to treat the contract as breached and terminate its own performance.  *Id.* at 559.  *See also Toyota Tsusho America, Inc. v. Crittenden*, 732 So. 2d 472, 476 (Fla. 5th DCA 1999) (involving a breach of a global settlement agreement with various constituent agreements and holding that "once appellees breached any of the terms of the global settlement agreement, Toyota was entitled to treat the breach as a discharge of its contractual obligation to make payments under the parties' consulting agreement"); *Benemerito & Flores*, 751 So. 2d at 93 (an employer's breach of the compensation provision of an employment contract excused the employee from complying with the contract's covenant not to compete because of the "general rule … that a material breach of the agreement allows the non-breaching party to treat the breach as a discharge of his contract liability"); *Venus Laboratories, Inc. v. Katz*, 601 So. 2d 630, 631 (Fla. 3d DCA 1992) (looking past contractual labels regarding compensation for consulting services rather than for sale of assets, and finding a failure to pay to be an anticipatory breach of contract entitling the non-breaching party to payment of all sums owed), *review denied*, 613 So. 2d 12 (Fla. 1992).

COFFEY BURLINGTON

OFFICE IN THE GROVE, PENTHOUSE   2699 SOUTH BAYSHORE DRIVE   MIAMI, FLORIDA 33133
T: 305.858.2900   F: 305.858.5261
Email: info@coffeyburlington.com   www.coffeyburlington.com

23.     Azoff was acting as Live Nation's agent in his nearly daily dealings with Smyth prior to January 25, 2010, when Live Nation's merger with Ticketmaster closed.  This agency relationship is evidenced by Azoff's constant and consistent reporting back to Rapino and Fogel of his conversations with Smyth before Live Nation's merger with Ticketmaster closed on January 25, 2010.  Additionally, the rights that Azoff was seeking with regard to the Rolling Stones were an asset of the merged Live Nation entity.  Furthermore, in the one-year period between announcement of the merger and its approval, Live Nation claims that a privileged attorney/client relationship existed between its general counsel (Rowles) and Azoff as concerns communications relating to Cohl Parties, with both Azoff and Rowles instructed during deposition not to answer questions regarding those communications, and emails between them (or between Azoff and Rapino reflecting the advice of Live Nation's counsel) withheld from production and placed on its 64-page privilege log as attorney/client communications.

24.     Cohl Parties did not challenge Live Nation's assertion of an attorney/client relationship governing the communications between Azoff and Rowles, or the obvious implication of agency that resulted from that relationship between Azoff and Live Nation's in-house counsel.  Under Fla. Stat. § 90.502(1)(b), "[a] 'client' is any person … or entity, either public or private, who consults a lawyer with the purpose of obtaining legal services or who is rendered legal services by a lawyer."  *See also Keir v. State*, 11 So. 2d 886, 888 (Fla. 1943) ("the relation of attorney and client must exist in order for such communications to be privileged"); Charles W. Ehrhardt, *Ehrhardt's Florida Evidence* § 502.2 (2010) ("[f]or the purpose of section 90.502, statements made by or to a representative or agent of either the client or the attorney are protected as if they were made by the client or the attorney").  If Azoff was somehow not representing Live Nation's interests in his dealings with Smyth, then Rowles could not have been

24

C O F F E Y   B U R L I N G T O N

OFFICE IN THE GROVE, PENTHOUSE    2699 SOUTH BAYSHORE DRIVE    MIAMI, FLORIDA 33133
T:  305.858.2900    F:  305.858.5261
Email: info@coffeyburlington.com    www.coffeyburlington.com

rendering him legal services, and no attorney/client relationship would have existed.  Based on the clear agency relationship, Live Nation is bound by the actions of Azoff.

Respectfully submitted,

Robert K. Burlington, Florida Bar No. 261882
rburlington@coffeyburlington.com
Daniel F. Blonsky, Florida Bar No. 972169
dblonsky@coffeyburlington.com
Fernando L. Tamayo, Florida Bar No. 28530
ftamayo@coffeyburlington.com
COFFEY BURLINGTON
Office in the Grove, Penthouse
2699 South Bayshore Drive
Miami, Florida 33133
Tel:  305-858-2900/Fax:  305-858-5261
*Counsel for Cohl and S2BN*

By:  s/Daniel F. Blonsky

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document was electronically filed using CM/ECF on June 11, 2012 on all counsel or parties of record on the Service List below.

*s/*Daniel F. Blonsky

## SERVICE LIST

Mark E. Zelek, Esq.
mzelek@morganlewis.com
Christopher J.M. Collings, Esq.
ccollings@morganlewis.com
Morgan, Lewis & Bockius LLP
5300 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131-2339
Telephone:   305.415.3000
Facsimile:    305.415.3001
*Attorneys for Live Nation*

COFFEY BURLINGTON

OFFICE IN THE GROVE, PENTHOUSE    2699 SOUTH BAYSHORE DRIVE    MIAMI, FLORIDA 33133
T:  305.858.2900    F:  305.858.5261
Email: info@coffeyburlington.com    www.coffeyburlington.com