UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-CIV-24144-CMA

LIVE NATION WORLDWIDE, INC.,

      **Plaintiff,**

v.

MICHAEL COHL and S2BN
ENTERTAINMENT CORPORATION
(f/n/a EVENTS ACQUISITION CORP.),

      **Defendants.**

_____/

MICHAEL COHL and S2BN
ENTERTAINMENT CORPORATION
(f/n/a EVENTS ACQUISITION CORP.)

      **Counterclaimants,**

v.

LIVE NATION WORLDWIDE, INC.

      **Counterdefendant.**

_____/

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

      Pursuant to the Court's Order Setting Trial and Pre-Trial Schedule (ECF No. 16) and

S.D. Fla. L.R. 16.1(e), Plaintiff Live Nation Worldwide, Inc. ("Live Nation") hereby submits

the following Proposed Findings of Fact and Conclusions of Law:

**I.      PROPOSED FINDINGS OF FACT**

      **A.      The 2007 Stock Purchase Agreement's binding non-compete covenant.**

      1.      Michael Cohl ("Cohl") is a well-established live music concert

promoter.

      2.      Pursuant to two separate Stock Purchase Agreements in 2006 and

2007 (the 2007 Stock Purchase Agreement is being referred to herein as the "SPA"),

Cohl sold his various concert promotion entities to Live Nation for approximately $174 million in cash and stock (as valued at the time).  *See* Am. Countercl. ¶¶ 7, 14.[1]

3.     Under the SPA, Cohl agreed to non-compete covenants "that prohibited him, on a worldwide basis, for a period of nine years . . . from engaging in certain activities," including the promotion of concert tours (the "Non-Compete").  *See id*. ¶ 15.

4.     In addition, Cohl agreed to serve as "the most senior executive of the 'Artist Nation Division' of Live Nation" and "subsequently became Chairman of the Board of Directors of Live Nation."  *See id.* ¶ 16.  Effective June 30, 2008, Cohl resigned from both positions.  *See id*. ¶ 17.

**B.     The Letter Agreement provided for the purchase of (1) assets and (2) relief from the Non-Compete.**

5.     After his resignation, Cohl and a company that he controlled as majority owner and CEO, Co-Defendant S2BN Entertainment Corporation ("S2BN") (collectively "Cohl Parties" or "Defendants"), entered into another agreement with Live Nation dated September 22, 2008 (the "Letter Agreement").

6.     Under the Letter Agreement's terms, Cohl bought two separate things from Live Nation.  First, pursuant to Sections 1.1 and 1.2 of the Letter Agreement, Cohl purchased various rights and assets, defined as "Purchased Assets," from Live Nation for the total purchase price of $9.85 million.  *See* Letter Agreement §§ 1.1, 1.2.

7.     Cohl's claims against Live Nation in this suit do not include any alleged breach of the provisions related to the Purchased Assets, and Cohl does not contend that Live Nation violated any rights or obligations concerning the Purchased Assets. *See id.*; Am. Countercl. ¶¶ 35-38.

---

[1]     Defendants' Answer [ECF No. 8], Amended Counterclaim [ECF No. 40], and Amended Affirmative Defenses [ECF No. 32] are referred to herein as "Ans.", "Am. Countercl." and "Am. Aff. Def.," respectively.

8.      Second, pursuant to Sections 1.3 through 1.6 and Section 1.9 of the Letter Agreement, Cohl "also paid separate and additional consideration in return for partial relief from the [Non-Compete] set forth in the SPA" in the amount of $5.5 million.  *See* 4/4/11 Order [ECF No. 38] (citing Countercl. ¶ 18).  The relief from the Non-Compete is categorized into five "buckets." *See* Letter Agreement § 1.3(b).  The only "bucket" at issue in this case is the second bucket, which allows Cohl to "co-promote with Live Nation concert tours of four music performers" defined as the "Cohl Relationship Artists." *See* 4/4/11 Order [ECF No. 38] (citing Countercl. ¶18; Am. Countercl. ¶ 18).

9.      But for the partial relief from the Non-Compete afforded by the Letter Agreement, the Non-Compete would have completely prohibited Cohl from promoting any Cohl Relationship Artist until the year 2016.  In other words, absent the $5.5 million fee that Cohl agreed to pay for the Non-Compete relief, Cohl would have been unable to engage in any promotion or related activities, including those that form the basis of his counterclaim.

10.     Under Section 2.3 of the Letter Agreement, Cohl also personally guaranteed timely performance of all contractual obligations, including payments for the Purchased Assets and the Non-Compete relief.  *See* Letter Agreement § 2.3.

C.     **The Letter Agreement unambiguously delineated the parties' respective rights and obligations related to the promotion of the Rolling Stones.**

11.     The negotiations over the Letter Agreement spanned approximately five months, and Live Nation and Defendants exchanged approximately nineteen versions of the draft Letter Agreement before execution.  During negotiations and execution of the Letter Agreement, both parties were represented by experienced counsel.

12.     Defendants' attorney John Perkins advised Cohl not to sign the Letter Agreement because he thought that it was too favorable to Live Nation and "outrageous" from Cohl's perspective, as there was no "wiggle room."  Nevertheless,

Cohl accepted the terms of the Letter Agreement, which are unambiguous, binding, and enforceable.  *See* Am. Countercl. ¶¶ 18, 34-38; Ans. ¶¶ 5-7 ("the terms of [the Letter Agreement] speak for themselves").

13.     While the Letter Agreement granted Cohl limited relief from the Non-Compete in order to attempt to co-promote a Rolling Stones tour (with Live Nation), that relief was expressly subject to various conditions. Specifically, Section 1.4, titled "Co-Promotion of Cohl Relationship Artists with the Company," clearly states that Cohl could not "engage in the activity of promoting concerts featuring the performances of [the Rolling Stones]" *unless* (i) Live Nation approved "the financial terms and other material agreements related to the promotion of any such live concerts" and (ii) "arrangements" acceptable to Live Nation were first entered into. *See* Letter Agreement § 1.4.

14.     Notwithstanding the limited and conditional relief provided in Section 1.4, it contains an overarching prohibition preventing the Cohl Parties from engaging in the promotion of live concert tours of Cohl Relationship Artists for their own account or with any party.  *See id.* § 1.4(c).

15.     While Section 1.9(a) does state that, assuming he was able, Cohl would "generally take the lead in conducting negotiations with [the Rolling Stones] in an effort to procure the rights to promote each concert tour," Section 1.9(b) expressly authorized Live Nation to "step-in" and itself promote any Rolling Stones tour directly.  Section 1.9 states in its entirety:

Section 1.9.  Coordination of Efforts with Regard to Cohl Relationship Artists: [Live Nation's] Freedom of Activity

(a) Generally. *Cohl represents* to [Live Nation], and [Live Nation] acknowledges, *that Cohl currently has a close business and working relationship with each of the Cohl Relationship Artists that should **enable Cohl to successfully negotiate the acquisition of the rights to promote the concert tours*** of each Cohl Relationship Artist. As provided in Section 1.4(a) hereof, it is the intent of the parties that [Live Nation] and Cohl will co-promote the concert tours of each Cohl Relationship Artist if Cohl is

successful in obtaining the rights to promote such concert tours. Therefore, it is the parties' intent that Cohl will, as long as he is alive and able to do so, generally take the lead in conducting negotiations with each of the Cohl Relationship Artists in an effort to procure the rights to promote each concert tour of the Cohl Relationship Artists during the remaining term of the Non-Compete Covenants. As Cohl negotiates the acquisition of the rights to promote the concert tour of any Cohl Relationship Artist, *Cohl will be required to remain in constant communication with [Live Nation] and its touring division head to advise of the terms under negotiation* and to allow [Live Nation] to provide its input and advice concerning the financial terms under negotiation in an effort to facilitate and simplify the approval process described in Section l.4(a)(A) of this letter. The foregoing provisions will not preclude [Live Nation] from engaging in discussions with any Cohl Relationship Artist (or the management of any Cohl Relationship Artist) in regard to the promotion rights for any proposed concert tour as [Live Nation] may believe, in good faith, will be helpful to Cohl's efforts in obtaining the rights to promote the concert tour of such Cohl Relationship Artist.

(b) [Live Nation's] Right to Step-In with Cohl Relationship Artists. *Notwithstanding Section 1.9(a)*, if [Live Nation] should determine, in *its reasonable judgment*, that Cohl will be *unable, for any reason,* to *successfully negotiate the acquisition of the rights to promote the concert tour* of [the Rolling Stones], then [Live Nation] will, after providing *reasonable prior notice* to Cohl, have the *free and unfettered right to thereafter bid or seek to obtain directly the right to promote any such concert tour for its own account without any duty to share, co-promote or jointly pursue with Cohl any such rights that [Live Nation] may acquire.*

(c) [Live Nation's] Freedom of Activity. Except as expressly contemplated by Section 1.9(a), (i) *nothing contained in this letter shall be deemed to create any implied duty or obligation on the part of [Live Nation]* that would require [Live Nation] to refrain from competing with, or bidding against the prospective interests of, Cohl, the Buyer or any affiliate of either Cohl or the Buyer and (ii) [Live Nation] shall have the sole and unfettered right to pursue its own business interests and activities in the same manner and to the same extent as [Live Nation] was free to do prior to the execution of this letter.

*See id.* § 1.9 (emphasis added).

> **D.    Live Nation determined that Cohl would be unable to successfully negotiate the acquisition of the Rolling Stones tour.**

16.    Thus, Section 1.9(b) provides an express carve-out that overrides all of Cohl's claimed rights in Section 1.9(a) if "[Live Nation] should determine, *in its reasonable judgment*, that Cohl will be unable, *for any reason*, to successfully negotiate the acquisition of the rights to promote the concert tour of [the Rolling Stones]." *See id.* § 1.9(b) (emphasis added). Section 1.9(b) of the Letter Agreement was intended to provide Live Nation an

easy way out of Section 1.9(a) without having to justify its reasons or get into a debate with Cohl as to whether he remained able to successfully negotiate the rights to promote any concert tour of the Rolling Stones.

17.     Beginning in January 2010, circumstances developed that led Live Nation to determine, in its reasonable judgment, that Cohl was no longer able to successfully negotiate the acquisition of those rights to promote any Rolling Stones Tour and, therefore, Live Nation invoked the provisions of Section 1.9(b) to directly negotiate the acquisition of the rights to promote any future Rolling Stones concert tour for its own account.

18.     Live Nation was privy to disturbing industry rumors that at least one other major player, its biggest competitor, AEG, was bidding on Rolling Stones tour promotion rights.   That AEG was a serious contender to secure Rolling Stones tour promotion rights was particularly disturbing to Live Nation because historically the entire industry (including Live Nation) would have presumed that Cohl would be the tour promoter. At or around the same time that it was rumored that AEG had submitted a tour proposal, Cohl either was not having any negotiations with the Rolling Stones about tour promotion rights, or was having covert negotiations in violation of his contractual obligation to remain in "constant communication" with Live Nation, as required by Section 1.9(a) of the Letter Agreement. *See id.* § 1.9(a).

19.     Industry rumors are a major means of communication in the concert industry.   Live Nation, like all other companies in the concert industry, receives and relies upon industry rumors in making business decisions.

20.     In January 2010, Irving Azoff ("Azoff"), the Chief Executive Officer of Ticketmaster Entertainment, Inc. ("Ticketmaster") at the time, was specifically told that AEG had submitted a $100 million tour proposal to the Rolling Stones.

6

21.     On or about January 29, 2010, Mick Jagger's lawyer and manager, Joyce Smyth ("Smyth"), told Azoff that a request for Live Nation to submit a tour proposal was on its way and that Cohl's involvement in any tour proposal would be a "negative."  Prior to this conversation, Smyth had told Azoff that her title was head of business affairs for the Rolling Stones, and she at all times operated in a manner consistent with that title.  Indeed, Cohl himself treated Smyth as the head of business affairs for the Rolling Stones.

22.     These representations had particular meaning to Azoff as he was previously engaged in communications with the Rolling Stones during 2009 and into early 2010 about the possibility of Front Line Management Group ("Front Line"), a subsidiary of Ticketmaster, becoming the band's business manager.

23.     Azoff, whose company, Ticketmaster, was a party to an executory, conditional Merger Agreement with Live Nation, told Live Nation about these discussions and the Rolling Stones' unwillingness to involve Cohl in any tour proposal negotiations.

24.     Live Nation also learned directly from Smyth about the Rolling Stones' reluctance to involve Cohl in any future tour.  For example, on February 3, 2010, Smyth told Live Nation's Executive Vice President and General Counsel, Michael Rowles ("Rowles"), that she spoke on behalf of the band and that the Rolling Stones were not happy with some of the ways in which Cohl had conducted business on their most recent tour, which was promoted by Cohl.  In particular, Smyth conveyed that the Rolling Stones were unhappy with certain venues and ticket prices and that the tour had been a negative "watershed" event for Cohl.  Smyth also indicated to Rowles that the Rolling Stones were not bound to Cohl, either contractually or otherwise, and that she was not sure, at that stage of the game, what Cohl "brought to the party."

25.     Moreover, sometime between Rowles's February 3, 2010 conversation with Smyth and February 8, 2010, Live Nation's President and Chief Executive Officer, Michael Rapino ("Rapino"), spoke with Smyth.   After Rowles reported his conversation with Smyth about Cohl to Rapino, Rapino thought he should call Smyth directly to make sure that he was not misinterpreting anything.  Smyth told Rapino that Mick Jagger and the rest of the band were unhappy with the last tour that Cohl had promoted for them, and that they would be looking for a different promoter for any future tour.  Smyth also made it abundantly clear that the Rolling Stones were willing to consider tour promotions with Live Nation, but only if Live Nation cut Cohl out of the picture.  Smyth expressly told Rapino that Live Nation would be much better off without Cohl as a partner, that Cohl would be excess baggage, and that Live Nation should be pursuing any future Rolling Stones tour on its own.

26.     Taking all of this information together, especially the facts that Live Nation's major competitor was bidding on promotion rights at a time when Cohl was not communicating with Live Nation about even having "negotiations" respecting promotion rights, and that the Rolling Stones were unhappy with Cohl and wanted Cohl out of the picture, Live Nation made a determination, using its own reasonable judgment, that Cohl would be unable to successfully negotiate the rights to promote any future Rolling Stones tour.

27.     The decision that Cohl would be unable to successfully negotiate the rights to any future Rolling Stones tour was not one that Live Nation took lightly— particularly given Cohl's representation in Section 1.9(a) of the Letter Agreement that he was capable of securing the rights to any future Rolling Stones tour.  But, it was a decision that Live Nation was authorized to make pursuant to the Letter Agreement's express language,

and it was a decision that Live Nation determined that it needed to make if it had any hope of securing those touring rights.

28.     Accordingly, relying on Section 1.9(b) of the Letter Agreement, Live Nation heeded Smyth's advice and the Rolling Stones' qualms about Cohl's continued involvement with the band and any future tour.  As required by the Letter Agreement, on February 8, 2010, Live Nation gave Defendants written notice ("Notice Letter") that (i) Live Nation had determined, in its reasonable judgment, that Cohl would not be able to successfully acquire the rights to promote any future Rolling Stones tour and (ii) Live Nation would be proceeding independently of Cohl to seek those promotion rights.  *See* Am. Countercl. ¶ 22, Ex. 2.  The notice language that Live Nation used came straight from Section 1.9 of the Letter Agreement. *See* Notice Letter; Letter Agreement § 1.9(b).

29.     The reasonableness of Live Nation's determination was later confirmed by the Rolling Stones in a press release responding to this lawsuit, in which the band explicitly disclaimed any relationship with Cohl.  *See* [ECF No. 23-1].  Specifically, the Rolling Stones explained: "*Following the end of the 2007 A Bigger Bang world tour The Rolling Stones became free from any contractual arrangements or agreements with Michael Cohl.  He is neither their representative nor their tour promoter.*"

**E.     When Live Nation gave Cohl notice that it was invoking the authorized co-promotion carve-out, *no one* at Live Nation was bidding on the rights to promote a Rolling Stones tour.**

30.     At the time that Live Nation sent Cohl the Notice Letter, there was no Rolling Stones tour available for bid.  *See* Am. Aff. Def. 2; Am. Countercl. ¶ 31.

31.     Prior to its sending the Notice Letter, Live Nation had not communicated with the Rolling Stones or their management regarding acquisition of Rolling Stones tour promotion rights.  Rather, the only person that the Cohl Parties contend had

allegedly infringing conversations with the Rolling Stones—i.e., conversations wherein promotion rights were negotiated and that were not "helpful" to Cohl's effort—was  Azoff.

32.     The conversations between Azoff and the Rolling Stones of which the Cohl Parties complain all took place prior to the completion of the Ticketmaster/Live Nation merger.  Live Nation, Inc. (the corporate parent of Plaintiff Live Nation Worldwide, Inc.) and Ticketmaster signed an "Agreement and Plan of Merger" on February 10, 2009.  Pursuant to the terms of the Agreement and Plan of Merger, Live Nation, Inc. and Ticketmaster agreed to merge, but that agreement was subjected to a number of conditions precedent.  For example, prior to completion of the proposed merger, both Live Nation, Inc.'s and Ticketmaster's shareholders had to approve the merger, and the merger had to be approved by the Department of Justice.  If any of these conditions precedent did not occur, there would have been no merger.  The final condition precedent was met when the Department of Justice approved the merger on January 25, 2010—almost a full year after Live Nation, Inc. and Ticketmaster signed the Agreement and Plan of Merger.  The closing of the merger between Ticketmaster and Live Nation, Inc. was then completed shortly thereafter and Live Nation, Inc. changed its name to Live Nation Entertainment, Inc.

33.     Before the merger was completed, Ticketmaster and Live Nation, Inc. were separate and distinct companies, and Azoff was the Chief Executive Officer of Ticketmaster and was not a Live Nation employee.  Azoff did not become an employee or agent of Plaintiff's parent, Live Nation Entertainment, Inc., until the merger was completed, and Azoff never held a position with Live Nation Worldwide, Inc.—the party to the Letter Agreement.

34.     Azoff was actively engaged in communications with the Rolling Stones and their representatives during 2009 and into early 2010 because he wanted to secure management rights.  Those communications solely involved the possibility of Azoff's artist

management company, Front Line, becoming the Rolling Stones' manager.  Azoff was not attempting to procure the rights to promote any future Rolling Stones tour.  While attempting to secure the rights to manage the Rolling Stones, Azoff had numerous communications with Smyth and Mick Jagger about many issues, including general tour concepts, and discussions about what types of tours the group should be doing.  Since an artist manager is responsible for managing all aspects of a band's career, discussions about management rights necessarily involve discussions about plans for touring, which is one of the most important parts of a band's career.

35.     During the course of his many discussions, Azoff learned that the Rolling Stones were not happy with Cohl.  Among other things, Azoff learned that the Rolling Stones felt that Cohl used the wrong strategy with their last tour.  For example, Smyth told Azoff that the band members thought that although the previous tour had brought in big grosses, there were too many empty seats and the ticket prices were too high, and there was also concern that the way in which the tour was set up—i.e., with two passes through Europe—was damaging to the band's brand.  In the process of vetting Azoff as a potential business manager, Smyth and Mick Jagger wanted Azoff's thoughts about these issues so that they could be resolved if and when the Rolling Stones decided to tour again.  Azoff passed these concerns along, not only to Live Nation but also to Cohl.

36.     An artist manager and a concert promoter are completely different; the difference is analogous to the difference between a lawyer and a doctor.  Concert promoters sell tickets to concerts.  They deal with issues related to concerts, such as concert production, staffing, marketing, and advertising.  While an artist manager may also deal with big-picture issues related to concert touring because his/her job is to manage all aspects of an artist's career, he/she is also responsible for many other aspects of an artist's career, including recording contracts, sponsorship arrangements, personal appearances, branding and touring.

37.     Azoff is an artist manager, not a concert promoter.

38.     Between September 22, 2008 and February 8, 2010, the date of the Notice Letter, Live Nation allowed Cohl to take the lead in conducting negotiations with the Rolling Stones in an effort to procure the promotion rights for any future concert tour.  It was not until March 25, 2010—after the Notice Letter—that Live Nation, for the first time, sent a proposal for promotion rights to a possible Rolling Stones tour.

39.     However, at no point from the execution of the Letter Agreement through the present have Defendants presented any Rolling Stones concert tour to Live Nation for its review or approval.

**F.     After the Notice Letter, Cohl failed to make the final payment of $2.6 million owed for the Purchased Assets, as well as the final payment of $2.75 million owed for the Non-Compete relief.**

40.     As described above, pursuant to the terms of the Letter Agreement, Cohl agreed to purchase various defined assets for the total price of $9.85 million, and he further agreed to purchase particularized relief from the Non-Compete for the separate and additional purchase price of $5.5 million.  Payment of the $9.85 million asset purchase price was to be made in three installments. *See* Letter Agreement § 1.2(a)(i)-(iii).  Payment of the $5.5 million purchase price for relief from the Non-Compete was to be made in two installments. *See id.* § 1.3(a)(ii)(A)-(B).

41.     In accordance with the payment plan established by the Letter Agreement, Defendants paid the first installment toward the $9.85 million asset purchase price in October 2008.

42.     Defendants later breached the Letter Agreement, however, by not paying the $2.25 million second installment of the asset purchase price and the $2.75 million first installment of the Non-Compete relief fee on or before September 22, 2009. Defendants have admitted that they refrained from making the required 2009 payments

because they were trying to use the payments as "leverage" to continue discussions with Live Nation about other business activities prohibited by the Non-Compete.

43.    Defendants made the required 2009 installment payment, albeit untimely, on the afternoon of October 27, 2009, but only after Live Nation had filed that morning a separate action for breach of contract for those sums.  Ans. ¶ 12.

44.    Defendants have used and enjoyed the agreed-upon benefits of the Purchased Assets and the relief from the Non-Compete for over three and a half years. However, to date, Defendants have failed to pay either the final $2.6 million installment owed toward the Purchased Assets or the final $2.75 million installment owed for the relief from the Non-Compete, both of which payments were due on or before September 22, 2010.  *See id.*

45.    Even though Defendants admit that, pursuant to the Letter Agreement, "Cohl did purchase other assets" in addition to the rights to promote any future Rolling Stones tour, Defendants make clear that they blame their failure to make the final installment payment for both the Purchased Assets (which have ***nothing*** to do with the promotion of any future Rolling Stones tour) and the relief from the Non-Compete (which includes performers other than the Rolling Stones) solely on the basis of Live Nation's Notice Letter.  *See* Am. Countercl. ¶¶ 28-29, 35.

## II.    PROPOSED CONCLUSIONS OF LAW

### A.    The Cohl Parties breached the Letter Agreement by not paying Live Nation the outstanding $2.6 million owed for the Purchased Assets.

Defendants' failure to pay the $2.6 million for the Purchased Assets was an independent breach of the Letter Agreement because the payment obligations are divisible. Whether a contract is divisible depends on the intention of the parties, and a court must determine the parties' intent by a fair construction of the terms of the contract itself and by subject matter that it references.  *See Local No. 234 v. Henley & Beckwith, Inc.*, 66 So. 2d

818 (Fla. 1953).  Unambiguous contract language—not a party's unexpressed or subjective intent—is the basis for contract evaluation.  *See Boat Town U.S.A., Inc. v. Mercury Marine Div. of Brunswick Corp.*, 364 So. 2d 15, 17 (Fla. 4th DCA 1978) ("the language used in a contract is the best evidence of the intent and meaning of the parties").

Here, the plain language of the contract expressly states that the obligations under the Letter Agreement shall be independent and divisible.  The only relevant evidence for consideration on the issue of divisibility is the language of the agreement itself, which shows that the parties intended that the various obligations be divisible.  The Letter Agreement explicitly states that the Cohl Parties will pay consideration in the amount of $9.85 million ("Base Purchase Price") for the Purchased Assets, and separate and distinct consideration in the amount of $5.5 million ("Non-Compete Relief Fee") for partial relief from existing non-compete covenants.  The fact that the parties set out different, separate, and distinct consideration for the two items strongly supports a finding of divisibility.  *See AMEC Civil, LLC v. State of Fla., Dep't of Transp.*, 41 So. 3d 235, 240 (Fla. 1st DCA 2010) (contract treated as indivisible when "each and all of its parts appear to be interdependent and common to one another ***and*** to the consideration" (emphasis added) (citing *Fla. Mortg. Fin., Inc. v. Flagler Plaza Corp.*, 308 So. 2d 571, 572 (Fla. 3d DCA 1975))).

Furthermore, the parties explicitly agreed and acknowledged in Section 1.3(c) that:

> the relief from the Non-Compete Covenants set forth in each of clauses (i), (ii), (iii), (iv), and (v) of Section 1.3(b) ***are separate and distinct from one another*** and that nothing contained herein shall be read to imply that (A) the type or nature of entertainment events included in the Purchased Assets shall be read to inform or define the types of entertainment events intended to be included in Section 1.3(b)(iv) because not all of the entertainment events included in the Purchased Assets are "Permitted Events" or (B) the Company has agreed, or will hereafter agree, to grant relief from the Non-Compete Covenants with respect to any other projects that may be similar in type, scope or nature to the Specific Projects.

*See* Letter Agreement § 1.3(c) (emphasis added).  As evidenced by the plain language of the Letter Agreement, the parties' intention was that the Non-Compete Relief Fee be entirely

divisible from the assets conveyed to the Cohl Parties in return for the Base Purchase Price and that the obligations be read separately and distinctly.  The intent of divisibility was so integral in the final, fully negotiated transaction that the parties deliberately stated that nothing in the section discussing the partial non-compete relief (Section 1.3) should be used to interpret the wholly separate and distinct obligations set forth in the section discussing the sale of assets (Section 1.2).

In analyzing an employment agreement and finding that the parties intended to make a severance clause divisible from a covenant to employ contained in the same agreement, Florida's Fourth District Court of Appeals succinctly (re)stated the proper inquiry for a court when facing the question of severability.  *See J.R.D. Mgmt. Corp. v. Dulin*, 883 So. 2d 314, 316 (Fla. 4th DCA 2004) (quoting *Robbins v. Frank Fehr Brewing Co.*, 284 S.W.2d 680 (Ky. 1955)).  "The essential test is simple.  Did the parties give a single assent to the whole transaction, or did they assent separately to several things?  The answer is ascertained by viewing the contract as a whole and gathering the intention of the parties from it."  *Id.* (holding a severance pay clause in an employment contract was divisible and may, therefore, be enforced independently of other covenants in the contract, specifically an agreement to employ).  The Letter Agreement makes clear that the parties negotiated and assented to separate and distinct obligations of different natures—which were to be performed in different manners at different times, and which were of distinct subject matters.   One agreement addresses the ***immediate*** conveyance incident to a sale of property, while the other grants multiyear ***continuing*** limited relief from an existing agreement that Cohl will not compete with Live Nation.

Based on the foregoing, it is clear that the parties intended to have two separate agreements and that each agreement is actionable as a separate breach of contract.  *See In re Gardiner, Inc.*, 831 F.3d 974, 976 (11th Cir. 1987) (although only one document

memorialized the parties' transaction, terms showed divisibility based upon (i) the nature and purpose of the agreements, (ii) consideration for each agreement is separate and distinct, and (iii) each party's obligations are not interrelated). The obligation to convey certain assets and rights in exchange for the Base Purchase Price is entirely divisible from the relief from the Non-Compete in exchange for that fee.

Where covenants are independent and divisible, as opposed to dependent and indivisible, an action may be maintained for breach of such independent covenants without excusing or voiding performance of the other covenants and obligations set forth in the contract. For example, in the real estate context, an agreement for the payment of a certain sum on delivery of a deed in a contract for the sale and purchase of real property is a classic example of a dependent covenant. *See Seybold v. Nicholson USA Props., LTD*, 890 So. 2d 351 (Fla. 5th DCA 2005). In contrast, when an undertaking in the same contract is to be performed at different times—such as a covenant to make improvements to the property—the covenant is independent, and an action at law may be maintained for its breach. *Id.* As explained in *Zambetti v. Commodores Land Co.*, 136 So. 644, 645 (Fla. 1931):

> The rule seems to be well settled that when covenants on the part of different parties to a contract are to be ***performed at different times*** . . . or when a covenant goes ***only to part of the consideration*** on both sides and a breach of such covenant may be compensated in damages and will not defeat the purpose of the contract, the covenant is independent and an action at law may be maintained for its breach by the party or parties interested.

In determining the divisibility issue, prior negotiations and dealings between the parties, to the extent not contained within the final agreement, cannot be used to vary or change the terms of the agreement under the parol evidence rule. *See Univ. of Miami v. Francois*, 76 So. 3d 360 (Fla. 3d DCA 2011) (explaining that neither the Addenda nor the "memorandum of settlement" could be relied upon to "explain" an agreement that, by its terms, required no explanation); *Wickenheiser v. Ramm Vending Promotion, Inc.*, 560 So. 2d 350, 352 (Fla. 5th DCA 1990) (holding "evidence that would contradict, add to, or subtract

from or affect the construction of a valid, complete and unambiguous written instrument is inadmissible under the parol evidence rule"); *see also Bragg v. Bill Heard Chevrolet, Inc.*, 374 F.3d 1060, 1066 (11th Cir. 2004); *JC Penney Co. v. Koff*, 345 So. 2d 732, 735 (Fla. 4th DCA 1977) (the parol evidence rule bars consideration of extrinsic evidence to explain or vary the express terms of a contract, unless an ambiguity is first found).  Since all of the parties agree that the Letter Agreement is an unambiguous and binding contract that "speaks for itself," parol evidence cannot be considered in deciding the divisibility issue.  *See* Ans. ¶¶ 5-7; Am. Countercl. ¶¶ 18-22, 34-38.  While this is a proper statement of Florida law applied to the facts of this case, the Court additionally finds that the $2.6 million is owed to Live Nation because it did not engage in a prior material breach of the Letter Agreement.

To state a claim for breach of contract under Florida law, a plaintiff must allege "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc*., 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *Friedman v. N.Y. Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. 4th DCA 2008)).  Here, the Letter Agreement is a binding contract and Defendants received the assets provided for by Sections 1.1 and 1.2.  By failing to make the $2.6 million payment for the Purchased Assets, Defendants breached their unconditional obligations under Section 1.2(a)(iii) of the Letter Agreement.  *See Hamilton v. Tanner*, 962 So. 2d 997, 1001 (Fla. 2d DCA 2007) (finding that each failure to pay an installment payment constitutes an individual breach); *Holiday Furniture Factory Outlet Corp. v. State Dep't of Corr.*, 852 So. 2d 926, 927 (Fla. 1st DCA 2003) (same); *Valiant Air Command, Inc. v. Frank K. Collins* & *Assocs.*, 500 So. 2d 577, 578 (Fla. 5th DCA 1986) ("Failure to pay under the contract constitutes a breach.").  Thus, Defendants are liable to Live Nation for $2.6 million of the Purchased Assets.

**B.      Defendants breached the Letter Agreement by not paying Live Nation the outstanding $2.75 million owed for relief from the Non-Compete.**

Defendants' failure to pay for the relief from the Non-Compete was another independent breach of the Letter Agreement.  There is no dispute that the Letter Agreement is a binding contract and that Defendants previously paid the first installment due under the Non-Compete agreement.  By failing to make the final $2.75 million payment for relief from the Non-Compete, Defendants breached their unconditional obligations under Section 1.3(a)(ii)(B) of the Letter Agreement.  *See Hamilton*, 962 So. 2d at 1001; *Holiday Furniture*, 852 So. 2d at 927; *Valiant Air Command*, 500 So. 2d at 578.  Live Nation has, therefore, suffered an additional $2.75 million in damages as quantified in the Letter Agreement.  While this is a proper statement of Florida law applied to the facts of this case, the Court additionally finds that the $2.75 million is owed to Live Nation because it did not engage in a prior material breach of the Letter Agreement.

**C.      Both Defendants are liable for the failure to make the $2.6 million asset payment and $2.75 million Non-Compete payment.**

Defendants S2BN and Cohl are both liable for the failure to make the $2.6 million asset payment and the $2.75 million Non-Compete payment.  S2BN is liable in its capacity as signatory and defined "Buyer" in the Letter Agreement.  *See* Letter Agreement § 1.2 ("[S2BN] will pay to [Live Nation] the sum of $9,850,000 as a base purchase price . . . for the Purchased Assets."); *id.* § 1.3 ("[S2BN] will pay [to Live Nation] $5,500,000 (the 'Non-Compete Relief Fee')").  Cohl is liable as guarantor because he personally guaranteed "the full, complete and timely performance of the obligations, liabilities and responsibilities of [S2BN]," and he became liable immediately upon S2BN's default.  *See id.* § 2.3; *see also Rooks v. Shader*, 384 So. 2d 681, 683 (Fla. 5th DCA 1980) ("An absolute guarantee is a contract by which the creditor is promised that if the debtor does not perform his obligations the guarantor will perform.  An absolute guarantor becomes liable immediately upon dispute

by the debtor."); *Givans v. Ford Motor Credit Co.*, 82 So. 3d 864, 865 (Fla. 4th DCA 2011) (same).  Thus, Defendants are jointly and severally liable for the $2.6 million owed to Live Nation for the Purchased Assets pursuant to Section 1.2 of the Letter Agreement and the $2.75 million owed to Live Nation for the relief from the Non-Compete pursuant to Section 1.3 of the Letter Agreement.  *See Vernon v. Serv. Trucking, Inc.*, 565 So. 2d 905, 906 (Fla. 5th DCA 1990); *Bank Atl. v. Berliner*, 912 So. 2d 1260, 1264 (4th DCA 2005) (agreeing with the joint and several liability finding of *Vernon*, even where the guarantor was sued separately from the maker and the other co-guarantor of the obligation).

> **D.    Defendants' affirmative defenses do not relieve them from their obligation to pay the entirety of the $5.35 million owed to Live Nation on the Letter Agreement, and Defendants do not meet their burden on their counterclaim that Live Nation materially breached the Letter Agreement.**

In an effort to avoid their promise to pay, Defendants assert several affirmative defenses.  "An affirmative defense is not a claim for relief, it is a defense." *Dougan v. Armitage Plumbing, LLC*, No. 6:11-cv-1409-0rl-22KRS, 2011 WL 5983352, at *1 (M.D. Fla. Nov. 14, 2011).  "An affirmative defense is one that *admits to the complaint*, but avoids liability, wholly or partly, by new allegations of excuse, justification or other negating matter." *Pujals ex rel. El Rey De Los Habanos, Inc. v. Garcia*, 777 F. Supp. 2d 1322, 1327 (S.D. Fla. 2011) (emphasis added).  Defendants also assert a counterclaim that Live Nation materially breached the Letter Agreement.  To state a claim for breach of contract under Florida law, a plaintiff must allege "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega*, 564 F.3d at 1272.  For the reasons set forth below, Defendants have not met their burden of proving any affirmative defense to any payment obligation or any material breach of the Letter Agreement.

**1.     Live Nation did not commit a prior material breach of the Letter Agreement.**

The Cohl Parties allege that Live Nation committed four prior material breaches, each arising under Section 1.9 of the Letter Agreement.  The Cohl Parties contend that Live Nation breached the following four provisions of the Letter Agreement:

> 1) Live Nation did not exercise reasonable judgment when it announced a determination on February 8, 2010 that Cohl will be unable to successfully negotiate the acquisition of the rights to promote any future Rolling Stones tour [stems from Section 1.9(b)];
>
> 2) Live Nation did not allow Cohl to take the lead in conducting negotiations with the Rolling Stones [stems from Section 1.9(a)];
>
> 3) Live Nation did not limit itself to discussions with Rolling Stones management that it believed would be helpful to Cohl's efforts [stems from Section 1.9(a)]; and
>
> 4) Live Nation did not provide Cohl with reasonable prior notice of any purported concerns that Live Nation had regarding his ability to negotiate and acquire rights for any future Rolling Stones tour [stems from Section 1.9(b)].

*See* Cohl Parties' Mot. Summ. J. [ECF No. 104] ("Cohl MSJ") at 5.  Since each of the alleged prior material breaches stems from Section 1.9(a) or (b) of the Letter Agreement, a determination of whether the Cohl Parties' allegations of prior material breach have merit necessarily turns on the rights and obligations that these provisions impose upon the parties.

None of these alleged material breaches by Live Nation has anything to do with the "separate and additional consideration" of $9.85 million that Defendants agreed to pay Live Nation for the purchase of the assets, as specified in Sections 1.1 and 1.2.  *See* 4/4/11 Order [ECF No. 38] at 2; Letter Agreement §§ 1.1-1.2.  Rather, each of these alleged material breaches by Live Nation relates exclusively to Defendants' "separate" rights to promote the Rolling Stones tour, which rights are addressed in Sections 1.3 through 1.6 and Section 1.9 of the Letter Agreement.  *See* Letter Agreement §§ 1.3-1.6, 1.9.  Therefore, there was simply no excuse for Defendants' refusal to pay the third and final $2.6 million installment for the

Purchased Assets, nor is there evidence to contravene Live Nation's breach of contract claim for the outstanding $2.75 million owed under Section 1.3 of the Letter Agreement.

**a.   Section 1.9 is clear and unambiguous, and must be interpreted according to the plain language used.**

Under Florida law, "courts must give effect to the plain language of contracts when that language is clear and unambiguous." *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1246 (11th Cir. 2002). Where a contract can be given a definite or certain legal meaning, it is not ambiguous and should be construed by the court as a matter of law. *Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc.*, 556 F.3d 1232, 1242 n.16 (11th Cir. 2009); *Bombardier Capital Inc. v. Progressive Mktg. Grp., Inc.*, 801 So. 2d 131, 134 (Fla. 4th DCA 2001). An ambiguity does not arise simply because the parties offer conflicting interpretations, but rather exists only if the language at issue is, "in fact, reasonably or fairly susceptible to the different constructions being advocated by the parties." *Arriaga,* 305 F.3d at 1246 (quoting *Royal Am. Realty, Inc. v. Bank of Palm Beach & Trust Co.*, 215 So. 2d 336, 338 (Fla. 4th DCA 1968)). Moreover, where words of a contract are clear and definite, they must be understood according to their "ordinary meaning," and the parties' intent must be garnered from the plain language used in the contract, not from the meaning imposed by extrinsic evidence. *See Institutional & Supermarket Equip., Inc. v. C&S Refrigeration, Inc.*, 609 So. 2d 66, 68 (Fla. 4th DCA 1992); *Bombardier Capital*, 801 So. 2d at 134. Further, "[c]ontracts should receive a construction that is reasonable, practicable, sensible, and just," and courts are "powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties." *7-Eleven, Inc. v. Stin, L.L.C.*, 961 So. 2d 977, 981 (Fla. 4th DCA 2007); *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290 (11th Cir. 2001).

Here, Section 1.9 of the Letter Agreement has definite legal meanings and interpretations, and must be construed as a matter of law, without reference to the parties'

subjective or unexpressed intent, because all parties agree that it is an unambiguous and binding contract that "speaks for itself."  *See* Ans. ¶¶ 5-7; Am. Countercl. ¶¶ 18-22.  While this is a proper statement of Florida law applied to the facts of this case, the Court additionally finds that Live Nation's interpretation of the Letter Agreement is consistent with the parties' intent.

> **b.**   **Pursuant to Section 1.9(b), Live Nation determined, in "its reasonable judgment," that Cohl would be "unable" to successfully negotiate the acquisition of the rights to promote any future Rolling Stones tour.**

Section 1.9(b) states that it applies "notwithstanding Section 1.9(a)."  As such, it provides an express carve-out that trumps any of Cohl's claimed rights in Section 1.9(a) if the conditions in Section 1.9(b) are met.  The Cohl Parties argue that three conditions of Section 1.9(b) were not met: (1) that Live Nation did not exercise "reasonable judgment," (2) that there is no evidence to show that Cohl was "unable" to acquire the rights to any future Rolling Stones tour, and (3) that Live Nation did not provide Cohl "reasonable prior notice."  Applying the appropriate standards, the evidence established that Live Nation complied with each of these requirements, and therefore had the "unfettered right to thereafter bid or seek to obtain directly the right to promote any such concert tour for its own account without any duty to share, copromote or jointly pursue with Cohl."  *See* Letter Agreement § 1.9(b).

> *i.*   *Live Nation properly exercised "its reasonable judgment."*

In interpreting the phrase "its reasonable judgment" the Eleventh Circuit's decision in *Ernie Haire Ford* is instructive.  *Ernie Haire Ford*, 260 F.3d at 1285.  In *Ernie Haire Ford*, the Eleventh Circuit was called upon to determine whether Ford Motor Company wrongfully refused to approve a proposed transaction involving the transfer and relocation of a dealership.  The plaintiffs argued that Ford did not use "its best judgment" as required by the contract when it rejected the relocation and transfer of the dealership, and that Ford violated

the implied covenant of good faith and fair dealing.  *Id.* at 1290.  To comply with the "best judgment" clause, the plaintiffs argued that Ford was required to "gather sufficient information and perform an analysis to have a proper basis to exercise its 'best judgment' and at least follow its own guidelines and procedures."  *Id.* at 1289.  The plaintiffs also presented a "plethora" of evidence supporting their argument that Ford's motive for rejecting the proposed transaction was wrongful.  *Id.*  The Eleventh Circuit rejected the plaintiffs' arguments.  Noting the "well-settled" contract interpretation rule that courts are "powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties," the court concluded that the district court correctly characterized the plain meaning of the contractual "its best judgment" language:

> Under the Dealership Agreement, it is [Ford's] ***own*** judgment that controls, not [plaintiffs'] judgment, not a jury's judgment and not a reasonable business person's judgment. Section 9(a) [including the "its best judgment" language] merely requires that [Ford] use ***its*** best judgment in determining the relocation of its dealerships. This clear and unambiguous provision cannot be interpreted as opening the door for a jury to second-guess [Ford's] judgment or as setting limits on [Ford's] reasons for making a relocation determination.

*Id.* at 1291 (emphasis in original).  Regarding the plaintiffs' implied covenant of good faith and fair dealing argument, the Eleventh Circuit explained that "the implied covenant cannot override an express contractual term," and thus concluded that the implied covenant only requires that a party not "capriciously exercise discretion accorded it under a contract so as to thwart the contracting parties' reasonable expectations."  *Id.*  The court specifically noted that "the limit placed on a party's discretion is not great," and that "unless no reasonable party would have made the same discretionary decision, it seems unlikely that the party's decision would violate the covenant of good faith."  *Id.* (internal citation omitted).  Finding that the central purpose of the contract at issue was to sell cars, not to relocate the dealership, and that Ford's decision did not preclude the plaintiffs from selling cars, the court concluded that although Ford's decision was not in plaintiffs' best interests, "it was neither capricious nor in

contravention of the parties' reasonable expectations." *Id.* at 1292.   Accordingly, the Eleventh Circuit concluded that the district court properly granted Ford's summary judgment motion on the plaintiffs' breach of contract claims. *Id.*

Here, like in *Ernie Haire Ford*, the contractual provision that is determinative includes an "its" modifier. *See* Letter Agreement § 1.9(b) ("if [Live Nation] should determine, in *its* reasonable judgment" (emphasis added)).   Accordingly, it is Live Nation's "***own*** judgment that controls, not [the Cohl Parties'] judgment, not a jury's judgment and not a reasonable business person's judgment." *Ernie Haire Ford*, 260 F.3d at 1291; *see also Burger King Corp. v. Ashland Equities, Inc.*, 217 F. Supp. 2d 1266, 1275-76 (S.D. Fla. 2002) (finding that Burger King did not "unreasonably" withhold consent where the language of the agreement placed the determination at issue within Burger King's "complete discretion," even though the agreement did not use as strong of language, such as "sole judgment," as in similar cases).   Further, as in *Ernie Haire Ford*, Rolling Stones tour promotion rights are not the central purpose of the Letter Agreement.   The Letter Agreement provided for the separate purchase of assets and relief from the Non-Compete.   Promotion rights are only one of five "buckets" of relief from the Non-Compete (and the Rolling Stones are only one of four artists included in that bucket), and the parties specifically "agreed and acknowledged" that the five buckets of relief from the Non-Compete "are separate and distinct from one another."   Most importantly, Live Nation's decision to exercise the carve-out authorized by Section 1.9(b) does not adversely affect or preclude Cohl's continuing right to pursue the right to promote any future Rolling Stones tour—a right that he would not have but for the purchase of relief from the Non-Compete. *See* Letter Agreement §§ 1.1-1.3, 1.3(c).

> ### ii.   *Live Nation determined that Cohl would be "unable" to successfully negotiate the rights to promote any future Rolling Stones tour.*

The second requirement of Section 1.9(b) is for Live Nation to have determined, "in its reasonable judgment," that Cohl will be *"**unable, for any reason**, to successfully negotiate the acquisition of the rights to promote the concert tour of [the Rolling Stones]." See* Letter Agreement § 1.9(b) (emphasis added).  The Cohl Parties argue that "unable" should be interpreted to mean "impossible."  "Unable" does not, however, mean "impossible."  The dictionary defines "unable" as "not able: incapable: as a: unqualified, incompetent b: impotent, helpless." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1284 (10th ed. 1998); *Garcia v. Fed. Ins. Co.*, 969 So. 2d 288, 292 (Fla. 2007) (applying definitions in *Merriam Webster's Collegiate Dictionary,* 10th edition, to determine meaning of terms used in a contract); *Gardner v. Johnson*, 451 So. 2d 477, 478 (Fla. 1984) (explaining that the plain and ordinary meaning of terms can be determined by reference to a dictionary).   "Able" is defined as "having sufficient power, skills, or resources to accomplish an object," "susceptible to action or treatment," and "marked by intelligence, knowledge, skill, or competence." MERRIAM-WEBSTER'S at 3.  Nothing in the plain, ordinary, and generally accepted meaning of "unable" permits an interpretation that requires impossibility.  Rather, all that was required for Live Nation to determine that Cohl was "unable, for any reason, to successfully negotiate the acquisition of the rights to promote the concert tour of [the Rolling Stones]" was for Live Nation to determine (in its own judgment) that Cohl lacked "sufficient power, skills, or resources" to "successfully negotiate the acquisition of the rights to promote the concert tour of [the Rolling Stones]."

This meaning and interpretation is also consistent with the language and representations made in Section 1.9(a).  In particular, in Section 1.9(a), Cohl "represented" to Live Nation that he "has a close business and working relationship with each of the Cohl

Relationship Artists that should *enable* Cohl to *successfully negotiate the acquisition of the rights to promote the concert tours of each Cohl Relationship Artist*." *See* Letter Agreement § 1.9(a) (emphasis added). "Enable" is defined as "to provide with the means or opportunity," "to make possible, practical or easy," and "to cause to operate." MERRIAM-WEBSTER'S at 380. In other words, in Section 1.9(a), Cohl represented that he had the "means or opportunity" to "successfully negotiate the acquisition of the rights to promote the concert tours of each Cohl Relationship Artist." By using virtually identical language in Sections 1.9(a) and (b), a proper construction must mean that if Cohl's representation from Section 1.9(a)—that he had the "means or opportunity" to successfully negotiate Rolling Stones tour promotion rights—turned out to be incorrect for any reason, then under Section 1.9(b) Live Nation could "step-in" and directly seek those promotion rights for its own account. *See Arriaga*, 305 F.3d at 1247 ("To construe the contract, one part of an agreement may be resorted to for the explanation of the meaning of the language of another part." (internal citations omitted)).

Further, defining "unable" to mean lacking in "sufficient power, skills, or resources," rather than to mean "impossible," is the only interpretation that gives any meaning to the phrase "for any reason" that follows "unable." *See* Letter Agreement § 1.9(b) ("if [Live Nation] should determine, in its reasonable judgment, that Cohl will be unable, *for any reason*" (emphasis added)). If unable meant "impossible," as the Cohl Parties suggest, then the "for any reason" language following "unable" would be rendered superfluous. It is a well-settled rule of contract construction that courts must "give meaning to each and every word [the contract] contains," and must "avoid treating a word as redundant or mere surplusage if any meaning, reasonable and consistent with the other parts, can be given to it." *Equity Lifestyle Props.*, 556 F.3d at 1242. As such, the Cohl Parties' interpretation of

"unable" to mean "impossible" would unreasonably rewrite or extinguish express terms of the Letter Agreement.

Accordingly, with the proper construction of both "its reasonable judgment" and "unable" in mind, for Live Nation to exercise the carve-out authorized by Section 1.9(b), Live Nation is only required to present some evidence to support its own subjective determination that—at the time it made its determination—Cohl lacked "sufficient power, skills, or resources" to successfully negotiate the acquisition of the rights to promote any future Rolling Stones tour.   Live Nation presented ample evidence in support of this determination.

For example, Live Nation based its determination on, among other things, Smyth's representations to (1) Azoff on or about January 29, 2010 that Cohl's involvement in a tour proposal for the Rolling Stones would be negative; (2) Rowles on February 3, 2010 that the band was unhappy with Cohl's performance on the "watershed" tour ending in 2007, and that there were questions regarding what Cohl "brought to the party"; and (3) Rapino in February 2010 that Mick Jagger and the band were not happy with the last tour and were looking for a new promoter, and that Live Nation would be better off if Cohl were out of the picture.[2]   In

---

[2]   Smyth's statements to Live Nation or Azoff are not hearsay.  Rule 801(c) of the Federal Rules of Evidence defines hearsay as "a statement offered in evidence to prove the truth of the matter asserted."   *See* Fed. R. Evid. 801(c); *see also Cargill v. Turpin*, 120 F.3d 1366, 1373 (11th Cir. 1997) (holding that statements not offered for their truth are not hearsay); *United States v. Cruz*, 805 F.2d 1464, 1477-78 (11th Cir. 1986) (holding that an out-of-court statement may be admitted if it is offered "to show the effect it has on the hearer"); *Givhan v. Elec. Eng'rs, Inc.*, 4 F. Supp. 2d 1331, 1335 (M.D. Ala. 1998) (stating that even though an affidavit contains statements that recount information made by other individuals, the information and statements made are admissible when offered to prove only that the statements were made, not when they are offered to prove the truth of the matters asserted therein); *accord Story v. Sunshine Foliage World, Inc.*, 120 F. Supp. 2d 1027, 1031 (M.D. Fla. 2000); *Fed. Deposit Ins. Corp. v. Stahl*, 89 F.3d 1510, 1521 (11th Cir. 1996).

The statements that Smyth made to Live Nation or Azoff regarding the Rolling Stones' concerns about conducting another tour with Cohl as promoter are not offered to prove the truth of the matters asserted therein (i.e., that the Rolling Stones did not want to do another tour with Cohl), but only to prove that the statements were made, and to show

addition to these representations, Live Nation heard from Azoff and industry rumors that at least one other major player, its biggest competitor, AEG, was bidding on Rolling Stones tour promotion rights, when historically it had just been presumed by the entire industry that Cohl would be the promoter.

After considering all of this information, Live Nation determined, in its own reasonable judgment, that Cohl would be unable to successfully negotiate the rights to promote any future Rolling Stones tour.  This was a decision Live Nation was authorized to make under Section 1.9(b) of the Letter Agreement.  It was not necessary, as Cohl contends, to first make any inquiry with the Rolling Stones' decision-makers or Cohl himself before making this determination.  *See Ashland Equities*, 217 F. Supp. 2d at 1277 (rejecting the defendants' contention that the plaintiff was required to discuss or acted in bad faith by not first discussing its denial of the defendants' application where there was no contractual language requiring the plaintiff to meet with or engage in discussions prior to denial); *Sembler Family P'ship #41*, *Ltd. v. Brinker Fla., Inc.*, 660 F. Supp. 2d 1307, 1312-13 (M.D. Fla. 2009) (where a contract permitted the defendant to terminate the contract if the defendant determined "in [its] sole discretion" that it was unable to construct a building at a cost reasonably satisfactory to the defendant, there was no requirement that the defendant obtain construction bids from outside contractors before terminating where the contract contained no express language imposing this condition).  Nor was it necessary for Live Nation to wait to make its determination until such time as there was a Rolling Stones tour available to bid on, as there is no such requirement in the Letter Agreement.  *See Sembler Family P'ship*, 660 F.

---

their "effect on the hearer," Live Nation.  The mere fact that the statements were made— regardless of whether they were true—impacted Live Nation's decision to exercise *its* reasonable judgment, and further supported Live Nation's ultimate discretionary conclusion that Cohl was unable to secure the Rolling Stones touring rights.  Since the statements do not meet Rule 801's definition of hearsay because they are not offered for the truth of the matter asserted, they are not subject to exclusion under Rule 802.

Supp. 2d at 1314 (rejecting the plaintiff's argument that the defendant's termination was premature where the plaintiff's contention was not supported by the express language of the agreement).

### iii.    *Live Nation gave Cohl "reasonable prior notice."*

The final requirement for Live Nation to exercise the express carve-out in Section 1.9(b) is that Live Nation provide Cohl "reasonable prior notice" before bidding on tours for its own account.  By waiting a full forty-five days after the Notice Letter to bid on tours for its own account, Live Nation more than complied with the "reasonable prior notice" requirement. *See* 5/3/11 Order [Dkt # 44] 9 n.4; *Perri v. Byrd*, 436 So. 2d 359, 361 (Fla. 1st DCA 1983) (two weeks' notice prior to termination of contract terminable at will was reasonable); *Monarch Beverage Co. v. Tyfield Importer's, Inc.*, 823 F.2d 1187, 1190 (7th Cir. 1987) (thirty days constituted reasonable prior notice for the termination of a distributorship agreement).

Cohl argues that Live Nation breached this provision because it did not give Cohl prior notice of Live Nation's purported concerns about his ability to successfully negotiate the acquisition of the rights to promote the next Rolling Stones tour before he was sent the February 8, 2010 Notice Letter.  But the Letter Agreement simply does not impose any such obligation on Live Nation to provide those details to Cohl prior to notifying him of its determination that he would be unable to successfully negotiate the rights to promote any future Rolling Stones tour.  *See* 5/3/11 Order [Dkt # 44] 9 n.4.  Rather, all Section 1.9(b) requires is that Live Nation provide Cohl sufficient advance notice of its intent to bid on tours for its own account.  Live Nation's Notice Letter did exactly that.  If Cohl had wanted the Letter Agreement to require Live Nation to give him prior notice of its concerns about his ability to successfully negotiate the acquisition of the rights to promote any future Rolling Stones tour prior to exercising the carve-out in Section 1.9(b), Cohl or his lawyers could have

insisted upon the inclusion of such language. *See generally Sembler Family P'ship*, 660 F.

Supp. 2d at 1311. Without such express language, however, this burden simply cannot be

imposed upon Live Nation. *See, e.g.*, *id.* at 1311-13; *Ashland Equities*, 217 F. Supp. 2d at

1277. Cohl's attempts to rewrite Section 1.9(b) to impose this obligation on Live Nation are

unavailing because courts are "powerless to rewrite the contract to make it more reasonable

or advantageous for one of the contracting parties." *Ernie Haire Ford*, 260 F.3d at 1290.

Additionally, to adopt Cohl's contention would be to emasculate Section 1.9(c), which

expressly prohibits creation of "any implied duty or obligation on the part of [Live Nation]

that would require [Live Nation] to refrain from competing with, or bidding against the

prospective interests of, the Cohl Parties."

### c. Prior to exercising the carve-out authorized by Section 1.9(b), Live Nation honored the contractual provisions of Section 1.9(a).

The Cohl Parties also argue that Live Nation breached two provisions found in

Section 1.9(a). Specifically, they allege that Live Nation did not allow Cohl to take the lead

in negotiating promotion rights with the Rolling Stones, and engaged in negotiations with the

Rolling Stones concerning promotion rights that were not "helpful" to Cohl's efforts.

Because Live Nation properly exercised the carve-out from Section 1.9(b) in February 2010,

any conduct of which the Cohl Parties complain must necessarily have occurred prior to this

date. Since it is undisputed that Live Nation did not have negotiations with the Rolling

Stones related to acquisition of tour promotion rights prior to this date, the sole basis for the

Cohl Parties' complaint is discussions between the Rolling Stones and Azoff. As set forth

below, however, prior to February 2010, Azoff was not Live Nation's agent as a matter of

law, and, moreover, Azoff's communications with the Rolling Stones prior to March 2010

were related to Azoff's attempts to become the Rolling Stones' manager, and were not

attempts to obtain promotion rights to any future Rolling Stones tours.

i.     *Azoff was not Live Nation's employee, agent, or representative.*

All of the communications between Azoff and the Rolling Stones of which the Cohl Parties complain occurred prior to the completion of the Ticketmaster/Live Nation merger. During the year between the time that the Agreement and Plan of Merger was signed and the time that the formal merger was completed (which is the same time period during which the Cohl Parties contend that Azoff was engaged in allegedly breaching tour promotion conversations with the Rolling Stones), Ticketmaster and Live Nation were separate and distinct companies, and Azoff remained the CEO of Ticketmaster and was not an employee of Live Nation. As Ticketmaster and Azoff remained separate and distinct from Live Nation, Live Nation had no authority to instruct or prohibit either of them from doing, or not doing, anything related to the Rolling Stones. Further, neither Ticketmaster nor Azoff was a party to the Letter Agreement between Cohl and Live Nation, and without privity of contract between Ticketmaster/Azoff and Cohl, Ticketmaster/Azoff had every right to talk to the Rolling Stones in whatever capacity, and about whatever issues, they so desired.

The Cohl Parties claim that Azoff is Live Nation's agent/representative. But the Cohl Parties have cited no authority—and the Court is aware of none—that would allow the Cohl Parties or the Court to attribute Azoff's premerger communications to Live Nation on the basis of Live Nation's limited assertion of privilege to certain conversations between Azoff and Live Nation's general counsel. The assertion of attorney-client privilege is not strictly limited to employee/agent relationships (e.g., joint defense, common interest). Further, the Cohl Parties have cited no authority—and the Court is again aware of none—that would allow the Cohl Parties to attribute such communications to Live Nation on the basis of an alleged "representative" capacity. The Cohl Parties' unsupported claim that Azoff's communications with the Rolling Stones can be attributed to Live Nation on the basis of an agency relationship is without merit.

It is the Cohl Parties' burden to show the grounds upon which Azoff's premerger communications with the Rolling Stones constitute a prior material breach. The merger between Ticketmaster and Live Nation was pending at the time of the communications, Azoff was not Live Nation's employee, and there was no contractual relationship between Azoff and Live Nation. Accordingly, the only way that Azoff's conversations with the Rolling Stones could constitute a prior material breach was if Azoff were acting as Live Nation's actual or apparent agent at the time the conversations took place. The Cohl Parties did not, however, present any evidence to support a finding of agency. For instance, the Cohl Parties presented no evidence that Live Nation held Azoff out as its agent or represented that Azoff was its agent, that Live Nation exercised control over any conversations Azoff had with the Rolling Stones—if any—that were related to promotion rights, or that the Rolling Stones thought or believed Azoff was Live Nation's agent. *See Rubin v. Gabay*, 979 So. 2d 988, 990 (Fla. 4th DCA 2008) ("To establish an actual agency relationship, the following elements must be established: (1) acknowledgement by the principal that the agent will act for it, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." (internal citation omitted)); *Roessler v. Novak*, 858 So. 2d 1158, 1161-62 (Fla. 2d DCA 2003) (explaining that "apparent agency exists only if all three of the following elements are present: (a) a representation by the purported principal; (b) a reliance on that representation by a third party; and (c) a change in position by the third party in reliance on the representation," and that apparent authority only exists where the principal creates the appearance of an agency relationship, and not from the subjective understanding of the person dealing with the purported agent or from appearances created by the purported agent himself). Given the complete lack of evidence to support a finding of agency, Azoff was not Live Nation's agent as a matter of law, and any of Azoff's actions or communications can be construed as nothing other than actions on behalf of Azoff himself, Ticketmaster, or Front

Line. *Rubin*, 979 So. 2d at 990 (noting that while the existence of an agency relationship is generally a question of fact, where the party bearing the burden of proof fails to produce any supportive evidence, it becomes a question of law to be determined by the court).

> **ii.   *Azoff's discussions with the Rolling Stones were limited to acquisition of artist management rights.***

The evidence showed that the communications Azoff had with the Rolling Stones and their representatives during 2009 and into early 2010 were solely in an attempt to become the Rolling Stones' manager.   There is nothing in the Letter Agreement that prohibited Live Nation (or Azoff) from engaging in discussions with the Rolling Stones concerning management rights.   Because discussions about management rights necessarily involve discussions about plans for touring, which is one of the most important parts of a band's career, many of these conversations touched on touring.   But the evidence was clear that Azoff was not attempting to procure the rights to promote any future Rolling Stones tour—not for himself, not for Ticketmaster, and not for Live Nation.

This distinction between manager and tour promoter was not lost on Cohl, who claims that he is not and never has been the manager of the Rolling Stones.   The distinction was not lost on Live Nation either, which did, in fact, want Azoff to become the Rolling Stones' manager because Azoff could then use that position to help steer the group toward picking Live Nation/Cohl as the promoter, and also because if Azoff were able to secure management of the Rolling Stones, then it would become an asset of Live Nation if and when the merger should be completed.   But just because Live Nation wanted Azoff to be the group's manager does not mean that Live Nation wanted to, or did, exclude Cohl from concert promotion.

Moreover, there is no evidence that Azoff's communications were "unhelpful" to Cohl's efforts to secure such promotion rights.   Although conversations wherein Smyth or Mick Jagger voiced complaints about Cohl or told Azoff that they wanted Cohl out of the picture are not, by definition, "helpful" to Cohl, the "unhelpfulness" of those conversations is

solely attributed to the Rolling Stones. The Letter Agreement cannot be construed in such a fashion that would require Live Nation to "put its head in the sand" and disregard such comments that came to Live Nation as a result of Azoff's communications with the band related to acquisition of management rights. Indeed, such an interpretation would be contrary to the carve-out provision in Section 1.9(b) that allows Live Nation to directly seek promotion rights if it determines Cohl is unable to successfully negotiate the acquisition of promotion rights. How could Live Nation ever determine Cohl was unable to successfully negotiate acquisition of promotion rights if Live Nation had to stick its fingers in its ears upon hearing complaints about Cohl?

Accordingly, notwithstanding the fact that Azoff was not Live Nation's employee, agent, or representative, there is no merit to the Cohl Parties' claims that Live Nation breached Section 1.9(a) of the Letter Agreement by not permitting Cohl to take the lead in negotiations and by not limiting itself to discussions that were helpful to Cohl.[3]

### 2. The Cohl Parties have no evidence that any alleged prior breach was "material."

To constitute a vital or material breach, a party's action must be such as to go to the "essence of the contract; it must be the type of breach that would discharge the injured party from further contractual duty on his part." *Beefy Trail, Inc. v. Beefy King Int'l, Inc.*, 267 So.

---

[3]  In fact, it was the Cohl Parties that committed the first breach of the Letter Agreement on June 7, 2009. On that date, Cohl sent an email to Mick Jagger, Keith Richards, and Charlie Watts with "RS Tour Proposal 2010" attached. In the "RS Tour Proposal 2010" (purportedly sent on behalf of the Cohl Parties and Live Nation) Cohl, among other things, offered the Rolling Stones a tour guarantee of $50 million and a net/net deal guaranteeing a minimum $25 million net profit to the band. Despite his admitted contractual obligation to "remain in constant communication" with Live Nation regarding the "financial terms" under negotiation, Cohl never discussed this proposal (or the multimillion dollar guarantee) with anyone at Live Nation before he submitted it to the Rolling Stones. By contrast, consistent with his obligations under the Letter Agreement, Cohl did remain in constant communication with Live Nation regarding financial terms under negotiation for Barbara Streisand, another Cohl Relationship Artist.

2d 853, 857 (Fla. 4th DCA 1972).  Where the outcome would be the same regardless of the allegedly breaching action, there is no "material" breach.  *See Covelli Family, L.P. v. ABG5, LLC*, 977 So. 2d 749, 752 (Fla. 4th DCA 2008).

As set forth above, the Rolling Stones tour promotion rights are but one of several assets purchased in the Letter Agreement, and nothing has happened that would terminate Cohl's continuing right to pursue promotion of any future Rolling Stones tour in accordance with the terms of the Letter Agreement.  Further, the Cohl Parties did not present any evidence that they sustained any damages as a result of Live Nation's alleged breaches, nor did they present any competent evidence that Cohl *could have* secured the promotion rights to a Rolling Stones tour but for Live Nation's alleged breaches of the Letter Agreement.  Indeed, both Cohl and Live Nation have submitted a Rolling Stones tour proposal, but to date, the Rolling Stones have not announced any plans for a future tour and no promoter has been selected for a future tour.  The Rolling Stones issued a press release in February 2011 stating that they had "no firm plans to tour at this time."  *See* [ECF No. 23-1].  And even Cohl conceded that "God knows" if or when the Rolling Stones will tour again.  *See* Cohl p. 142.  The fact that there is not now, and may never be, another Rolling Stones tour is fatal to Defendants' damages claim.  Moreover, Defendants have not timely or suitably provided disclosures/reports as to their claims of lost profits and S2BN's alleged diminution in value.

Finally, to the extent that the implied covenant of good faith and fair dealing is implicated, because Live Nation showed that it used "its reasonable judgment" in exercising the carve-out in Section 1.9(b), the Cohl Parties bear the burden to show that no reasonable person would have made the same decision as Live Nation.  *Ashland Equities*, 217 F. Supp. 2d at 1276-78; *Sembler Family P'ship*, 660 F. Supp. 2d at 1313; *see also generally*, *Arlaine & Gina Rockey, Inc. v. Cordis Corp.*, No. 02-22555-CIV, 2004 WL 5504978, at *50-51 (S.D. Fla. Jan. 5, 2004).  This the Cohl Parties have not done.

### 3.   Defendants' "implied covenant of good faith and fair dealing" defense is inapplicable in light of the Court's Orders.

Defendants claim as an affirmative defense that the "Cohl Parties are relieved of any further obligations under the Letter Agreement due to Live Nation's breach of the implied covenant of good faith and fair dealing." *See* Am. Aff. Def. 3-4.   The Court previously addressed the merits of such a claim in the context of Live Nation's Motion to Dismiss Defendants' implied covenant counterclaim.   In particular, after considering Defendants' implied covenant counterclaim—which was based on the same conduct as that supporting Defendants' affirmative defense—the Court concluded that "the allegations underlying the claim for breach of the implied covenant are duplicative of those supporting the breach-of-contract claim," and therefore dismissed Defendants' counterclaim. *See* 4/4/11 Order [ECF No. 38] and 5/3/11 Order [ECF No. 44].   For the same reasons the Court previously dismissed Defendants' implied covenant counterclaim, it finds that Defendants' affirmative defense of the implied covenant of good faith and fair dealing likewise fails.

Moreover, even if Defendants could assert an affirmative defense predicated upon the implied duty of good faith and fair dealing, the "duty of good faith must relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements."   *Cibran v. BP Prods. N. Am., Inc. f/k/a Amoco Oil Co.*, 375 F. Supp. 2d 1355, 1359 (S.D. Fla. 2005).   "Rather than serving as an independent term within a contract, the implied covenant 'attaches . . . to the performance of a specific contractual obligation.'"   *Id.* (citing *Ernie Haire Ford*, 260 F.3d at 1291); *Mount Sinai Med. Ctr. of Greater Miami, Inc. v. Heidrick & Struggles, Inc.*, 329 F. Supp. 2d 1309, 1312 (S.D. Fla. 2004) (finding that contract alone sets out duties of a party's underlying investigation and granting summary judgment in defendant's favor).   The implied covenant of good faith and fair dealing cannot be maintained (1) in derogation of the express terms of

the underlying contract or (2) in the absence of a breach of an express term in the underlying contract, and cannot, in any event, override an express contractual term.  *Ashland Equities*, 217 F. Supp 2d at 1278 (finding that no contractual language required franchisor to perform the duties that it admittedly did not and that franchisee contended it should have, and granting defendant/franchisor's summary judgment motion); *Ernie Haire Ford*, 260 F.3d at 1291. Simply stated, even if an implied duty/covenant existed, "[t]he implied obligation of good faith cannot be used to vary the terms of an express contract."  *Id.* at 1291.

### 4.    Defendants' defense of "unclean hands" is inapplicable

Further, since Defendants' only claim is for damages, their pleadings establish that an adequate remedy at law exists, and this court lacks jurisdiction to award equitable relief. *See, e.g., Greenfield Villages v. Thompson*, 44 So. 2d 679, 683 (Fla. 1950) ("[W]here the only relief sought . . . is one for which a plain, adequate and complete remedy at law exists—then a court of equity has no jurisdiction and a resort thereto is improper and unnecessary.").

Defendants assert as an affirmative defense that "Live Nation's claims are barred by the doctrine of unclean hands." *See* Am. Aff. Def. 5-6. The equitable doctrine of "unclean hands" applies when a party seeking equitable relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation. *Regions Bank* v. *Old Jupiter, LLC,* No. 10-80188-CIV, 2010 WL 5148467, at *5 (S.D. Fla. Dec. 13, 2010). The unclean hands doctrine traditionally only applies to claims for equitable relief or in opposition to equitable defenses. *Id.*  Thus, where, as here, a plaintiff seeks to recover only the legal remedy of damages, the unclean hands doctrine is legally inapplicable, and the Court grants Live Nation judgment on that defense.  *Id.* (granting summary judgment for the plaintiff on a defendant's unclean hands defense because the plaintiff sought damages, not equitable relief).

### 5.      Defendants' defense of "set-off" is inapplicable.

Defendants assert that the "Cohl Parties are entitled to a set-off against any sums." Am. Aff. Def. 6.  However, "set-off is not an affirmative defense to be considered by the jury but is a determination regarding damages to be made by the court after the verdict is rendered." *KMS Rest. Corp.* v. *Wendy's Int'l Inc.*, 194 F. App'x 591, 598 (11th Cir. 2006) (quoting *Felgenhauer* v. *Bonds*, 891 So. 2d 1043, 1045 (Fla. 2d DCA 2004)).  "A set-off is a permissive counterclaim . . . that is interposed defensively . . . to defeat or reduce a plaintiff's recovery but which does not seek affirmative relief." *Allapattah Servs., Inc. v. Exxon Corp.*, 157 F. Supp. 2d 1291, 1322 (S.D. Fla. 2001).  As set-off is not an affirmative defense, it cannot be used as an excuse for Defendants' nonpayment.

## III.    PROPOSED CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that final judgment will be entered by separate order in favor of Live Nation and against the Cohl Parties, jointly and severally, on both Live Nation's breach of contract claims and the Cohl Parties' counterclaim.  Live Nation is asked to submit a proposed order of final judgment on or before _____, 2012 that awards it the full amount of damages sought plus pre- and postjudgment interest.

Respectfully submitted,

*Christopher J.M. Collings*
Mark E. Zelek
  Florida Bar No. 667773
Christopher J.M. Collings
  Florida Bar No. 184403
Morgan, Lewis & Bockius LLP
200 South Biscayne Boulevard – Suite 5300
Miami, Florida  33131-2339
Telephone:   305.415.3000
Facsimile:   305.415.3001
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 11, 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the Mailing Information list for CASE NO. 10-CIV-24144-CMA.  Counsel of record currently identified on the Mailing Information list to receive e-mail notices for this case are served via Notices of Electronic Filing generated by CM/ECF.  Counsel of record who are not on the Mailing Information list to receive e-mail notices for this case have been served via U.S. Mail.

*Christopher J.M. Collings*
Christopher J.M. Collings